**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | **Chapter 7 Case** |
| | ) | |
| **JONATHAN F. GLICK,** | ) | **Case No. 13-20989** |
| | ) | |
| **Debtor.** | ) | **Judge A. Benjamin Goldgar** |
| _____ | ) | |
| | ) | |
| **John Gierum, not individually but as trustee of** | ) | |
| **the bankruptcy estate of Jonathan F. Glick** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Adv. No. _____** |
| **Jonathan Glick, JCG 2012 Trust dated February** | ) | |
| **4, 2012, Nancy Glick, trustee of the JCG 2012** | ) | |
| **Trust, Lawrence Glick, predecessor trustee of the** | ) | |
| **JCG 2012 Trust, Bari Wood, Michelle Alilovich,** | ) | |
| **Theodore Allen Wolff, BTM, LLC, an Illinois** | ) | |
| **limited liability company, Robert Chapman,** | ) | |
| **Optimum Fulfillment, LLC, an Illinois limited** | ) | |
| **liability company, Horwood, Marcus & Berk,** | ) | |
| **Chartered, an Illinois corporation; Hal J. Wood,** | ) | |
| **Jeffrey A. Hechtman, and Kenneth A. Goldstein,** | ) | |
| **as agents of Horwood, Marcus & Berk and The** | ) | |
| **Law Office of William J. Factor, Ltd.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**ADVERSARY COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE**
**AND AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS, AVOIDANCE**
**OF UNAUTHORIZED POST-PETITION TRANSFERS AND AN ACCOUNTING**

John Gierum, not individually but as trustee of the bankruptcy estate of Jonathan Glick,

by and through his approved and appointed special counsel (the "Trustee" or the "Plaintiff"), for

avoidance and recovery of fraudulent transfers, avoidance of unauthorized post-petition transfers

and an accounting, against the Defendants, JCG Trust dated February 4, 2012 ("JCG 2012

Trust"), Nancy Glick ("Nancy"), trustee of the JCG 2012 Trust, Lawrence Glick ("Larry"), the

predecessor trustee of the JCG 2012 Trust, Bari Wood ("Bari"), Michelle Alilovich ("Michelle"),

Theodore Allen Wolff ("Wolff"), BTM, LLC ("BTM"), an Illinois limited liability corporation,

Robert Chapman ("Chapman"), Optimum Fulfillment, LLC ("Optimum"), an Illinois limited

liability corporation, Horwood, Marcus & Berk, Chartered, an Illinois corporation ("HMB"), Hal

J. Wood ("Hal"), Jeffery A. Hechtman ("Hechtman") and Kenneth A. Goldstein ("Goldstein") as

agents of HMB, and the Law Office of William J. Factor ("Factor") avoidance of unauthorized

post-petition transfers and for an accounting (the "Complaint").  In support of the Complaint, the

Trustee alleges as follows:

## I.      Nature of the Action

1.      This is an action pursuant to Sections 542, 544, 548, 549 and 550 of the United

States Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure to (i)

avoid, recover and turnover fraudulent transfers made by Glick to the JCG 2012 Trust for the

benefit of his wife, Stacey Glick ("Stacey"), and his children, Zachary Glick ("Zach") and

Chase Glick ("Chase"); (ii) avoid unauthorized post-petition transfers; and (iii) for an

accounting.

2.      Glick, with the assistance of his family and his legal counsel, formed a

complicated web of companies, transferred assets from one company to another company and

created a fictitious trust, all while paying himself and shielding any viable assets from his

creditors for the sole benefit of his wife and children.  Attached is a chart of the Glick entities

("Glick Entities Chart") as **Exhibit 1** and made a part hereof.

3.      In February 2012, after Glick defaulted on his debts to multiple creditors, he

formed the JCG 2012 Trust in order to operate his newly formed businesses, Telegraph

Partners Inc., an Illinois corporation ("Telegraph"), Bannockburn Entertainment Group LLC,

an Illinois limited liability company ("BEG"), Madhouse LLC, a Delaware limited liability

corporation ("Madhouse"), Madhouse Toys, LLC, an Illinois limited liability company ("Madhouse Toys"), Visionaries LLC, a Delaware limited liability company ("Visionaries") and Impact Management Group, LLC, an Illinois limited liability company ("Impact") and avoid paying the debts to Franklin, AEB and Glen Eagle Partners, Ltd. ("Glen Eagle") among other creditors. See **Exhibit 1**.

4.      Glick, with the assistance of HMB, formed the JCG 2012 Trust as an intentionally defective trust, which allowed Glick to conduct new business, develop new products and pay bills without having to answer to the debts of his creditors.

5.      Glick also transferred a valuable license in a toy product, through non-exclusive license agreements, from one of his entities to another in order to avoid paying creditors while, at the same time, paying himself and certain employees/independent contractors through administrative service agreements, which he created, negotiated and executed on behalf of both companies to the transaction.

6.      On information and belief, Glick continued to make unauthorized post-petition payments to his friends, colleagues and family without authorization of the Trustee.

7.      The total claims filed in this Chapter 7 Case total over $8 million.  Based upon the foregoing, the Trustee is requesting that all the assets that have been transferred by Glick, without authority and/or fraudulently, both pre-petition and post-petition, be avoided and recovered by the Trustee for the benefit of creditors of this bankruptcy estate.  In addition, Glick should provide the Trustee with an immediate accounting.

## II.      Jurisdiction and Venue

8.      The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and (e).

9.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) and (H).

202717816.1 45961/172896

10.     Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

11.     This proceeding has been brought in accordance with Rule 7001, *et. seq.* of the Federal Rules of Bankruptcy Procedure.

### III.     Parties

12.     The Trustee is the duly authorized and appointed trustee in the Chapter 7 Case.

13.     Glick, an entrepreneur in the toy industry, is a Chapter 7 Debtor in Bankruptcy Case No. 13 B 20989, which was filed in the United States Bankruptcy Court for the Northern District of Illinois on May 18, 2013 (the "Chapter 7 Case").  Glick resides in Bannockburn (Lake County) Illinois.

14.     Defendant, JCG 2012 Trust, was formed by HMB in Chicago (Cook County) Illinois on February 4, 2012.  Glick is the grantor of the JCG 2012 Trust, but he is not a beneficiary or trustee.  The JCG 2012 Trust was formed as an intentionally defective grantor trust with nominal consideration ($10 cash).  A copy of the JCG 2012 Trust Agreement is attached hereto and incorporated herein as **Exhibit 2**.

15.     Defendant, Nancy, is the Debtor's mother and the current Trustee of the JCG 2012 Trust.  Nancy resides in Chicago (Cook County) Illinois.

16.     Defendant, Larry, is the Debtor's father and the predecessor Trustee of the JCG 2012 Trust.  Larry resides in Chicago (Cook County) Illinois.  A copy of Larry's resignation and Nancy's acceptance, as successor trustee of the JCG 2012 Trust dated April 10, 2013, is part of **Exhibit 1**.

17.     Defendant, HMB, is a law firm operating its business at 500 W. Madison, Suite 3700, Chicago (Cook County) Illinois.  HMB assisted Glick with the formation of the JCG 2012 Trust.

4

18.     Defendant, Hal was, at all relevant times, a partner in the law firm of HMB and an agent of HMB.

19.     Defendant, Hechtman was at all relevant times, a partner in the law firm of HMB and an agent of HMB.

20.     Defendant, Goldstein was at all relevant times, a partner in the law firm of HMB and an agent of HMB.

21.     Defendant, Bari, is Hal's wife and was formerly outside counsel to Glick and many of his entities while employed at the law firm of Chuhak & Tecson ("Chuhak").  Bari is no longer affiliated with Chuhak but remains counsel to Glick and many of his entities.  Larry, Glick's father, is of counsel at Chuhak, specializing in the areas of estate planning and asset protection.

22.     Defendant, Michelle, the long-time assistant to Glick, resides in Libertyville (Lake County) Illinois.

23.     Defendant, Wolff, the former accountant to Glick, resides in Highland Park (Lake County) Illinois.

24.     Defendant, Factor, operates its office in Northbrook and Chicago (Cook County) Illinois and is current counsel to Glick in the Chapter 7 Case.

25.     Defendant, BTM, an Illinois limited liability company, operates its business at 2801 Lakeside Drive, Bannockburn (Lake County) Illinois 60015.

26.     On information and belief, Defendant, Chapman, resides in Northbrook (Cook County) Illinois.

27.     Defendant, Optimum, an Illinois limited liability company, operates its business at 229 W. Main Street, Ottawa, Illinois 61350.

5

## IV.    Background Facts

28.    On May 18, 2013 (the "Petition Date"), the Debtor filed the Chapter 7 Case.

29.    On the same date, the Debtor filed his Bankruptcy Schedules and Statement of Financial Affairs (collectively, the "Schedules").

30.    On May 23, 2013, the Debtor amended the Schedules to identify thirty-three entities in which he was an officer, partner or manager within six years prior to the Petition Date.  A list of the thirty-three entities is attached hereto and incorporated herein as **Exhibit 3**.

31.    A majority of the entities are owned, either in whole or in part, by two limited partnerships: JZ Enterprises Limited Partnership and JC Illinois Ventures Limited Partnership (collectively, the "Limited Partnerships").   The general partner of JZ Enterprises Limited Partnership is JZ Enterprises GP Inc. ("JZ Enterprises").   Glick's sons, Zach and Chase, each own thirty-two percent (32%) interest in JZ Enterprises. See **Exhibit 1**.

32.    The Limited Partnerships are owned, in turn, by the Jonathan F. Glick Trust dated October 25, 1999 (the "JCG 1999 Trust").  The entities owned by the JCG 1999 Trust shall hereinafter be referred to as the "1999 Trust Entities".   Other entities listed on the Schedules are owned by the JCG 2012 Trust (the "2012 Trust Entities").  See **Exhibit 1**.

33.    Prior to the filing of the Chapter 7 Case, Glick had sole decision making authority for the Limited Partnerships, the 1999 Trust Entities and the 2012 Trust Entities.

34.    Upon his appointment as Chapter 7 Trustee, the Trustee succeeded to Glick's interests in the Limited Partnerships, JZ Enterprises and the 1999 Trust Entities and all of the entities owned by those separate entities, including Play Makers Group, LLC ("Play Makers").  Since the Petition Date, Play Makers has generated over $1.7MM of revenue, none of which was either disclosed to, or turned over to the Trustee.

202717816.1 45961/172896

35.     Since the filing of the Chapter 7 Case, Glick has and continues to make decisions and take actions on behalf of the Limited Partnerships and the 1999 Trust Entities without the consent of the Trustee.

### A.     1999 Trust Entities

36.     Many of the 1999 Trust Entities are insolvent and no longer operating including Awesome Toys, LLC, an Illinois limited liability company ("Awesome"), Excitement, LLC, an Illinois limited liability company ("Excitement") and Virtual Experience, LLC, an Illinois limited liability company ("Virtual").

37.     Awesome, Excitement and Virtual were all involved in some portion of the business of developing, manufacturing and selling toys to various wholesale and retail stores including, but not limited to, Toys "R" Us, Menards and Costco.

### B.     Default to AEB

38.     AEB, an Illinois Chartered Bank, is a creditor of the Debtor and filed a claim in the Chapter 7 Case in the amount of $1,484,909.81 [Claim No. 11-1].

39.     On or about January 14, 2008, AEB entered into a Loan and Security Agreement (the "AEB Loan Agreement") with Awesome and Excitement whereby Awesome and Excitement borrowed the aggregate maximum principal amount of $800,000.00 (the "AEB Loan") for use in their business operations.  A copy of the AEB Loan Agreement is attached hereto and incorporated herein as **Exhibit 4**.

40.     As set forth in the AEB Loan Agreement, Awesome and Excitement promised to pay all amounts borrowed, along with all accrued and unpaid interest, to AEB on or before January 14, 2009.

202717816.1 45961/172896

41.     On or about July 31, 2008, the AEB Loan Agreement was amended and restated pursuant to that certain First Amended and Restated Loan and Security Agreement dated July 31, 2008, whereby the amounts lent by AEB to Awesome and Excitement were increased and the maturity date extended.

42.     Despite further extensions of credit to Awesome and Excitement and their respective promises as evidence by the numerous agreements entered into between them and AEB including a Forbearance Agreement dated June 30, 2011 (the "<u>AEB Forbearance Agreement</u>"),  Awesome and Excitement failed to comply with the terms of the AEB Forbearance Agreement entered between the parties by failing to make the following payments: (i) installment payments of interest to AEB, which were due on October , 2011 and November 1, 2011, respectively; (ii) the principal payment due on November 5, 2011; and (iii) the payment of the AEB Loan on or before December 1, 2011.  A copy of the AEB Forbearance Agreement is attached hereto and incorporated herein as **<u>Exhibit 5</u>**.

43.     Glick guaranteed the debt of Awesome and Excitement to AEB.  A copy of the Continuing Unconditional Guaranty dated January 14, 2008 and First Amendment to and Affirmation of Guaranty are attached hereto and incorporated herein as **<u>Exhibit 6</u>**.

44.     Robert Nathan ("<u>Nathan</u>") is a creditor of the Debtor, having filed a claim in the Chapter 7 Case in the amount of $2,282,827.94 [Claim No. 12-1].  Nathan is a co-guarantor of certain loans to AEB and was a guarantor with Glick of certain loans to Northern Trust Bank.

45.     AEB sent a notice of default to Awesome and Excitement on or about February 6, 2012, which stated that as of January 31, 2012, the amount of $1,287,339.26 remained due and owing to AEB.  Interest continued to accrue on the unpaid obligation at a rate of $424.73

8

per day.  A copy of the Notice of Default is attached hereto and incorporated herein as **Exhibit 7**.

46.    On March 2, 2012, AEB filed a Verified Complaint at Law against Awesome, Excitement, Glick and Nathan seeking to recover amounts due to AEB.

47.    On September 18, 2013, the Circuit Court of Cook County entered a judgment order against Awesome and Excitement in the amount of $1,354,928.51 (the "Judgment Order").  A copy of the Judgment Order is attached hereto and incorporated herein as **Exhibit 8**.

C.    **Default to Franklin**

48.    Franklin, a financial services company in the business of providing financial services to various companies, is a creditor of the Debtor and filed a claim in the Chapter 7 Case in the estimated amount of $600,000.00 [Claim No. 2-1].  Fordham Financial Services Inc. is an Illinois corporation and a member of FCN.

49.    On or about July 9, 2009, Fordham and Virtual entered into a Factoring Agreement (the "Factoring Agreement") whereby Virtual agreed to assign and sell its interest in and to all of the present and future accounts receivables to Fordham and, in turn, Fordham advanced funds to Virtual on the assigned invoices for sales of various toys by Virtual to retail stores.

50.    Simultaneous to and in conjunction with the execution of the Factoring Agreement, Glick Group, another Glick owned and managed entity as more fully defined below, executed a Continuing Unconditional Guaranty dated July 9, 2009, guaranteeing payment of any amounts due to Fordham pursuant to the Factoring Agreement (collectively, the "Franklin Guarantors").

202717816.1 45961/172896

51.     On or about December 10, 2010, Virtual defaulted under the terms of the Factoring Agreement.

52.     On or about February 24, 2011, representatives of Franklin, Glick and Bari met to discuss the default by Virtual under the Factoring Agreement.  During the meeting, Virtual acknowledged its indebtedness to Fordham/Franklin in excess of $400,000.00, and Glick requested the continuation of the Factoring Agreement in exchange for granting Franklin a second mortgage, as additional collateral, on Glick's residence at 2125 Telegraph Road, Bannockburn (Lake County) Illinois 60015 (the "<u>Glick Residence</u>").

53.     On or about May 3, 2011, Virtual and Franklin, as assignee of Fordham, amended the Factoring Agreement acknowledging the assignment of the Factoring Agreement from Fordham to Franklin and all ancillary documents related thereto (the "<u>Amended Factoring Agreement</u>").   A copy of the Amended Factoring Agreement is attached hereto and incorporated herein as **<u>Exhibit 9</u>**.

54.     The Amended Factoring Agreement included the execution of (i) a Term Note dated May 3, 2011, executed by Virtual in favor of Franklin in the amount of $495,260.41 (the "<u>Franklin Term Note</u>"); (ii) a Continuing Unconditional Guaranty executed by Glick and Glick Group (the "<u>Continuing Unconditional Guaranty</u>") and (iii) a Junior Mortgage and Assignment of Leases on the Glick Residence (the "<u>Junior Mortgage</u>") executed by Glick and his wife, Stacey.  A copy of the Franklin Term Note, Continuing Unconditional Guaranty and Junior Mortgage and Assignment of Leases are attached hereto and incorporated herein as **<u>Exhibit 10</u>**, **<u>Exhibit 11</u>** and **<u>Exhibit 12</u>**, respectively.

55.     On or about August 23, 2011, Virtual defaulted under the Amended Factoring Agreement and the Franklin Term Note (the "<u>Franklin Notice of Default</u>").

56.     On or about September 27, 2011, Glick, on information and belief, became aware of the default by Virtual under the Franklin Term Note and Amended Factoring Agreement.

57.     On or about December 14, 2012, Franklin filed a Complaint and Confession of Judgment against Virtual, Glick and Glick Group in the Circuit Court of Cook County, Illinois entitled *Franklin Capital Holdings, LLC v. Virtual Experience LLC et al.,* Docket No. 12 L 51565, to recover the sum of $454,741.02 including interest due under the Franklin Term Note in addition to the amount of $10,099.75 due under the Amended Factoring Agreement.

58.     On or about January 14, 2013, judgment was entered in favor of Franklin and against Virtual in the sum of $456,221.02 and against Glick Group and Glick in the sum of $466,320.76 (the "Franklin Judgment").  A copy of the Franklin Judgment is attached hereto and incorporated herein as **Exhibit 13**.

### D.     Default to Glen Eagle

59.     Glen Eagle Partners, Ltd. ("Glen Eagle") is an Illinois limited partnership doing business at 1007 Church Street, Evanston, Illinois.  Glen Eagle is a creditor of the Debtor having filed a claim in the Chapter 7 Case in the amount of $1,277,459.65 [Claim No. 15-1].

60.     On December 1, 2009, Virtual executed its Amended and Restated Promissory Note in the principal amount of $1,000,000, payable to Glen Eagle (the "Glen Eagle Note").  A copy of the Glen Eagle Note is attached hereto and incorporated herein as **Exhibit 14**.

61.     On or about the same date, Glick guaranteed the debt of Virtual to Glen Eagles (the "Glick Guaranty").  A copy of the Glick Guaranty is attached hereto and incorporated herein as **Exhibit 15**.

62.     Upon execution of the Glen Eagle Note and Glick Guaranty, Glen Eagle wired the funds to Virtual at the Northern Trust Company in Chicago, Illinois.

11

63.     The Glen Eagle Note required payment of interest for twenty-four months. Virtual made interest payments on the Glen Eagle Note only nine times during the twenty-four month period.  As a result, late charges became due from Virtual to Glen Eagle in the aggregate amount of $54,005.85.

64.     After November 30, 2011, default interest became due and payable under the Glen Eagle Note.

65.     On November 26, 2012, Glen Eagle filed a complaint in the Circuit Court of Cook County against Virtual and Glick seeking to recover all amounts due and owing under the Glen Eagle Note.

66.     On January 7, 2014, judgment was entered in favor of Glen Eagle and against Virtual in the amount of $1,227,459.65 (the "Glen Eagle Judgment").  A copy of the Glen Eagle Judgment is attached hereto and incorporated herein as **Exhibit 16**.

67.     A judgment was not entered by Glen Eagle against Glick due to the filing of the Chapter 7 Case.

**E.     Non-Exclusive Regener8r Licenses**

68.     Awesome was formed on February 22, 2001.  Glick was the manager of Awesome and had the ultimate decision making authority for Awesome.

69.     On information and belief, on or about September 9, 2003, Awesome was assigned all right, title and interest in and to a multi-configurable toy vehicle including US Patent Application 10/663254 (the "Regener8rs") by the inventors of the toy ("Inventors").

70.     The Regener8rs were sold to various big box retailers, both online and in stores, including, but not limited to, Price Choppers, Kroger, Toys "R" Us  and Costco.

71.    As consideration of the assignment, Awesome agreed orally to pay the Inventors a royalty on the defined Net Selling Price of Regener8rs, at varying rates.  The agreed upon royalty rate was 3% for all sales in the United States and 2% for international sales.

72.    On or about June 11, 2008, Awesome and the Inventors amended and restated their agreement in writing (the "Amended and Restated Patent Agreement").

73.    The Amended Restated Patent Agreement provided, *inter alia*, that Awesome desired to enter in to a license for certain intellectual property in a toy with another party, which toy was based upon the configuration of the Regner8rs. The Inventors agreed to reduce their royalty on sales of such toys to 1.5% of the defined Net Selling Price for sales within the United States; however, royalties on Regener8rs, which did not implement the intellectual property of the second party, remained at 3% of Net Selling Price for sales in the United States and 2% of the Net Selling Price for international sales.  A copy of the Amended and Restated Patent Agreement is attached hereto and incorporated herein as **Exhibit 17**.

### (i)    **Awesome to Excitement**

74.    On information and belief, Awesome granted a non-exclusive license to Excitement to sell Regener8rs.

75.    At some point, Awesome and Excitement entered into a distribution agreement to sell Regener8rs.

76.    Many of the customers of Awesome were also customers of Excitement.

### (ii)    **Awesome to Virtual**

77.    On January 1, 2011, Awesome granted a non-exclusive license to Virtual to sell Regener8rs (the "Virtual License").  A copy of the Virtual License is attached hereto and incorporated herein as **Exhibit 18**.

13

78.     At the time that Awesome executed the Virtual License, it had debts due and owing to AEB, factories, law firms and other creditors.  On information and belief, Glick was a guarantor of the debt due and owing to Virtual.

79.     The Virtual License provided, *inter alia*, that Virtual had the worldwide, non-exclusive right to manufacture, distribute, sell, market, advertise, identify and promote Regener8rs incorporating one or more additional characters or properties licensed to Virtual by a third party. Virtual License, § 2.

80.     The Virtual License had a perpetual term.  Virtual License, § 5.1.

81.     As consideration for the license, Virtual agreed to pay Awesome a royalty of 3% of the Net Wholesale Selling Price (as defined in the Virtual License) during the first six months following the date that licensed products were first shipped to retail stores. Thereafter, the royalty escalated to 4%. Virtual License, § 3.1.

82.     The Virtual License further provided a guarantee by Virtual of a fully recoupable minimum royalty of $10,000 paid to Awesome over the term of the agreement and any defined Sell-Off Period following termination. The minimum royalty was due to be paid no later than December 31, 2013. Virtual License, § 3.2.

83.     The Virtual License further provided that Virtual would pay Awesome a fully recoupable minimum annual royalty of an amount equally to 50% of the aggregate royalty payments made in the immediately preceding year.  Virtual License, § 3.2.

84.     Glick executed the Virtual License on behalf of both Awesome and Virtual, as the Manager of each respective entity.

202717816.1 45961/172896

85.     Upon information and belief, at least as early as July 12, 2010, Virtual entered into a license agreement with Marvel Characters, B.V. for the use of Regener8rs in the United States, Canada and Australia.

86.     Upon information and belief, at least as early as April 4, 2011, Virtual also entered into another license agreement with Marvel Characters, B.V. for the use of certain character properties on the Regener8rs in the United States and Canada.

87.     Upon information and belief, at least as early as August 27, 2011, Virtual also entered into a license agreement with Spider-Man Merchandising L.P for the use of certain character properties on Regener8rs in the United States and Canada.

88.     On or about February 24, 2012, Awesome and Virtual terminated the Virtual License by written agreement, and provided that all royalties due to Awesome pursuant to the Virtual License were deemed as having been paid.

89.     At the time the license agreement between Awesome and Virtual terminated, Virtual had debts due and owing to Franklin and Glen Eagle.  Glick was a guarantor of the debt to Franklin and Glen Eagle.

90.     After Virtual stopped selling Regener8rs, it did not have any source of income by which to pay its creditors.

    **(iii)     Awesome to Glick Group**

91.     The Glick Group ("Glick Group") was formed on July 8, 2008 The sole member of Glick Group is JZ Enterprises, LP, which is 99% owned by the JCG 1999 Trust. Glick was the manager of Glick Group and had the ultimate decision making authority for Glick Group. HMB assisted with the formation of Glick Group.

92.     Bari was the Chief Operating Officer of the Glick Group.

15

93.     On or about January 1, 2011, Awesome entered into a License Agreement with Glick Group in which Awesome licensed certain intellectual property to Glick Group including Regener8rs ("Glick Group License").  A copy of the Glick Group License is attached hereto and incorporated herein as **Exhibit 19**.

94.     At the time that Awesome executed the Glick Group License, it had debts due and owing to AEB, factories, law firms and other creditors.

95.     The Glick Group License provided, *inter alia*, that Glick Group had the worldwide, non-exclusive right to manufacture, distribute, sell, market, advertise, identify and promote Regener8rs incorporating one or more additional characters or properties licensed to Glick Group by a third party. Glick Group License, § 2.

96.     The Glick Group License has a perpetual term and, upon information and belief, remains in full force and effect.  Glick Group License, § 5.1.

97.     As consideration for the license, Glick Group agreed to pay Awesome a royalty of 3% of the Net Wholesale Selling Price (as defined in the Glick Group License) during the first six months following the date that licensed articles were first shipped to retail stores. Thereafter, the royalty escalated to 4%.  Glick Group License, § 3.1.

98.     The Glick Group License further provided a guarantee by Glick Group of a fully recoupable minimum royalty of $10,000 paid to Awesome over the term of the agreement and any defined Sell-Off Period following termination. The minimum royalty was due to be paid no later than December 31, 2013. Glick Group License, § 3.2.1.

99.     The Glick Group License further provided that Glick Group shall pay Awesome a fully recoupable minimum annual royalty of an amount equally to 50% of the aggregate royalty payments made in the immediately preceding year. Glick Group License, § 3.2.1.

16

100.    Glick executed the Glick Group License on behalf of both Awesome and Glick Group, as the Manager of each respective entity.

101.    On or about February 24, 2012, Awesome and Glick Group amended the Glick Group License to redefine the territory as being only outside of the United States, with the exception of "gift with purchase" sales, for which the territory is worldwide.

102.    Upon information and belief, at least as early as December 31, 2011, Glick Group entered into a license agreement with Marvel Characters, B.V. for the use of certain character properties on the Regener8rs in the United States and Canada.

103.    Upon information and belief, at least as early as December 31, 2011, Glick Group also entered into a license agreement with Spider-Man Merchandising L.P for the use of certain character properties on Regener8rs in the United States and Canada.

104.    Glick Group sold Regener8rs to many of the same customers as Virtual.

        **(iv)    <u>Awesome to Play Makers</u>**

105.    On February 24, 2012, the same date that the license between Awesome and Virtual terminated, Play Makers, a Delaware limited liability corporation was formed, with the assistance of HMB.  Glick is the manager of Play Makers and has the ultimate decision making authority for Play Makers.

106.    Play Makers is owned 100% by the JCG 1999 Trust, and its assets and liabilities are property of the bankruptcy estate.

107.    After the formation of Play Makers, Awesome, at the direction of Glick, entered into a non-exclusive license agreement with Play Makers to sell Regener8rs.

108.    On or about February 24, 2012, the same date as Play Makers was formed, Awesome entered into a License Agreement with Play Makers ("<u>Play Makers License</u>") in

which Awesome licensed certain intellectual property to Play Makers.  A copy of the Play Makers License is attached hereto and incorporated herein as **Exhibit 20**.

109.    At the time that Awesome executed the Play Makers License, Awesome and Virtual had debts due and owing to AEB, Franklin, Glen Eagle, factories, law firms and other creditors.

110.    The Play Makers License provided, *inter alia*, that Play Makers had the worldwide, non-exclusive right to manufacture, distribute, sell, market, advertise, identify and promote Regener8rs incorporating one or more additional characters or properties licensed to Play Makers by a third party. Play Makers License, § 2.

111.    The Play Makers License had a perpetual term Play Makers License, § 5.1.

112.    As consideration for the license, Play Makers agreed to pay Awesome a royalty of 3% of the Net Wholesale Selling Price (as defined in the Play Makers License) during the first six months of the following the date that licensed articles were first shipped to retail stores. Thereafter, the royalty escalated to 4%. Play Makers License, § 3.1.

113.    The Play Makers License further provides a guarantee by Play Makers of a fully recoupable minimum royalty of $10,000.00 paid to Awesome over the term of the agreement and any defined Sell-Off Period following termination. The minimum royalty was due to be paid no later than December 31, 2013. Play Makers License, § 3.2.

114.    The Play Makers License further provides that Play Makers shall pay Awesome a fully recoupable minimum annual royalty of an amount equally to 50% of the aggregate royalty payments made in the immediately preceding year. Play Makers License, § 3.2.

115.    Glick executed the Play Makers License on behalf of both Awesome and Play Makers, as the Manager of each respective entity.

202717816.1 45961/172896

116.    Upon information and belief, at least as early as March 24, 2012, Play Makers entered into a license agreement with Marvel Characters, B.V. for the use of certain character properties on the Regener8rs in the United States and Canada.

117.    Upon information and belief, at least as early as July 27, 2013, Play Makers became a licensee of certain character properties from Marvel Characters, B.V. for use on the Regener8rs in the United States and Canada, and for sales to Costco in Australia, Mexico, South Korea and the United Kingdom.

118.    The Regner8rs could only be sold with the Marvel License.  The Marvel License created significant value to the company that was selling the Regener8rs.  On information and belief, Bari negotiated the Marvel License.

119.    The Marvel License with Play Makers terminated on December 31, 2014.

120.    Play Makers renewed the Marvel License effective January 1, 2015 until January 1, 2017.

121.    During the pending bankruptcy, Bari negotiated the Marvel License renewal on behalf of Playmakers, without authority from the Trustee.

122.    In 2013, the same year as the filing of the Chapter 7 Case, Regener8rs were being manufactured and sold through Play Makers.

123.    In 2013, Play Makers had revenue in excess of $1.7 million.

124.    Glick directed that Play Makers pay certain debts of Awesome and not others including the debt to ANBO, one of the factories that manufactured Regener8rs.

125.    Play Makers is one of the 1999 Trust Entities that was profitable prior to and after the Petition Date.

126.    BTM was formed on the same date that Play Makers was incorporated, February 24, 2012.

127.    BTM, a friendly creditor, is the secured lender of Play Makers with a blanket lien on all the assets of Play Makers.

128.    The money lent by BTM to Play Makers was transferred through the Glick Group to Marvel.

129.    On information and belief, BTM financed the receivables due Play Makers to prevent the receivables from becoming property of the bankruptcy estate.

130.    On information and belief, BTM has a control account agreement with Play Makers.

131.    On information and belief, HMB assisted Glick with drafting the corporate security documents between Play Makers and BTM.

132.    Bari also assisted with the review of the legal documents between Play Makers and BTM.

133.    The managing member of BTM, Robert Chapman ("Chapman"), is also the managing member of Barbie C, an Illinois limited liability company, formed on March 19, 2014 ("Barbie C"). Barbie C purchased the rights in and to the patent for the Regner8rs from AEB during the pendency of the Chapter 7 Case.

134.    Chapman is also the managing member of Optimum Fulfillment, an Illinois limited liability company, which packages and distributes the Regener8rs to the big box retailers including Costco and Meijer.

135.    Chapman, and/or one of his companies, is on every side of the Regener8r transaction.   On information and belief, Chapman, individually, or through one of his

companies, lent money to finance Play Makers, obtained a security interest in Play Makers and was a customer of Play Makers.

136.    Notwithstanding the financing by BTM, Play Makers, on information and belief, continued to collect the receivables on its behalf.

137.    In 2012, BTM paid Marvel directly for the Marvel License.

138.    Glick was the signatory on the checkbook for Play Makers.

139.    The same factories that manufactured Regener8rs for Awesome manufactured Regener8rs for the Glick Group, Virtual and Play Makers.

140.    At some point, Glick, as manager of Awesome, Excitement, Virtual and the Glick Group and the grantor and beneficiary of the JCG 1999 Trust decided which debts to pay and which debts not to pay.

141.    Many of the debts that were paid by Awesome, Excitement, Virtual and the Glick Group were to Glick through administrative service agreements that he created, negotiated and executed.

F.    **Administrative Services Agreements**

(i)    **Awesome and Glick Group**

142.    In addition to selling Regener8rs, the Glick Group provided administrative services to entities owned by both the JCG 1999 Trust and JCG 2012 Trust.

143.    On or about January 1, 2010 Awesome entered into an "Administrative Services Agreement" with the Glick Group in which Awesome purportedly retained Glick Group to provide specified administrative, management and financial services to Awesome (the "Awesome ASA").  A copy of the Awesome ASA is attached hereto and incorporated herein as **Exhibit 21**.

144.    The Awesome ASA had original term of one year and automatically renewed for successive one year periods. Awesome ASA, § 2.

145.    On information and belief the Awesome ASA remains in full force and effect.

146.    The services provided by Glick Group to Awesome include, without limitation: cash management; income tax planning and compliance; information technology related services and strategic planning. Glick Group also agreed to provide services as requested by Awesome, including: negotiating, procuring, and maintaining insurance; legal services; accounts payable services; provision of equipment, inventory and supplies; employ and manage personnel; certain leasing and subleasing; and "all other such services as may be reasonably requested" by Awesome.  Awesome ASA, § 3.

147.    As consideration for the services provided by Glick Group to Awesome, Awesome agreed, *inter alia*, to pay a management service fee to Glick Group, consisting of 105% percent of actual costs of services provided by Glick Group to Awesome including, but not limited to, salary and benefits of employees of Glick Group sued by Awesome, general and administration management overhead, research and development services, costs of capital employees, and information technology services. In the event that Awesome paid any costs directly, in lieu of Glick Group paying expenses on Awesome behalf, "Glick Group shall still be entitled to 5.0% of said costs." Awesome ASA, § 4.

148.    The Awesome ASA further provided that Glick Group was the exclusive provider of the defined and enumerated services to Awesome and "shall conduct, supervise and coordinate all day-to-day business functions taking place at Awesome." Awesome ASA, § 5.

149.    Glick Group retained the right to provide all defined and enumerated services to any other person or entity.  Awesome ASA, § 13.

22

150.    Glick executed the Awesome ASA on behalf of both Awesome and Glick Group, as the Manager of each respective entity.

151.    Glick Group continued to receive payments from Awesome while other creditors of Awesome had debts that remain unpaid.

### (ii)    Glick Group and Play Makers

152.    On or about February 4, 2012, Play Makers entered into an "Administrative Services Agreement" with the Glick Group (the "Play Makers ASA"), even though Play Makers was not incorporated until February 24, 2012  A copy of the Play Makers ASA is attached hereto and incorporated herein as **Exhibit 22**.

153.    In the Play Makers ASA, Play Makers purportedly retained Glick Group to provide specified administrative, management and financial services to Play Makers.  The Play Makers ASA had original term of one year and automatically renewed for successive one year periods.  Play Makers ASA, § 2.

154.    On information and belief the Play Makers ASA remains in full force and effect.

155.    The services by Glick Group to Play Makers include, without limitation: cash management; income tax planning and compliance; information technology related services and strategic planning. Glick Group also agreed to provide services as requested by Play Makers, including: negotiating, procuring, and maintaining insurance; legal services; accounts payable services; provision of equipment, inventory and supplies; employ and manage personnel; certain leasing and subleasing; and "all other such services as may be reasonably requested" by Play Makers.  Play Makers ASA, § 3.

156.    As consideration for the provision of services by Glick Group to Play Makers, Play Makers agreed, *inter alia*, to pay a management service fee to Glick Group, consisting of 105% percent of actual costs of services provided by Glick Group to Play Makers including,

23

but not limited to, salary and benefits of employees of Glick Group sued by Play Makers, general and administration management overhead, research and development services, costs of capital employees, and information technology services. In the event that Play Makers paid any costs directly, in lieu of Glick Group paying expenses on Play Makers behalf, "Glick Group shall still be entitled to 5.0% of said costs." Play Makers ASA, § 4.

157.    The Play Makers ASA further provided that Glick Group was the exclusive provider of the defined and enumerated services to Play Makers and "shall conduct, supervise and coordinate all day-to-day business functions taking place at Play Makers." Play Makers ASA, § 5. Glick Group retained the right to provide all defined and enumerated services to any other person or entity. Play Makers ASA, § 13.

158.    Glick executed the Play Makers ASA on behalf of both Play Makers and Glick Group, as the Manager of each respective entity.

159.    On information and belief, Glick Group continued to receive payments from Play Makers while other creditors remained unpaid.

160.    Glick Group and Play Makers are part of the 1999 Trust Entities and have not provided an accounting to the Trustee despite repeated requests.

### (iii)    Glick Group and BEG

161.    On or about September 1, 2012, BEG entered into an "Administrative Services Agreement" with the Glick Group (the "BEG ASA").  A copy of the BEG ASA is attached hereto and incorporated herein as **Exhibit 23**.

162.    In the BEG ASA, BEG retained Glick Group to provide specified administrative, management and financial services to BEG.  The BEG ASA had original term of one year and automatically renewed for successive one year periods.  BEG ASA, § 2.

163.    On information and belief, the BEG ASA remains in full force and effect.

24

164.    The services provided by Glick Group to BEG include, without limitation: conduct, supervise and coordinate all day-to-day business functions taking place at BEG, negotiating, procuring, and maintaining insurance; legal services; accounts payable services; provision of equipment, inventory and supplies; employ and manage personnel; certain leasing and subleasing; and "all other such services as may be reasonably requested" by BEG.  BEG ASA, § 3.

165.    As consideration for the provision of services by Glick Group to BEG, BEG agreed, *inter alia*, to pay a management service fee to Glick Group, of $10,000 per month as long as BEG shared office space with the Glick Group.  The fee, however, was to be reduced to $7,600 per month upon BEG acquiring separate office space from the Glick Group.  BEG ASA, §4.

166.    The BEG ASA further provided that BEG would be solely responsible for compensation to all employees of BEG and all out-of-pocket expenses attributable to BEG. BEG ASA, §4.

167.    The BEG ASA further provided that Glick Group was the exclusive provider of the defined and enumerated services to BEG and "shall arrange for the employment and/or provision of such personnel as reasonably necessary for BEG to conduct its business.  BEG acknowledged that such employees are not exclusively providing services to BEG and may provide services for other entities as well as BEG.  Notwithstanding Section 4 of the BEG ASA, Glick Group has the sole and exclusive right to hire and fire all such personnel as well as determine appropriate salaries.  BEG ASA, §6.

168.    The BEG ASA granted the Glick Group, during the term of the BEG ASA, a non-exclusive royalty free, nontransferable license, without the right to sublicense to use all of

BEG's trademarks, copyrights, trade names, service marks and logs, for marketing purposes and the performance of Glick Group's obligations under the BEG ASA.  BEG ASA, §10.

169.    The BEG was drafted by an employee of Glick Group who represented Glick Group only.  BEG ASA, §14(j).

170.    Glick executed the BEG ASA on behalf of both BEG and Glick Group, as the Manager of each respective entity.

171.    On information and belief, the Glick Group continued to receive payments from BEG that were not disclosed to the Trustee.

**G.    Scheme to Defraud Creditors**

172.    Except for the parties, the Awesome ASA, the Play Makers ASA and BEG ASA were virtually identical agreements where Glick Group received a fee for providing administrative and management services to Awesome, Play Makers and BEG.

173.    Except for different decals, the Regener8rs sold by Play Makers were virtually the same product as the Regener8rs sold by Awesome, Virtual and the Glick Group.

174.    Except for the parties, the license agreements that Marvel had with Play Makers were essentially the same license agreements that Marvel had with Awesome, Glick Group and Virtual.

**(i)    Formation of 2012 JCG Trust and 2012 Trust Entities**

175.    With knowledge of the ongoing and defaulting debts of Awesome, Excitement and Virtual and in an effort to avoid payment of his personal obligations to AEB, Franklin and Glen Eagle, Glick, with the assistance of the law firm of HMB, specifically, Hal, Hechtman and Goldstein (hereinafter collectively referred to as "HMB") and Bari formed the JCG 2012 Trust and the 2012 Trust Entities. During all relevant times, Hal, Hechtman and Goldstein were attorneys employed by HMB.

26

176.    On February 4, 2012, the JCG 2012 Trust was formed.  Glick was the grantor of the JCG 2012 Trust.

177.    Glick is the grantor of JCG 2012 Trust, which owns 92% of BEG and 100% of Telegraph.  Visionaries and Madhouse are wholly owned subsidiaries of BEG.  On information and belief, Madhouse Toys is a subsidiary of Madhouse, and Impact is a subsidiary of Visionaries. See **Exhibit 1**.

178.    Larry is the Debtor's father, and was the initial trustee of the JCG 2012 Trust.

179.    On April 10, 2013, Larry resigned as trustee of the JCG 2012 Trust.  On that date, Nancy was appointed as successor trustee.  Nancy is the Debtor's mother and the current Trustee of the JCG 2012 Trust.  A copy of Larry's resignation and Nancy's acceptance as successor trustee of the JCG 2012 Trust dated April 10, 2013, is part of **Exhibit 2**.

180.    On December 4, 2014, the Creditors deposed Nancy in connection to her administration as successor trustee of the JCG 2012 Trust.  Nancy does not have any documents in her possession relating to the JCG 2012 Trust and therefore, did not bring any documents to the deposition.

181.    Nancy cannot recall whether she has ever seen the JCG 2012 Trust documents.

182.    Upon her appointment as successor trustee, Nancy became a fiduciary of the JCG 2012 Trust.

183.    Upon being appointed as trustee, Nancy never retained a lawyer to advise her how to act as a fiduciary of the JCG 2012 Trust.

184.    Prior to her appointment as successor trustee of JCG 2012 Trust, Nancy had never acted as a trustee for any other trusts or any other companies.

202717816.1 45961/172896

185.    Nancy has limited knowledge of the operations of the JCG 2012 Trust and the 2012 Trust Entities.

186.    Nancy relied on the statements of Glick when the 2012 Trust Entities were formed.

187.    In January 2013, according to the records produced to the creditors by the JCG 2012 Trust, Larry allegedly received two loans from Telegraph; one for $11,900 and one for $8,100.  The loans were made by the JCG 2012 Trust.

188.    Nancy testified that she has no idea why Larry would be receiving a shareholder loan from Telegraph Partners in the amount of $11,900 in January 2013.

189.    Nancy testified that she has no idea why Glick would be receiving a shareholder loan from Telegraph Partners in the amount of $8,100 in 2013.

190.    Glick is the manager of JC Management.  JC Management received payments from Telegraph in 2013.

191.    Nancy testified that she has no idea why JC Management would be receiving payments from Telegraph Partners in 2013.

192.    Nancy testified that she has no idea why Stacey would be receiving two distributions, one in the amount of $8,000 and another in the amount of $450, from Telegraph Partners on February 21, 2013. .

193.    ZBT is a college fraternity.  ZBT received a distribution from the JCG 2012 Trust.  Nancy testified that she does not know if ZBT is a shareholder of any of the 2012 JCG Trust Entities.

194.    Nancy does not receive any written reports from Glick regarding the 2012 Trust Entities.

202717816.1 45961/172896

195.    Nancy cannot recall whether she ever met with the accountant, David Arenberg, to prepare tax returns for any of the 2012 Trust Entities.

196.    Nancy believes that the JCG 2012 Trust was formed to provide future business for Glick's sons, Zach and Chase.

197.    The JCG 2012 Trust did not make any financial contribution in consideration of its 100% ownership of Telegraph Partners or its 92% ownership of BEG, Madhouse and Visionaries.

198.    Nancy does not know what type of financial support is needed for Stacey, Zach and Chase, the beneficiaries of the 2012 JCG Trust.

199.    Nancy does not know how much money that she and her husband, Larry, have given to Glick and his family on an annual basis.

200.    Nancy cannot recall whether Glick Group is an entity owned by the JCG 1999 Trust.

201.    Nancy cannot recall how much financial support the JCG 2012 Trust has provided to Chase in 2014.

202.    Nancy cannot recall how much financial support the JCG 2012 Trust has provided to Zach in 2014.

203.    Nancy cannot recall how much financial support the JCG 2012 Trust has provided to Stacey in 2014

204.    The JCG 2012 Trust does not have a bank account.

**(ii)    Telegraph Partners**

205.    Telegraph Partners is a limited liability company which was formed by Bari on March 22, 2012.

202717816.1 45961/172896

206.    Glick is the manager of Telegraph Partners and has the sole decision making authority with respect to Telegraph Partners.

207.    Nancy believes that Telegraph Partners is a BEG entity that pays Glick for his management services.  Telegraph Partners, however, is a separate limited liability company owned by the JCG 2012 Trust.

208.    Even though Telegraph Partners is part of the JCG 2012 Trust, Nancy does not know its physical location.

209.    Nancy does not know the officers or members of Telegraph Partners.

210.    Nancy does not know the status of the business operations of Telegraph Partners.

211.    Nancy is not sure if Telegraph Partners is a limited liability company.

212.    Nancy does know whether Telegraph Partners earned income in 2013.

213.    Nancy does not know if Telegraph Partners has any bank accounts.

214.    Nancy cannot recall what employees, if any, work for Telegraph Partners other than Glick.

215.    Nancy cannot recall whether sales were up or down for Telegraph Partners in November 2014.

216.    Glick has never discussed with Nancy who to hire for Telegraph Partners.

217.    Nancy cannot recall Glick's compensation from Telegraph Partners in 2012.

218.    Telegraph Partners has made loans to Glick; however. there are no written promissory notes between Glick and Telegraph Partners.

219.    The Trustee did not provide Play Makers with authority to pay Glick.

220.    In 2014, after the Petition Date, Play Makers, without authority from the Trustee, repaid a loan to Telegraph Partners.

221.    Nancy cannot recall whether Glick ever borrowed money from Telegraph Partners.

222.    Nancy does not know the accuracy of a balance sheet of Telegraph Partners dated as of December 31, 2013.

223.    Nancy does not know who prepared balance sheets for Telegraph Partners.

224.    Nancy does not know when Telegraph Partners made loans to Glick.

225.    Nancy cannot recall the terms of any loan from Telegraph Partners to Glick.

226.    Nancy does not know about a loan made from Telegraph Partners to Glick, which was in excess of $142,000.00

227.    Nancy does know whether any loan to Glick by Telegraph Partners is collectable.

228.    Nancy does not know what percentage ownership the JCG 2012 Trust owns in Telegraph Partners.

229.    The check register for Telegraph Partners identifies distributions for the JCG 2012 Trust.

230.    Nancy has no idea as to the business purpose of Telegraph Partners even though the JCG 2012 Trust owns 100% of Telegraph Partners.

231.    The check register for Telegraph Partners identifies payments to Prima Donna Productions, Inc. ("Prima Donna"), which is an Illinois corporation that is owned seventy percent (70%) by Glick and thirty percent (30%) by Stacey.  Glick is the President of Prima Donna.

31

232.    Prima Donna had a credit card that was used to make payments for all the 1999 Trust Entities.  None of the other 1999 Trust Entities had a credit card.

233.    Telegraph Partners made lease payments for Audis driven by Stacey, Zach and Chase.

234.    Stacey would unilaterally request distributions from the JCG 2012 Trust.

235.    Glick makes the decision on the payments Stacey receives from Telegraph Partners.

236.    Stacey receives discretionary distributions from Telegraph Partners but does not have an employment agreement with Telegraph Partners.

237.    Stacey, however, did not ask for a distribution to pay the accountant so her joint tax returns could be filed during the Chapter 7 Case.

238.    Glick had the sole decision making authority on which payments should be made by Telegraph Partners.

239.    Glick took loans from Telegraph Partners.

240.    Since the JCG 2012 Trust does not have a separate bank account, Telegraph Partners acts as a conduit for payments to the beneficiaries of the JCG 2012 Trust.

### (iii)    **Bannockburn Entertainment Group**

241.    BEG is an Illinois limited liability formed on July 19, 2012.  Glick is the manager of BEG and has the ultimate decision making authority with respect to BEG.  BEG owns 100% of Visionaries, 100% of Madhouse LLC and 100% of Madhouse Toys.  See **Exhibit 1**.

242.    Eric Ashworth ("Eric"), a friend of Glick, capitalized BEG with $600,000, which was put into the company as $300,000 in debt and $300,000 in equity.  In exchange, Eric became an owner of 8% of BEG, Madhouse and Visionaries.

32

243.    Glick determined that the amount invested by Eric would be sufficient to capitalize BEG.

244.    BEG was funded one hundred percent (100%) with Eric's financial contributions.

245.    Glick never provided Eric with a business plan.

246.    The JCG 2012 Trust did not make any investment into BEG; however, it received a ninety-two percent (92%) interest in BEG.

247.    Nancy did not review any documents at the time BEG was formed.

248.    Nancy did not review any documents regarding the capital being invested into BEG.

249.    Nancy does not know why Eric decided to extend the loan he made to BEG.

250.    Nancy does not know the background of Eric and cannot recall when the last time she met with him.

251.    BEG was set up as a holding company for Madhouse and Visionaries.

252.    Nancy believed that she was acting in her capacity as trustee by having the JCG 2012 Trust invest in Madhouse and Visionaries; however the JCG 2012 Trust did not invest any money into Madhouse and Visionaries

253.    BEG does not have any assets other than Madhouse and Visionaries.

254.    Nancy did not consult with any outside advisors regarding the terms of the investment.

255.    Nancy cannot recall whether sales were up or down for BEG in November 2014.

202717816.1 45961/172896

256.   Nancy cannot recall why BEG would be paying an administrative fee to Telegraph Partners in November 2012.

257.   After Nancy was appointed trustee of the JCG 2012 Trust, BEG paid approximately $75,000 to the Glick Group in the last quarter of 2012.  Nancy cannot explain that transfer.

258.   Nancy cannot explain a single expense on the check register for BEG in 2012.

259.   Nancy does not know why Glick Group would be receiving income from BEG in November 2012.

260.   Nancy cannot recall the terms of any loan from BEG to Glick.

261.   Nancy cannot recall who controls BEG.

262.   Nancy believes that BEG's business operations are not doing well, but she hasn't done anything personally to improve the business.

263.   At some point, BEG stopped paying bills, and the wholly owned subsidiaries of BEG, Madhouse and Visionaries, started paying their own bills.

264.   Nancy cannot recall ever seeing the checking account for BEG.

265.   Since the JCG 2012 Trust does not have a separate bank account, BEG acts as a conduit for payments to the beneficiaries of the JCG 2012 Trust.

266.   Nancy cannot recall whether she is a signatory for any checking account for BEG.

267.   BEG was making payments to the Glick Group for administrative fees in October 2012 based upon an administrative agreement where BEG would share office space and personnel until BEG found a separate office.

202717816.1 45961/172896

268.    Nancy cannot recall the cost of office space and personnel that Glick Group was providing to BEG.

269.    Nancy cannot recall whether there is an actual written administrative agreement between Glick Group and BEG.

270.    Glick negotiated and executed the Administrative Services Agreement on behalf of Glick Group.

271.    Glick negotiated and executed the Administrative Services Agreement on behalf of BEG.

272.    Glick decided unilaterally how much money should be paid by BEG to the Glick Group.

273.    The same management services provided by the Glick Group to BEG were provided by Telegraph Partners.

274.    In 2014, BEG paid administrative fees to Telegraph Partners in the aggregate amount of $549,000.

275.    BEG paid management fees to JC Management Services, LLC ("JC Management").  JC Management is an Illinois corporation, which was incorporated by HMB on November 16, 2012, to run the office of BEG.  Glick is the manager of JC Management with ultimate decision making authority for JC Management.

276.    On information and belief, the same management services provided by Glick through Glick Group were the same management services provided by Glick through JC Management and Telegraph Partners.

277.    Glick received management and administrative fees from the Glick Group, JC Management Services and Telegraph Partners.  Glick had decision making authority to

35

determine how much in fees he received from these entities.   The management and administrative fees have not been disclosed to the Trustee.

### (iv)   Madhouse and Visionaries

278.   At the time Nancy took over as successor trustee of the JCG 2012 Trust, she believed that two companies, Madhouse and Visionaries, were part of the JCG 2012 Trust but were not doing business at that time.

279.   Madhouse and Visionaries began operating business after BEG was formed.

280.   Madhouse and Visionaries were incorporated as limited liability companies in Delaware on November 7, 2011.  Hechtman, an attorney at HMB incorporated Madhouse and Visionaries.

281.   Glick is the manager of both Madhouse and Visionaries and has the ultimate decision making authority for both Madhouse and Visionaries.

282.   Madhouse was set up to be a developer and wholesale distributor of consumer goods such as spa facial masks, eye masks and jewelry.

283.   The customers of Madhouse are Price Choppers, Kmart, Kroger and other big box retailers (collectively, the "Retailers").

284.   Madhouse would present products and distribute products to Retailers.

285.   Madhouse was capitalized through BEG.

286.   At some point, Madhouse started to be financed through BTM.

287.   In 2013, BTM lent $250,000 to Madhouse over a period of time.

288.   On information and belief, Bari reviewed the loan documents between BTM and Madhouse.

289.   On information and belief, BTM has a blanket lien on all the assets of Madhouse.

290. On information and belief, Madhouse has a bank account controlled by BTM at Harris Bank.

291. Visionaries was set up to be a branding, marketing and sales management company for third parties.

292. Visionaries helped brand various consumer products such as Oxygen for Energy. The customers of Visionaries are Oxygen for Energy, Spa Life among others.

293. Nancy, however, cannot recall what products are branded and marketed.

294. Glick's role in Madhouse and Visionaries was to produce business and develop products.

295. Nancy cannot recall the best-selling or worst-selling product for Madhouse during November 2014.

296. Nancy believes that sales and expenses were down for Madhouse in November 2014, but she cannot recall the decrease in sales.

297. Madhouse and Visionaries are wholly owned subsidiaries of BEG, although Madhouse and Visionaries were formed prior to the formation of BEG.

298. Madhouse sells various products such as fake nails, soaps and bottles of oxygen and produces rag dolls to big box retailers such as Price Choppers.

299. Nancy does not know how much income the JCG 2012 Trust earned from Madhouse in 2012.

300. Nancy does not know how much income was generated by the JCG 2012 Trust from Visionaries in 2013.

301. Nancy cannot recall the physical location of Madhouse or the officers of Madhouse.

302.    Nancy cannot explain any transactions by Madhouse between November 5, 2013 and December 31, 2013.

303.    When Madhouse and Visionaries became wholly owned subsidiaries of BEG, they did not have any assets.

### (v)    JCG 2012 Trust Created for the Same Purpose as JCG 1999 Trust

304.    The JCG 1999 Trust was created for estate planning purposes to benefit Glick's sons, Zach and Chase.

305.    The 1999 Trust Entities were in the business of developing, manufacturing and selling products and toys to various wholesale and retail stores including, but not limited to, Toys "R" Us, Menards and Costco.

306.    When certain of the 1999 Trust Entities, specifically, Virtual and Awesome, became insolvent, Glick formed the 2012 JCG Trust and the 2012 Trust Entities.

307.    The JCG 2012 Trust was created for the same purpose as the JCG 1999 Trust - to provide a future business for Glick's children, Zach and Chase.

308.    The JCG 1999 Trust was created to provide future business for Zach and Chase.

309.    Glick cannot explain the difference between the JCG 1999 and the JCG 2012 Trust.

310.    The Limited Partnerships did not have employees or bank accounts.

311.    JZ Enterprises  did not have employees or a bank account.

312.    The JCG 1999 Trust did not have a bank account.

313.    The JCG 2012 Trust did not have a bank account.

314.    The JCG 2012 Trust made distributions to the beneficiaries of the JCG 2012 Trust at the direction of Glick.

315.    Neither the JCG 1999 Trust nor the JCG 2012 had separate bank accounts.

202717816.1 45961/172896

316.    QuickBooks records were not kept for either the JCG 1999 Trust or JCG 2012 Trust.

317.    None of the 1999 Trust Entities or 2012 Trust Entities had their own credit cards.

318.    In February, 2012, HMB and Bari assisted with creating the JCG 2012 Trust at a time when Glick was insolvent and owed several million dollars to creditors.

319.    At the time the JCG 2012 Trust was created and Play Makers was incorporated, Glick and  Awesome were in default under its loan obligations in excess of $1,000,000.00 with AEB, and Glick and Virtual were in default under its loan obligations with Franklin in excess of $600,000.00.

320.    Upon information and belief, HMB knew or were aware of the 1999 Trust Entities financial distress when they assisted with the creation of Play Makers, one of the 1999 Trust Entities that was profitable, and with documenting the security interest of BTM, the secured lender that was incorporated on the same day as Play Makers as well as the creation of the JCG 2012 Trust.

321.    The JCG 2012 Trust and Play Makers were created by Glick with the intent to hinder, delay or defraud the Plaintiffs by transferring business opportunities and profits away from Virtual and Awesome to Play Makers and the JCG 2012 Trust Entities.

### H.    Unauthorized Post-Petition Transfers

322.    After the Petition Date, Play Makers, one of the 1999 Trust Entities, without authority of the Trustee, made payments to the Debtor's current counsel, the Law Offices of William J. Factor, Ltd. ("Factor Law"), in connection with his representation in the Chapter 7 Case.

202717816.1 45961/172896

323.   After the Petition Date, Play Makers, without authority of the Trustee, made payments to Bari.

324.   After the Petition Date, Play Makers, without authority of the Trustee, made payments to Michelle, Glick's long-time assistant.

325.   After the Petition Date, Play Makers, without authority of the Trustee, built new tooling in order to manufacture Regener8rs for Costco.

326.   After the Petition Date, Play Makers, without authority of the Trustee, paid the lease payments for the Audi A5 driven by Glick.

327.   Since the Petition Date, the Trustee has not received an accounting from Play Makers, the Glick Group or the JCG 1999 Trust despite repeated requests.

328.   On January 26, 2015, the Trustee requested tax returns and other financial records from the Debtor, the JCG 1999 Trust and the 1999 Trust Entities (the "Trustee Letter"). A copy of the Trustee Letter is attached hereto and incorporated herein as **Exhibit 24**.

329.   On information and belief, as of the filing of the Complaint, the Debtor has not filed tax returns for himself, individually, or the Glick Group, JZ Enterprises and the Limited Partnerships.

## COUNT I

### (JCG 2012 Trust - 11 U.S.C. §§ 548 and 550 (actual fraud))

330.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 330.

331.    The formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by Glick within two (2) years prior to the filing of the Chapter 7 Case.

332.    The formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by the Debtor for the benefit of the Debtor's wife and sons at the expense of creditors.

333.    The formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by the Debtor, as grantor of the JCG 2012 Trust, with the actual intent to hinder, delay or defraud creditors to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred or indebted.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against the JCG 2012 Trust finding that the formation of the JCG 2012 Trust and the transfer of assets and business opportunities into the JCG 2012 Trust and the 2012 Trust Entities should be avoided pursuant to 11 U.S.C §548, allowing the Trustee to recover the value of the JCG 2012 Trust pursuant to 11 U.S.C. §550, and granting such other and further relief as may be appropriate.

## COUNT  II

### (JCG 2012 Trust - 11 U.S.C. §§ 548 and 550 (constructive fraud))

334.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 334.

335.    The formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by Glick within two (2) years prior to the filing of the Chapter 7 Case.

336.    At the time of the transfer of the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor received less than reasonably equivalent value in exchange for such transfer.

337.    At the time of the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor was insolvent or become insolvent as a result of such transfer.

338.    At the time of the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor was engaged in business or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small.

339.    At the time of the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

340.    At the time of the transfer assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider.

202717816.1 45961/172896

341.    At the time of the transfer, the JCG 2012 Trust and the property within the JCG 2012 Trust was a large portion of the Debtor's assets.

342.    By virtue of the fraudulent transfer, all the JCG 2012 Trust, and all the assets therein, are property of the Debtor's bankruptcy estate.

343.    The value of the JCG 2012 Trust is of significant value and would greatly benefit the Debtor's bankruptcy estate.

344.    The Trustee could use the value of the business within the JCG 2012 Trust for the administration of the Chapter 7 Case and for distribution to the Debtor's creditors.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against the JCG 2012 Trust finding that the formation of the JCG 2012 Trust and the transfer of assets and business opportunities into the JCG 2012 Trust and the 2012 Trust Entities should be avoided pursuant to 11 U.S.C §548, allowing the Trustee to recover the value of the JCG 2012 Trust pursuant to 11 U.S.C. §550, and granting such other and further relief as may be appropriate.

## COUNT  III

### (JCG 2012 Trust – 740 ILCS 160/5(a)(2); 11 U.S.C. §§ 544 & 550 (actual fraud))

345.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 345.

346.    The formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by Glick within four (4) years prior to the filing of the Chapter 7 Case.

347.    The transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by the Debtor with the actual intent to hinder, delay or defraud creditors.

43

348.    Pursuant to 11 U.S.C. §544(b), the Plaintiffs, on behalf of the Trustee, may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of Chapter 11 of the United States Code or that is not allowable only under Section 502(e) Chapter 11 of the United States Code.

349.    The Plaintiffs, on behalf of the Trustee, may avoid the formation of the JCG 2012 Trust pursuant to 11 U.S.C. §544(b) and the Illinois Fraudulent Transfer Act, 740 ILCS 160/5(a)(2) and recover those transfers pursuant to 11 U.S.C. §550.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against the JCG 2012 Trust finding that the formation of the JCG 2012 Trust and the transfer of assets and business opportunities into the JCG 2012 Trust and the 2012 Trust Entities should be avoided pursuant to 11 U.S.C §544(b) and the Illinois Fraudulent Transfer Act, 740 ILCS 160/5(a)(2) and recover those transfers pursuant to 11 U.S.C. §550, and granting such other and further relief as may be appropriate.

## COUNT  IV

### (JCG 2012 Trust - 11 U.S.C. §§544 & 550 & 740 ILCS 160/5(a)(2)(constructive fraud))

350.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 350.

351.    The formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust was made by Glick within four (4) years prior to the filing of the Chapter 7 Case.

352.    The Debtor received less than reasonably equivalent value for the transfers of assets and business opportunities into the JCG 2012 Trust.

44

353.    On the date of the transfer of the formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

354.    On the date of the formation of the JCG 2012 Trust and the transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust, the Debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay them as they came due.

355.    The Trustee may avoid the transfers pursuant to 11 U.S.C. §544(b) and the Illinois Fraudulent Transfer Act, 740 ILCS 160/5(a)(2) and recover those transfers pursuant to 11 U.S.C. §550.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against the JCG 2012 Trust finding that the formation of the JCG 2012 Trust and the transfer of assets and business opportunities into the JCG 2012 Trust and the 2012 Trust Entities should be avoided pursuant to 11 U.S.C §544(b) and the Illinois Fraudulent Transfer Act, 740 ILCS 160/5(a)(2), recover those transfers pursuant to 11 U.S.C. §550 and granting such other and further relief as may be appropriate.

## COUNT V

### (Larry Glick – Aiding and Abetting Scheme to Defraud)

356.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 356.

357.    Larry is of counsel at the law firm of Chuhak & Tecson, specializing in estate planning and asset protection.

358.    Larry is the Debtor's father, initial trustee of the 2012 JCG Trust and the person who funded most of the payments to the Debtor's counsel in connection with filing the Chapter 7 Case.

359.    Larry resigned as trustee to the 2012 JCG Trust only one month prior the filing of the Chapter 7 Case.

360.    Upon Larry's resignation, Nancy became the successor trustee of the 2012 JCG Trust.

361.    Nancy was the Trustee of the JCG 2012 Trust in name only.

362.    Nancy had no idea of the investments of the JCG 2012 Trust, the distributions made to the beneficiaries of the JCG 2012 Trust or  the business operations of the JCG 2012 Trust.

363.    Although Nancy was named successor Trustee of the JCG 2012 Trust, she did so at the direction of her husband, Larry.

364.    By virtue of the foregoing, Larry played a central role in aiding and abetting the Debtor's efforts to hide or fraudulently transfer assets from the 1999 JCG Trust, which is property of the bankruptcy estate, to the JCG 2012 Trust for the sole benefit of the Debtor's wife, Stacey, and children, Zach and Chase and to avoid paying the claims of his son's creditors.

365.    On information and belief, Larry was aware of his role in the scheme to defraud when he provided legal and financial assistance to Glick.

202717816.1 45961/172896

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against Larry Glick directing that Larry Glick be found to have aided and abetted the Debtor's fraudulent transfer and concealment scheme, return the avoided transfers (or the value thereof) to the Trustee, together with such interest as legally owing with respect thereto, and granting further relief as may be just and proper under the circumstances.

## COUNT  VI

### (Nancy Glick – Aiding and Abetting Scheme to Defraud)

366.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 366.

367.    Nancy, the Debtor's mother and successor trustee of the 2012 JCG Trust, played a role in aiding and abetting the Debtor's efforts to hide or fraudulently transfer assets from the JCG 2012 Trust.

368.    One month prior to the filing of the Chapter 7 Case, Nancy stepped into the role of fiduciary of the JCG 2012 Trust.

369.    Nancy was the Trustee of the JCG 2012 Trust in name only.

370.    Nancy had no idea of the investments of the JCG 2012 Trust, the distributions made to the beneficiaries of the JCG 2012 Trust or the business operations of the JCG 2012 Trust.

371.    Although Nancy was named successor Trustee of the JCG 2012 Trust, she did so at the direction of her husband, Larry, and her son, Glick.

372.    Nancy's role as Trustee was a complete sham.

373.    By Nancy becoming successor trustee one month prior to the filing of the Chapter 7 Case, she actively participated in the ongoing scheme to defraud creditors.

47

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against Nancy Glick directing that Nancy Glick be found to have aided and abetted the Debtor's fraudulent transfer and concealment scheme, return the avoided transfers (or the value thereof) to the Trustee, together with such interest as legally owing with respect thereto, and granting further relief as may be just and proper under the circumstances.

## COUNT  VII

**(BTM, Chapman & Optimum Fulfillment- Aiding and Abetting Scheme to Defraud)**

374.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 374.

375.    Chapman, manager of BTM and the Debtor are friends.

376.    Upon information and belief, Chapman knew that Glick and his companies, Awesome and Virtual, were in debt and needed financing to perpetuate the sale of Regenr8rs and maintain the Marvel License.

377.    Instead of providing financing to Virtual or Awesome, the existing companies selling Regenr8rs, Chapman and Glick formed two new limited liability companies to continue the sale of the Regenr8rs.

378.     BTM, and Play Makers were incorporated on the same date: February 24, 2012.

379.    Both BTM and Play Makers were incorporated at the time when Glick, Awesome and Virtual were insolvent or in financial distress owing millions to creditors.

380.    By forming Play Makers to continue the same business as Virtual and Awesome, the Debtor knew there would be insufficient assets to satisfy the debts of Virtual and Awesome and instead diverted the business assets, opportunities  and future profits to Play Makers.

381.    In February, 2012, BTM and Play Makers entered into a Factoring Agreement wherein BTM ostensibly loaned Play Makers $350,000.00 and BTM was granted a security interest in all of Play Maker's receivables.

382.    Upon information and belief, Chapman and/or BTM knew that the loan to Play Makers allowed the Debtor and Play Makers to continue the business of selling Regener8rs and to divert sales and profits from Virtual and Awesome to the detriment of creditors.

383.    On or about February 24, 2012, Awesome entered into a non-exclusive license agreement with Play Makers to sell Regener8rs and terminated the same non-exclusive license agreement with Virtual.

384.    The same factories that manufactured Regener8rs for Play Makers manufactured Regener8rs for the Glick Group, Virtual and Awesome.

385.    In lieu of paying Awesome royalties under the non-exclusive license agreement, the Debtor, as manager of both Awesome and Play Makers, unilaterally determined and diverted the funds due Awesome to pay Awesome's debts to the factories manufacturing the Regenr8rs, the same factories used by Play Makers to manufacture the Regenr8rs.

386.    Upon information and belief, the factories would not continue to manufacture the Regenr8rs for Play Makers unless the debts incurred by Awesome were paid.

387.    On information and belief, BTM has a control account agreement with Play Makers and in 2012, BTM paid Marvel directly for the Marvel License to insure the continued sale of the Regener8rs.

388.    Chapman is also the managing member of Barbie C, LLC, an Illinois limited liability company, formed on March 19, 2014.  Barbie C purchased the rights in and to the patent for the Regner8rs from AEB during the pendency of the Chapter 7 Case.

49

389.     Chapman is also the managing member of Optimum Fulfillment, an Illinois limited liability company, which packages and distributes the Regener8rs to the big box retailers including Costco and Meijer.

390.     Chapman, and/or one of his companies, is on every side of the Regener8r transaction.    On information and belief, Chapman, individually, or through one of his companies, lent money to finance Play Makers, obtained a security interest in Play Makers and was a customer of Play Makers.

391.     The agreements between BTM and Play Makers are not arm's length transactions.

392.     The alignment of interest between BTM and Play Makers renders BTM a non-statutory insider.

393.     Based on the above described conduct, Chapman, BTM and Optimum Fulfillment participated in and/or aided and abetted the Debtor in the scheme to defraud the creditors of Virtual, Awesome and Glick.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in his favor and against Robert Chapman, BTM, an Illinois limited liability company and Optimum Fulfillment, an Illinois limited liability company, directing that they each be found to have aided and abetted the Debtor's fraudulent transfer and concealment scheme, return the avoided transfers (or the value thereof) to the Trustee, together with such interest as legally owing with respect thereto, and granting further relief as may be just and proper under the circumstances.

## **COUNT VIII**

### **(HMB, Hechtman, Goldstein and Hal –Aiding and Abetting Scheme to Defraud)**

202717816.1 45961/172896

394.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 394.

395.    HMB, the law firm where Bari's husband, Hal, worked assisted with setting up the JCG 2012 Trust, the 2012 Trust Entities and drafting the loan documents with BTM.

396.    In February, 2012, Hal, Hechtman and Goldstein were attorneys with HMB and assisted with creating the JCG 2012 Trust at a time when Glick was insolvent and owed several million dollars to creditors.

397.    At the time the JCG 2012 Trust was created and Play Makers was incorporated, Glick and Awesome were in default under its loan obligations in excess of $1,000,000.00 with AEB, and Glick and Virtual were in default under its loan obligations with Franklin in excess of $600,000.00.

398.    Upon information and belief, HMB knew or were aware of the 1999 Trust Entities financial distress when they assisted with the creation of Play Makers, one of the 1999 Trust Entities that was profitable, and with documenting the security interest of BTM, the secured lender that was incorporated on the same day as Play Makers as well as the creation of the JCG 2012 Trust.

399.    The JCG 2012 Trust and Play Makers were created with the intent to hinder, delay or defraud the Plaintiffs by transferring business opportunities and profits away from Virtual and Awesome to Play Makers and the JCG 2012 Trust Entities.

400.    HMB assisted Glick with forming the 2012 Trust Entities and the JCG 2012 Trust in order to transfer assets and business opportunities to a new intentionally defective grantor trust at a time when Glick, individually, and the 1999 Trust Entities were defaulting on

debts to multiple creditors and were set up to provide future value to Glick's children, Zach and

Chase as well as his wife, Stacey.

401.    HMB, played a vital role in the ongoing scheme to defraud creditors.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy

estate of Jonathan Glick, requests the entry of a judgment their favor and against Jeffrey

Hechtman, Kenneth Goldstein, Hal Wood and Horwood, Marcus & Berk directing that Horwood,

Marcus & Berk be found to have aided and abetted the Debtor's fraudulent transfer and

concealment scheme, return the avoided transfers (or the value thereof) to the Trustee, together

with such interest as legally owing with respect hereto, and granting further relief as may be just

and proper under the circumstances.

## COUNT IX

### (Bari Wood–Aiding and Abetting Scheme to Defraud (Play Makers))

402.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set

forth and incorporated herein as paragraph 402.

403.    Bari, acted as legal counsel to the 1999 Trust Entities, the JCG 2012 Trust and

the JCG 2012 Trust Entities as well as Chief Operating Officer of the Glick Group.

404.    In November, 2011, Bari instructed HMB to incorporate two entities,

Visionaries, LLC and Madhouse, LLC; these two entities are owned by BEG and although the

JCG 2012 Trust did not make any financial contribution, it owns 92% of BEG.

405.    On or about February 4, 2012, Bari assisted HMB with the creation of the JCG

2012 Trust at a time when Glick was insolvent and owed several million dollars to creditors.

406.    On or about February 24, 2012, Bari assisted HMB with the creation of  Play

Makers at a time when Glick was insolvent and owed several million dollars to creditors.

202717816.1 45961/172896

407.    At the time Play Makers was incorporated, Glick and Awesome were in default under its loan obligations in excess of $1,000,000.00 with AEB, and Glick and Virtual were in default under its loan obligations with Franklin in excess of $600,000.00.

408.    In February, 2012, Bari negotiated and drafted a Factoring Agreement on behalf of Play Makers with BTM, which granted BTM a blanket lien on the assets of Play Makers, as a secured creditor in consideration for financing Play Makers' receivables.

409.    On or about February 24, 2012, Bari, drafted the non-exclusive license agreement between Awesome and Play Makers in which Play Makers was granted the right to manufacture, distribute, sell market, and promote Regener8rs.

410.    The Play Makers License is identical to the non-exclusive license agreement entered into previously between Awesome and Virtual and Glick Group, under which Awesome and Virtual sold Regener8rs.

411.    Like the previous license agreements, Play Makers was required to pay Awesome a recoupable minimum annual royalty of an amount equally to 50% of the aggregate royalty payments made in the immediate preceding year. Play Makers License, §3.2.

412.    In lieu of paying royalty payments to Awesome and subjecting the funds to attachment by Awesome's creditors, Glick, as manager of Play Makers, diverted the funds for payment to Marvel and BTM among others.

413.    Upon information and belief, Bari negotiated the Marvel License in which Play Makers became a licensee of certain character properties from Marvel Characters, B.V. for use on the Regener8rs. The Marvel License terminated on December 31, 2014.

202717816.1 45961/172896

414.   During the pending bankruptcy, Bari negotiated the renewal of the Marvel License and, on information and belief, extended the term of the Marvel License from January 1, 2015 through January 1, 2017, without the Trustee's authority.

415.   Play Makers had revenue in excess of $1.7 million dollars during the same year, the Debtor filed for bankruptcy.

416.   Play Makers is one of the 1999 Trust Entities and is property of the Debtor's Estate.

417.   At the time, Bari assisted with the creation of Play Makers for the purpose of selling and marketing Regener8rs pursuant to the Marvel License, Bari knew that the previous companies selling Regener8rs, Virtual and Awesome, were insolvent or in financial distress owing millions to its creditors.

418.   Bari knew that by negotiating and drafting the Play Makers License and negotiating for the Marvel License extension, Play Makers could continue selling Regener8rs and produce a profit, allowing Glick to benefit at the expense of his creditors as well as those of Virtual and Awesome.

419.   Play Makers was created with the intent to hinder, delay or defraud the Plaintiffs by transferring business opportunities and profits away from Virtual and Awesome to Play Makers.

420.   Bari, as both legal counsel and Chief Operating Officer of Glick Group played a vital role in the ongoing scheme to defraud creditors.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in their favor and against Bari Wood finding that Bari Wood aided and abetted the Debtor's fraudulent transfer and concealment

54

scheme, return the avoided transfers (or the value thereof) to the Trustee, together with such interest as legally owing with respect hereto, and granting further relief as may be just and proper under the circumstances.

## COUNT X

### (Bari Wood–Aiding and Abetting Scheme to Defraud (JCG 2012 Trust))

421.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 421.

422.    Bari acted as legal counsel to the 1999 Trust Entities, the JCG 2012 Trust and the JCG 2012 Trust Entities as well as Chief Operating Officer of the Glick Group.

423.    On or about February 4, 2012, Bari assisted HMB all attorneys with HMB, with the creation of the JCG 2012 Trust at a time when Glick and the 1999 Trust Entities were insolvent and owed several million dollars to creditors.

424.    Upon information and belief, Bari drafted or assisted with the preparation of the BTM loan documents with Madhouse, and the Administrative Service Agreements between the JCG 2012 Trust Entities and the Glick Group and BEG, respectively (collectively, "ASA").

425.    Bari knew that she was facilitating the business of Madhouse by drafting and or negotiating the loan documents and ASA and diverting business opportunities and monies to the JCG 2012 Trust Entities at a time when the Debtor and the JCG 1999 Trust Entities were in financial distress.

426.    Bari knew that at the time of these transactions, the Debtor, and the JCG 1999 Trust Entities would incur debts beyond the Debtor's ability to pay as the debts matured.

427.    Bari assisted the Debtor with forming the 2012 Trust Entities and the JCG 2012 Trust in order to transfer assets and business opportunities to a new intentionally defective

202717816.1 45961/172896

grantor trust at a time when Glick, individually, and the 1999 Trust Entities were in default to multiple creditors.

428.    The JCG 2012 Trust was created with the intent to hinder, delay or defraud the Plaintiffs by transferring business opportunities and profits away from the JCG 1999 Trust and the 1999 Trust Entities.

429.    Bari, as both legal counsel to the JCG 2012 Trust and 2012 Trust Entities as well as Chief Operating Officer of Glick Group, played a vital role in the ongoing scheme to defraud creditors.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests the entry of a judgment in their favor and against Bari Wood finding that Bari Wood aided and abetted the Debtor's fraudulent transfer and concealment scheme, return the avoided transfers (or the value thereof) to the Trustee, together with such interest as legally owing with respect hereto, and granting further relief as may be just and proper under the circumstances.

## COUNT XI

### (Bari Wood - Turnover of Property of the Estate 11 U.S.C.§ § 542 & 549)

430.    The Plaintiffs adopt and realleges paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 430.

431.    Since the Petition Date, Bari, on information and belief, received payments from Play Makers without authority from the Trustee.

432.    Play Makers is one of the 1999 Trust Entities.

433.    On information and belief, Bari may have received additional payments for legal and administrative fees from other 1999 Trust Entities.

202717816.1 45961/172896

434.    The payments received by Bari from the JCG 1999 Trust constitute property of the Debtor's bankruptcy estate.

435.    The Trustee did not provide authority for Play Makers to transfer funds to Bari.

436.    The Trustee did not provide authority for any of the 1999 Trust Entities to transfer payments to Bari.

437.    These payments are property of the Debtor's estate that the Trustee may use to pay creditors.

438.    Glick has refused to provide an accounting of all payments from the 1999 Trust Entities after the Petition Date despite repeated requests.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that Bari Wood be directed to immediately turnover the unauthorized post-petition payments she received from the any of the 1999 Trust Entities, or account for the value, pursuant to 11 U.S.C. §§542 and 549 and for such other and further relief as this Court deems appropriate.

## <u>COUNT  XII</u>

### (Factor Law - Turnover of Property of the Estate 11 U.S.C.§ §  542 & 549)

439.    The Plaintiffs adopt and realleges paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 439.

440.    Since the Petition Date, Factor Law received payments from Play Makers for attorneys' fees without authority from the Trustee.

441.    Play Makers is one of the 1999 Trust Entities.

442.    On information and belief, Factor Law may have received additional payments for legal fees from other 1999 Trust Entities.

202717816.1 45961/172896

443.    The payments received by Factor Law from the 1999 JCG Trust constitute property of the Debtor's bankruptcy estate.

444.    The Trustee did not provide authority for Play Makers to transfer funds to Factor Law.

445.    The Trustee did not provide authority for any of the 1999 Trust Entities to transfer payments to Factor Law.

446.    These payments are property of the Debtor's estate that the Trustee may use to pay creditors.

447.    Glick has refused to provide an accounting to the Trustee of all payments from the 1999 Trust Entities after the Petition Date despite repeated requests.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that the Law Offices of William J. Factor be directed to immediately turnover the unauthorized post-petition payments it received from any of the 1999 Trust Entities, or account for the value thereof, pursuant to 11 U.S.C. §§542 and 549 and for such other and further relief as this Court deems appropriate.

## COUNT XIII

### (Michelle Alilovich - Turnover of Property of the Estate 11 U.S.C.§ § 542 & 549)

448.    The Plaintiffs adopt and realleges paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 448.

449.    Since the Petition Date, Michelle, on information and belief, received payments from Play Makers without authority from the Trustee.

450.    Play Makers is one of the 1999 Trust Entities.

451.    On information and belief, Michelle may have received additional payments for legal fees from other 1999 Trust Entities.

58

452.    The payments received by Michelle from the JCG 1999 Trust constitute property of the Debtor's bankruptcy estate.

453.    The Trustee did not provide authority for Play Makers to transfer funds to Michelle.

454.    The Trustee did not provide authority for any of the 1999 Trust Entities to transfer payments to Michelle.

455.    These payments are property of the Debtor's estate that the Trustee may use to pay creditors.

456.    Glick has refused to provide an accounting of all payments from the 1999 Trust Entities after the Petition Date despite repeated requests.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that Michelle Alilovich be directed to immediately turnover the unauthorized post-petition payments she received from the any of the 1999 Trust Entities, or account for the value, pursuant to 11 U.S.C. §§542 and 549 and for such other and further relief as this Court deems appropriate.

## COUNT XIV

### (Theodore Allen Wolff - Turnover of Property of the Estate 11 U.S.C.§ § 542 & 549)

457.    The Plaintiffs adopt and realleges paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 457.

458.    Wolff received a payment from Glick in September 2013 in the amount of $1,000.00.

459.    The Trustee did not provide authority for Glick to pay Wolff.

460.    This payment is property of the Debtor's estate that the Trustee may use to pay creditors.

202717816.1 45961/172896

461.    Wolff may have received additional post-petition payments from Glick.

462.    Glick has refused to provide an accounting of all payments from him or the 1999 Trust Entities after the Petition Date despite repeated requests.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that Theodore Allen Wolff be directed to immediately turnover the unauthorized post-petition payments he received from Glick or any of the 1999 Trust Entities, or account for the value, pursuant to 11 U.S.C. §§542 and 549 and for such other and further relief as this Court deems appropriate.

## COUNT  XV

### (Jonathan Glick- Turnover of Property of the Estate 11 U.S.C.§§542 & 549)

463.    The Plaintiffs adopt and realleges paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 463.

464.    On information and belief, Glick has received multiple payments from the 1999 Trust Entities since the filing of the Chapter 7 Case.

465.    The Trustee did not provide authority for Glick to pay himself compensation or otherwise.

466.    These payments are property of the Debtor's estate that the Trustee may use to pay creditors.

467.    Glick has refused to provide an accounting of all payments made to Glick from the 1999 Trust Entities after the Petition Date.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that Jonathan Glick be directed to immediately turnover the unauthorized post-petition payments he received from Glick or any of the 1999 Trust Entities, or

60

account for the value, pursuant to 11 U.S.C. §§542 and 549 and for such other and further relief as this Court deems appropriate.

## COUNT XVI

### (Accounting – 1999 Trust Entities)

468.    The Plaintiffs adopt and reallege paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 468.

469.    Despite repeated requests, Glick has refused to provide an accounting to the Trustee of all payments from the 1999 Trust Entities after the Petition Date.

470.    The Trustee is entitled to an accounting because there is a need for discovery as to the amount in the estate, the transfers to and from the 1999 Trust Entities both prior to and after the filing of the Chapter 7 Case.

WHEREFORE, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that the Debtor provide an accounting of all cash flowing into and out of the 1999 Trust Entities since the filing of the Chapter 7 Case and for any further relief this Court finds just and equitable under the circumstances.

## COUNT XVII

### (BTM-Subordination of Lien 11 U.S.C, §510(c)(1))

471.    The Plaintiffs adopt and realleges paragraphs 1 through 329 as though fully set forth and incorporated herein as paragraph 471.

472.    Chapman, the manager of BTM, and the Debtor are friends.

473.    Upon information and belief, Chapman knew that Glick and his companies, Awesome and Virtual, were in debt and needed financing to perpetuate the sale of Regenr8rs and maintain the Marvel License.

61

474.    Instead of providing financing to Virtual or Awesome, the existing companies selling Regenr8rs, Chapman and Glick agreed to finance a new entity, Play Makers, to sell Regenr8rs. BTM, and Play Makers were incorporated on the same date: February 24, 2012.

475.    Both BTM and Play Makers were incorporated at the time when Glick, Awesome and Virtual were insolvent or in financial distress owing millions to creditors.

476.    By forming Play Makers to carry on the same business as Virtual and Awesome, sale of Regene8rs, the Debtor knew there would be insufficient assets to satisfy the debts of Virtual and Awesome and instead diverted the business assets and future profits to Play Makers.

477.    In February, 2012, BTM and Play Makers entered into a Factoring Agreement wherein BTM loaned Play Makers $350,000.00, and BTM took a security interest in all receivables.

478.    Upon information and belief, Chapman and/or BTM knew that the loan to Play Makers allowed the Debtor and Play Makers to continue the business of selling Regener8rs and to divert sales and profits from Virtual and Awesome to the detriment of creditors.

479.    On or about February 24, 2012, Awesome entered into a non-exclusive license agreement with Play Makers to sell Regener8rs and, at the same time, terminated the same non-exclusive license agreement with Virtual.

480.    The same factories that manufactured Regener8rs for Play Makers manufactured Regener8rs for the Glick Group, Virtual and Awesome.

481.    In lieu of paying Awesome royalties under the non-exclusive license agreement, the Debtor, as manager of both Awesome and Play Makers, determined unilaterally to divert

funds due Awesome to pay Awesome's debts to AEB, among others, to pay the factories manufacturing Regenr8rs on behalf of Play Makers.

482.    Upon information and belief, the factories would not continue to manufacture the Regenr8rs for Play Makers unless the debts incurred by Awesome were paid.

483.    In lieu of paying Awesome royalties under the non-exclusive license agreement, the Debtor, as manager of both Awesome and Play Makers, determined unilaterally to divert funds due Awesome to pay Awesome's debts to AEB, among others, to pay Marvel and BTM who were providing the licensing rights and financing to Play Makers to sell Regener8rs, the same toys that were previously being sold by Awesome.

484.    On information and belief, BTM has a control account agreement with Play Makers and in 2012, BTM paid Marvel directly for the Marvel License to insure the continued sale of the Regener8rs.

485.    Chapman, the managing member of BTM, is also the managing member of Barbie C, an Illinois limited liability company, formed on March 19, 2014.   Barbie C purchased the rights in and to the patent for the Regner8rs from AEB during the pendency of the Chapter 7 Case.

486.    Chapman is also the managing member of Optimum Fulfillment, an Illinois limited liability company, that packages and distributes the Regener8rs to the big box retailers including Costco and Meijer.

487.    Chapman, and/or one of his companies, is on every side of the Regener8rs transaction.  Chapman, individually, or through one of his companies, BTM and/or Optimum Fulfillment lent money to finance Play Makers, took a security interest in Play Makers and was

a customer of Play Makers in order for Play Makers to sell Regener8rs instead of Awesome or Virtual due to the mounting debts of both companies.

488.   The agreements between BTM and Play Makers are not arm's length transactions.

489.   The alignment of interest between BTM and Play Makers renders BTM a non-statutory insider.

490.   Based on the above described conduct, BTM participated in and/or aided and abetted the Debtor in the scheme to defraud the creditors of Virtual, Awesome and Glick.

491.   BTM's is guilty of misconduct and should not be allowed to retain an unfair advantage at the expense of the Plaintiffs and other creditors.

492.   Pursuant to Section 510(c)(1), BTM's lien on the receivables of Play Makers should be subordinated to the interests of the Trustee on the basis that BTM participated in the scheme to defraud the creditors of Virtual, Awesome, and Glick.

Wherefore, the Trustee, not individually but solely in his capacity of the bankruptcy estate of Jonathan Glick, requests that the lien of BTM be equitably subordinated to the interest of the Trustee and for any further relief this Court finds just and equitable under the circumstances.

Respectfully submitted,

John Gierum, not individually but as trustee of the bankruptcy estate of Jonathan Glick

By _/s/ Scott N. Schreiber_____
      His special counsel

Scott N. Schreiber, Esq. (#6191042)
Pamela J. Leichtling, Esq. (#6183213)
Clark Hill PLC

202717816.1 45961/172896

150 N. Michigan Avenue, #2700
Chicago, Illinois 60601
(312) 985-5902


By:    /s/ Michelle G. Novick
          His special counsel

Michael L. Gesas, Esq. (#06186924)
Michelle G. Novick, Esq. (#06207045)
ARNSTEIN & LEHR LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Tel: (312) 876-7100




By:    /s/ Joel A. Stein
          His special counsel

Joel A. Stein, Esq. (#3122304)
Brian D. Saucier, Esq. (#6226006)
Deutsch Levy & Engel Chartered
225 W. Washington St., Ste. 1700
Chicago, IL 60606
(312) 853-8456

65