## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| JONATHAN F. GLICK, | ) | No. 13 B 20989 |
| | ) | |
| Debtor. | ) | |
| ———————————————————— | ) | |
| | ) | |
| JOHN GIERUM, not individually but as trustee | ) | |
| of the bankruptcy estate of Jonathan F. Glick, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 A 324 |
| | ) | |
| JONATHAN GLICK; JCG 2012 TRUST | ) | |
| dated February 4, 2012; NANCY GLICK, | ) | |
| trustee of the JCG 2012 Trust; LAWRENCE | ) | |
| GLICK, predecessor trustee of the JCG 2012 | ) | |
| Trust; BARI WOOD; MICHELLE | ) | |
| ALILOVICH; THEODORE ALLEN WOLFF; | ) | |
| BTM, LLC, an Illinois limited liability | ) | |
| company; ROBERT CHAPMAN; OPTIMUM | ) | |
| FULFILLMENT, LLC, an Illinois limited | ) | |
| liability company; HORWOOD, MARCUS | ) | |
| & BERK, CHARTERED, an Illinois | ) | |
| corporation; HAL J. WOOD, JEFFREY A. | ) | |
| HECHTMAN, and KENNETH A. | ) | |
| GOLDSTEIN, as agents of Horwood, | ) | |
| Marcus & Berk; and THE LAW OFFICE OF | ) | |
| WILLIAM J. FACTOR, LTD., | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## <u>MEMORANDUM OPINION</u>

Jonathan Glick is an entrepreneur. In the early 2000s, Glick did business in the children's

toy and consumer goods industries through a complex web of limited liability companies and

partnerships. A trust established in 1999 was the ultimate owner of these entities, but practically

speaking Glick ran them all.  One of Glick's principal products was a toy car in which a Glick company, Awesome Toys, LLC, held the patent rights.  Awesome Toys licensed several other Glick companies to sell the toy car.

Working capital was necessary to run this enterprise, and different Glick businesses borrowed money from different lenders on a secured basis.  Glick guaranteed all the loans.  Eventually, though, the businesses ran into trouble and defaulted.  The lenders accommodated Glick for a time but ultimately sued the businesses and Glick.

During these financial troubles, Glick had his lawyers establish a new trust and new companies, some owned by the new trust and some by the old.  Most of the new companies sold consumer goods like facial masks and jewelry, but one of them, Play Makers Group, sold the toy car, and Awesome Toys licensed Play Makers to sell it.

Meanwhile, the lenders obtained judgments in their actions against Glick and began enforcing them.  (One of the lenders even seized and sold the patent rights to the toy car.)  Faced with the judgments, Glick filed this chapter 7 case in 2013.  John Gierum was appointed trustee, and in 2015 he filed this adversary proceeding.

In his complaint, Gierum asserts that the Glick businesses were a sham, simply alter egos of Glick himself.  Gierum alleges that the issuance of the license to Play Makers was a fraudulent pre-petition transfer, as were several other transfers, and that Glick also made unauthorized post-petition transfers.  According to Gierum, Glick perpetrated these transfers through his lawyers, his business associates, even his parents, all to the detriment of his creditors.

With twenty-three counts directed at fifteen defendants, the amended complaint is a massive tome:  667 paragraphs of allegations spread over 91 pages, plus nearly 500 pages of

exhibits. Gierum ultimately asks for the many Glick companies and the two trusts to be declared

Glick's alter egos and ordered to turn over their assets. Alternatively, Gierum asks to avoid the

transfers (pre- and post-petition) and recover the transferred assets. He also requests damages

against Glick's lawyers, business associates, and parents for aiding and abetting the transfers.

And he wants an order requiring an accounting from some of the Glick companies as well as an

order subordinating a claim based on a loan to one of them.

Fourteen of the fifteen defendants have moved to dismiss twenty-two of the twenty-three

counts in the amended complaint. The motions seek dismissal under Rules 12(b)(1) and 12(b)(6)

of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (made applicable

by Fed. R. Bank. P. 7012(b)), for lack of jurisdiction and failure to state a claim. For the reasons

set forth below, the motions will be granted in part and denied in part. All but two of the claims

will be dismissed with prejudice.

## I. Facts

On a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations in the

complaint are taken as true, and all reasonable inferences are drawn in favor of the non-movant.

*Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015). (The same is true under Rule 12(b)(1).

*Id.*). In addition to the allegations, the court considers facts evident from exhibits attached to the

complaint, *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639-40 (7th Cir. 2015); Fed. R.

Civ. P. 10(c) (made applicable by Fed. R. Bank. P. 7010), as well as facts alleged for the first

time in a response to a dismissal motion, provided they are consistent with the complaint,

*Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012), and do not concern fraud,

*United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016).

-3-

The facts come from Gierum's sprawling amended complaint and its exhibits. Even greatly distilled, these facts make for an unsatisfying narrative, dull and difficult to follow. That cannot be helped, given the complexity of Glick's affairs, the detail necessary to address Gierum's legal theories, and the carelessness with which the amended complaint was drafted.

### A.  The JCG 1999 Trust

The story, such as it is, begins in 1999, when Glick established the JCG 1999 Trust (the "JCG 1999 Trust"). (Am. Compl. ¶¶ 33, 363, Ex. 2). Glick was the settlor and is also trustee. (Am. Compl. ¶ 363, Ex. 2 at 1). If he is unable or declines to act as trustee, his wife, Stacey Glick, and the Northern Trust Company become co-trustees. (*Id.* Ex. 2 at 48 & amend. dated Dec. 6, 2001, at 3). The JCG 1999 Trust was created "with the intent to shelter assets as a wealth management and estate planning strategy"; the goal was to benefit Glick's two sons by "provid[ing] a future business" for them. (Am. Compl. ¶ 366; *see also id.* ¶ 332, 335-36).

Under the trust declaration, Glick is entitled during his life to use income and principal of the trust estate as he deems necessary. (Am. Compl. Ex. 2 at 2, 4-5). In fact, the trustee is obligated in making distributions to use his discretionary powers "primarily to benefit the beneficiary [Glick] rather than the remaindermen [Stacey and any Glick children]." (*Id.* Ex. 2 at 28). If there is more than one beneficiary, however, the trustee can make distributions in "such equal or unequal proportions" as he sees fit considering "the standard of living to which [the] beneficiary shall have become accustomed to at the time of [Glick's] death." (*Id.*). The "best interests" of a beneficiary "include any educational, business or personal endeavor" the trustee deems to be in the beneficiary's best interest. (*Id.* at 29).

On Glick's death (and assuming Stacey survives him), the trust estate is divided into a

-4-

marital trust and a family trust. (*Id.* at 8-9). The marital and family trusts are then each divided into two other trusts. (*Id.* at 10, 21). Income from the two family trusts is paid to Stacey during her life, and on her death separate trusts are created for each Glick child. (*Id.* at 11, 13, 17). Income from the two marital trusts is also paid to Stacey during her life. (*Id.* at 24-25). On her death, the assets of one of the marital trusts are used to fund one of the family trusts. (*Id.* at 25). The other marital trust is divided into equal shares for each Glick child. (*Id.* at 26).

During his life, Glick has the power to amend or revoke the JCG 1999 Trust in his discretion. (Am. Compl. ¶ 363, Ex. 2 at 1). If the trust is revoked, trust property reverts to him. (*Id.* Ex. 2 at 1-2). The declaration provides that Illinois law governs the JCG 1999 Trust's validity and interpretation. (*Id.* Ex. 2 at 51).

## B. The JCG 1999 Trust Property

According to the trust declaration, Glick "transferr[ed], assign[ed], and set[] over to himself as trustee" (i) the property described in schedule A attached to the JCG 1999 Trust, and (ii) the life insurance policies described in schedule B. (*Id.* at 1). The copies of schedules A and B attached to the amended complaint, however, do not list any property or policies, and Gierum alleges that the JCG 1999 Trust "had no assets at its inception." (Am. Compl. ¶ 367).

But according to Gierum, the JCG 1999 Trust eventually came to hold significant interests in property. On dates Gierum does not specify and in ways he does not describe, interests in thirty-three limited liability companies allegedly became, directly or indirectly, part of the JCG 1999 Trust estate. (*Id.* ¶ 367). One of those companies – of some importance here – was JZ Enterprises Limited Partnership ("JZ Enterprises LP"), a Delaware limited partnership. (*See* Pl. Resp. at 4). Another was JC Illinois Ventures Limited Partnership ("JC Illinois Ventures

LP"), an Illinois limited partnership. (Am. Compl. ¶ 32).

The JCG 1999 Trust owns 99 percent of JZ Enterprises LP. (*Id.* ¶ 377). The other one

percent is owned by JZ Enterprises GP, Inc. ("JZ Enterprises GP"), a Delaware corporation,

which in turn is owned by the JCG 1999 Trust and Glick's sons' "individual trusts, the Zachary

Glick Trust and the Chase Glick Trust."[1/] (*Id.* ¶ 379, 399).[2/]

JZ Enterprises LP is the sole member (and so the sole owner) of three limited liability

companies: The Glick Group ("Glick Group"), an Illinois LCC; Play Makers Group ("Play

Makers"); and Awesome! Group LLC. (*Id.* ¶¶ 92, 387; Ex. 30). Awesome! Group LLC in turn

owns 100 percent of Awesome Toys, LLC ("Awesome Toys"). (*Id.* ¶ 387). JZ Enterprises LP

also has an indirect interest in two other LLCs: Virtual Experience, LLC ("Virtual"), and

Excitement LLC ("Excitement"). (*Id.* Ex. 1).

Glick was the manager of Glick Group, Play Makers, Awesome! Group LLC, Awesome

Toys, Virtual, and Excitement, and he had sole decision-making authority for each of them. (*Id.*

¶¶ 34, 69, 388). Bari Wood ("Bari") was chief operating officer of Glick Group and acted as its

---

[1/]    The amended complaint describes the ownership of JZ Enterprises GP inconsistently. Sometimes Glick himself is an owner. (*See* Am. Compl. ¶ 379). Other times the JCG 1999 Trust is an owner. (*See id.* 399). Similarly, Glick's sons are sometimes owners (*see id.* ¶ 32), and other times the sons' trusts are owners (*see id.* ¶¶ 379, 399). The organizational chart attached as an exhibit to the amended complaint shows the JCG 1999 Trust and the sons' trusts as joint owners. (*Id.* Ex. 1 (copy appended to this opinion)). When exhibits to a complaint contradict the complaint's allegations, the exhibits govern. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

[2/]    Gierum does not allege JZ Enterprises GP's state of incorporation, but he implies in his response that the company is a Delaware corporation. (*See* Pl. Resp. at 40). Information on the web site of the Delaware Department of State, Division of Corporations, confirms as much. *See* https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx. The court can take judicial notice of information on government web sites. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

legal counsel.  (*Id.* ¶ 556).

## C. The Toy Car Licenses and Marvel Licenses

In 2003, the inventors of a small, reconfigurable toy car known as a "Regener8r" assigned their right, title, and interest in the toy car and a related United States patent application to Awesome Toys.  (*Id.* ¶ 70).  In exchange, Awesome Toys agreed to pay the inventors royalties based on certain percentages of national and international sales.  (*Id.* ¶ 72).

At some point that Gierum does not allege, Awesome Toys granted to Excitement a non-exclusive license to manufacture and sell the toy car.  (*Id.* ¶ 75).  In January 2011 Awesome Toys granted the same non-exclusive license to Virtual (the "Awesome Toys/Virtual License").  (*Id.* ¶ 78, Ex. 19).

Under the Awesome Toys/Virtual License, Virtual received the perpetual "worldwide, non-exclusive right to manufacture, distribute, sell, advertise, identify and promote [the toy car] incorporating one or more additional characters or properties licensed to Virtual by a third party." (*Id.* ¶¶ 80, 81).  Virtual in turn agreed to pay Awesome Toys a royalty based on a percentage of net sales.  (*Id.* ¶ 82).  The Awesome Toys/Virtual License allowed the parties to "terminate" the license agreement "by mutual written consent at any time." (Am. Compl. Ex. 19 at 4).

That same month, Awesome Toys granted to Glick Group a second non-exclusive license involving the toy car (the "Awesome Toys/Glick Group License").  (*Id.* ¶ 94, Ex. 20).  Glick Group received the same perpetual rights to the toy car that Virtual had received.  (*Id.* ¶¶ 96-97).  In return Glick Group agreed to pay royalties based on the same percentage of net sales.  (*Id.* ¶ 98).  The license also allowed the parties to terminate the agreement by mutual consent.  (*Id.* Ex. 20 at 4).  Glick Group sold the toy car to essentially the same customers as Virtual.  (*Id.* ¶ 105).

-7-

In July 2010, August 2011, and December 2011, Virtual and Glick Group entered into separate license agreements with Marvel Characters, B.V., Marvel Characters, L.P., and Spider-Man Merchandising, L.P. (collectively "Marvel"). (*Id.* ¶¶ 86-88, 103-04). Under the Marvel licenses, Virtual and Glick Group were permitted to incorporate in the design of the toy car popular superhero comic-book characters like "Spiderman." (*Id.* ¶¶ 88, 104).

### D. Awesome Toys, Excitement, and Virtual's Secured Debt

In January 2008, American Enterprise Bank ("AEB") had entered into a loan and security agreement with Awesome Toys and Excitement under which the two companies borrowed $800,000. (*Id.* ¶ 40). Repayment was secured by a first priority security interest "in and to any and all" of Awesome Toys' property, including "[a]ll Accounts . . . whose sale, lease, or other disposition by [Awesome Toys] has given rise to Accounts" and all proceeds of the pledged property. (*Id.* Ex. 4 at 19). Awesome Toys and Excitement promised to repay the loan in a year (*id.* ¶¶ 40-41), but the parties later amended the loan agreement a number of times to increase the amounts borrowed and extend the maturity date (*id.* ¶ 42). Glick personally guaranteed the obligations of Awesome Toys and Excitement to AEB. (*Id.* ¶ 44).

To enable it to do business, Virtual obtained funding from two other sources, Franklin Capital ("Franklin") and Glen Eagle Partners, Ltd. ("Glen Eagle"). In July 2009, Virtual entered into a factoring agreement with Franklin under which Franklin advanced funds in exchange for the assignment of Virtual's future accounts receivable from its toy sales. (*Id.* ¶ 50). Virtual executed a note to Glen Eagle in exchange for a loan in the principal amount of $1 million with interest payable in twenty-four monthly installments. (*Id.* ¶¶ 61, 64, Ex. 15). Glick guaranteed the note to Glen Eagle. (*Id.* ¶¶ 62-63).

-8-

In 2011, Awesome Toys' and Excitement's relationship with AEB began to sour. For reasons Gierum does not explain, Awesome Toys and Excitement stopped making payments to AEB. The two companies entered into a forbearance agreement with AEB, but they quickly defaulted when, among other things, they failed to pay off the loan before December 1, 2011. (*Id.* ¶ 43).

Two months after the default, AEB demanded that Awesome Toys, Excitement, and Glick (as guarantor) pay the outstanding loan amount of $1,287,339.26 plus interest. (*Id.* ¶ 46). When they did not, AEB filed a complaint on March 2, 2012, in the Circuit Court of Cook County, Illinois, for breach of the loan agreement and guaranty. (*Id.* ¶ 47). On September 28, 2013, the state court entered a judgment in favor of AEB and against Awesome Toys and Excitement for $1,354,928.51. (*Id.* ¶ 48).[3/]

Meanwhile, Virtual had defaulted under its factoring agreement with Franklin in December 2010. (*Id.* ¶ 52). In an apparent attempt to salvage the situation, Glick and Bari met with Franklin on February 24, 2011. (*Id.* ¶ 53). Glick offered to grant Franklin a second mortgage on his residence to secure repayment the more than $400,000 in outstanding debt. (*Id.*). Franklin accepted the offer, and the factoring agreement was amended. (*Id.* ¶ 55). The amendment called for Virtual's execution of a $495,260 term note guaranteed by Glick and Glick Group and secured by a second mortgage on the residence. (*Id.*). To no avail. Virtual defaulted under the term note in August 2011. (*Id.* ¶ 56).

In early 2012, Glick threatened that if Franklin did not provide Virtual with additional financing, he would simply start a new company to sell the toy car. (*Id.* ¶ 438; Pl. Resp. at 28).

---

[3/]    No judgment was entered against Glick presumably because he had filed bankruptcy in May 2013.

Franklin refused and on December 14, 2012, sued Virtual, Glick, and Glick Group in the Circuit

Court of Cook County for breach of the note and guaranty. (*Id.* ¶ 58). A little over a year later,

the court entered judgment in favor of Franklin and against Virtual for $456,221.02 and against

Glick and Glick Group for $466,320.76. (*Id.* ¶ 59).

Virtual had no more success with the Glen Eagle loan. Only nine interest payments were

made, prompting Glen Eagle to sue Virtual and Glick in the Circuit Court of Cook County on

November 26, 2012. (*Id.* ¶¶ 63-66). In January 2014, the state court entered judgment in favor

of Glen Eagle and against Virtual for $1,227,459.65. (*Id.* ¶ 67).[4/]

### E.  Awesome Toy's Termination of the Awesome Toys/ Virtual License and Grant of a License to Play Makers

On February 24, 2012, while Awesome Toys, Excitement, and Virtual were in default to

their lenders, Glick made some changes in the toy car licensing arrangements among his

companies. He had Awesome Toys terminate the non-exclusive license with Virtual, deeming

paid in full all royalties Virtual owed. (*Id.* ¶ 89). With the assistance of lawyers at Horwood,

Marcus & Berk Chartered ("HMB"), Glick formed Play Makers, a Delaware limited liability

company. (*Id.* ¶¶ 106, 548, 551). Glick then had Awesome Toys enter into a license agreement

with Play Makers (the "Awesome Toys/Play Makers license") substantially similar to the

Awesome Toys/Virtual license, giving Play Makers the same rights in the toy car that Virtual

had. (*Id.* ¶¶ 108, 110-111). Awesome Toys' royalty arrangement with Play Makers was also the

---

[4/]      No judgment was entered against Glick, again because of his pending bankruptcy
case.

same. (*Id.* ¶ 112).[5/]

About a month later, Glick and Bari negotiated a license agreement between Play Makers and Marvel, allowing Play Makers to use the Marvel superhero characters in the toy car's design (the "Play Makers/Marvel License"). (*Id.* ¶¶ 116, 566). The Play Makers/Marvel License had a termination date of December 31, 2014, but was later extended to January 1, 2017. (*Id.* ¶¶ 119-120).

The toy car was a success for Play Makers: in 2013, the company had revenues in excess of $1.7 million. (*Id.* ¶ 123).

### F. Play Makers' Funding from BTM

Unsurprisingly, Play Makers did not approach AEB, Franklin, or Glen Eagle for working capital. Play Makers instead obtained secured loans from BTM, LLC ("BTM"). (*Id.* ¶ 164). Glick's friend, Robert Chapman, was BTM's managing member. (*Id.* ¶ 160). BTM was formed on February 24, 2012, the same day the Awesome Toys/Virtual License was terminated, Play Makers was formed, and Awesome Toys issued the Awesome Toys/Play Makers license. (*Id.* ¶¶ 89, 106, 108, 126).

Less than a month later, Play Makers and BTM entered into a factoring agreement under which Play Makers "assigned and sold" its accounts receivable (with certain exceptions) to BTM (the "BTM Factoring Agreement"). (*Id.* ¶ 135, Ex. 24 at 5). Glick, Glick Group, and JZ Enterprises LP, each guaranteed Play Makers' obligations under the factoring agreement. (*Id.* ¶

---

[5/]      Although the Awesome Toys/Virtual license was terminated, it appears the Awesome Toys/Glick Group license was not – at least, Gierum does not allege that it was. Nor does Gierum allege that the Awesome Toys license to Excitement was terminated. The only change, then, was the termination of one non-exclusive license and the entry into another.

140).

Play Makers and JZ Enterprises, LP also entered into an equity rights agreement with

BTM. (*Id.* ¶ 141). Under that agreement, BTM was given the option to purchase up to 49

percent of JZ Enterprises LP's interests in Play Makers for $1,078,000. (*Id.* ¶¶ 142-143).

On March 19, 2012, Play Makers executed a $350,000 promissory note in favor of BTM

due December 31, 2012 (the "BTM Note"). (*Id.* ¶ 148). The BTM Note provided that it would

be paid from sums BTM retained under the BTM Factoring Agreement. (*Id.* ¶ 150). BTM and

Play Makers agreed that BTM would disburse $195,000 of the BTM Note to pay amounts due

Marvel. (*Id.* ¶ 152). The BTM Note was secured by all of Play Makers' property except the

receivables that had not been assigned. (*Id.* ¶ 153).

### G.  Optimum Fulfilment and Barbie C LLC

Chapman is the managing member of two other Illinois LLCs: Optimum Fulfilment

("Optimum") and Barbie C ("Barbie C"). (*Id.* ¶¶ 162, 539). Optimum packages and distributes

the toy car to retailers like Costco and Meijer. (*Id.* ¶¶ 162, 540). Barbie C was formed in March

2014 and, as explained below, currently holds the patent rights for the toy car. (*Id.* ¶¶ 160-61).

### H.  Administrative Services Agreements

The relationships among the Glick entities extended beyond the patent licenses. Glick

Group also had administrative services agreements with Awesome Toys, Play Makers, and

Bannockburn Entertainment Group ("BEG"), an Illinois LLC that Glick formed in 2012. (*Id.* ¶ 3,

270).

### 1. Glick Group/Awesome Toys

Around January 1, 2010, Glick Group entered into an administrative services agreement with Awesome Toys (the "Awesome Toys ASA"). (*Id.* ¶¶ 171-72). Under the Awesome Toys ASA, Glick Group agreed to provide Awesome Toys with services such as cash management, tax compliance, and information technology services. (*Id.* ¶ 175). In exchange, Awesome Toys agreed to pay Glick Group a management service fee equal to 105 percent of Glick Group's costs, including salaries and employee benefits, overhead, and the like. (*Id.* ¶ 176). Glick Group retained the right to provide these same services to any other person or entity. (*Id.* ¶ 178).

The Awesome Toys ASA had a one-year renewable term and is still in effect. (*Id.* ¶¶ 173-74).

### 2. Glick Group/Play Makers

On February 4, 2012, Glick Group entered into an administrative services agreement with Play Makers (the "Play Makers ASA"). (*Id.* ¶ 181). Under the Play Makers ASA, Glick Group agreed to provide the same services to Play Makers that it provides to Awesome Toys. (*Id.* ¶ 184). The fee arrangement was also the same: 105 percent of Glick Group's costs. (*Id.* ¶ 185). The arrangement was exclusive, but the exclusivity ran in one direction. Play Makers agreed to retain Glick Group alone to render the specified services; Glick Group, on the other hand, had the right to provide services to others. (*Id.* ¶ 186).

The Play Makers ASA had a one-year term, with automatic annual renewals. (*Id.* ¶ 182). It, too, is currently in effect, and Glick Group continues to receive payments from Play Makers under it. (*Id.* ¶¶ 183, 188).

### 3. Glick Group/BEG

Around September 1, 2012, Glick Group entered into an administrative services agreement with BEG (the "BEG ASA"). (*Id.* ¶ 190). Bari drafted the BEG ASA. (*Id.* ¶ 198). Under it, Glick Group agreed to conduct BEG's day-to-day operations, negotiate insurance policies, render leasing services and provide "such [other] services as may be reasonably requested." (*Id.* ¶ 193). In exchange, BEG agreed to pay Glick Group a $10,000 monthly management service fee as long as the two companies shared office space. (*Id.* ¶ 194). If BEG moved to different space, the fee would be reduced to $7,600 per month. (*Id.*).

The term of the BEG ASA was one year with automatic one-year renewals. (*Id.* ¶ 191). It is still in effect, and Glick Group continues to receive payments from BEG. (*Id.* ¶¶ 192, 200).

### I. The JCG 2012 Trust and JCG 2012 Trust Entities

On February 4, 2012 – around the time Play Makers was formed and while Awesome Toys, Excitement, and Virtual were in default to their lenders – Glick formed a new trust, the JCG 2012 Trust ("the JCG 2012 Trust"), with the assistance of Bari and HMB. (*Id.* ¶¶ 15, 334, 347, 558). Glick was the settlor. (*Id.* Ex. 2 at 1). Glick's wife, Stacey, and his "descendants" are the beneficiaries. (*Id.* ¶ 227; Ex. 2 at 2). Glick's father, Lawrence Glick ("Larry"), was the initial trustee of the JCG 2012 Trust, but in April 2013 Glick's mother, Nancy Glick ("Nancy"), succeeded him and is the current trustee. (*Id.* ¶¶ 16, 17).

Under the JCG 2012 Trust declaration, the trustee has discretion to distribute net income and principal to the beneficiaries, as long as the distributions are in the beneficiaries' best interest. (*Id.* Ex. 2 at 2). Unlike the trustee of the JCG 1999 Trust, the trustee of the JCG 2012 Trust cannot distribute net income or principal to support Glick or to satisfy any of his

-14-

obligations. (*Id.*).

On Glick's death, any remaining trust assets are retained in a family trust for the benefit of Stacey and Glick's descendants. (*Id.*). The trustee has discretion to distribute net income and principal of the family trust to the beneficiaries, as long as the distributions are in their best interest. (*Id.* at 2-3). On Stacey's death (or on the first date when Glick has no living child under age twenty-two, whichever occurs first), the trustee is required to distribute the remaining assets of the family trust *per stirpes* to Glick's descendants. (*Id.* at 3).

Unlike the JCG 1999 Trust, the JCG 2012 trust is irrevocable. (*Id.* at 1). The declaration provides that Illinois law governs the JCG 2012 Trust's validity and interpretation. (*Id.* at 32).

The JCG 2012 Trust owns, directly or indirectly, interests in several Glick entities, including BEG, Visionaries, LLC ("Visionaries"), Telegraph Partners, Inc. ("Telegraph"), and Madhouse, LLC ("Madhouse"). (Am. Compl. ¶¶ 3, 206, Ex. 3). Telegraph is an Illinois corporation. (*Id.* ¶ 3). Madhouse and Visionaries are Delaware corporations formed with the assistance of Jeffrey Hechtman ("Hechtman"), an HMB partner, on November 7, 2011. (*Id.* ¶ 308). BEG, an Illinois LLC, was set up as a holding company for Madhouse and Visionaries and holds 100 percent of each. (*Id.* ¶¶ 3, 280, 463, 465). Another of Glick's friends, Eric Ashworth, capitalized BEG with $600,000, which "was put into the company as $300,000 in debt and $300,000 in equity." (*Id.* ¶ 271). Ashworth owns eight percent of BEG; the JCG 2012 Trust owns the remaining 92 percent. (*Id.* ¶¶ 206, 271).

Madhouse develops and distributes consumer goods: spa facial masks, eye masks, and jewelry. (*Id.* ¶ 310). Its customers are "big box" retailers like Kmart. (*Id.* ¶ 311). Visionaries is "a branding, marketing, and sales management company for third parties." (*Id.* ¶ 319). Glick

served as manager of Visionaries, Madhouse, and Telegraph. (*Id.* ¶¶ 235, 309). He exercised

sole decision-making authority for all three. (*Id.* ¶¶ 267, 309).

Although Nancy has been trustee of the JCG 2012 Trust since 2013, she knows little

about what Gierum calls its "operations" or the operations of Visionaries, BEG, Telegraph, and

Madhouse. (*Id.* ¶ 214). For example, Glick and Larry received shareholder loans from

Telegraph, but she does not know why. (*Id.* ¶¶ 216, 218). Nor can she recall how much financial

support the JCG 2012 Trust provided to Stacey or the Glick sons in 2014. (*Id.* ¶¶ 230-32).

### J. The Bankruptcy Case and Post-petition Events

On May 18, 2013. Glick filed a petition for relief under chapter 7 of the Bankruptcy Code

(the "petition date"). (*Id.* ¶ 14). Gierum was appointed trustee of Glick's bankruptcy estate.

### 1. Post-petition Payments

After the petition date, Play Makers made payments to Glick's bankruptcy lawyer,

William Factor ("Factor"), as well as to Bari, Glick's office assistant, Michelle Alilovich

("Alilovich"), and Glick himself. (*Id.* ¶¶ 350-52, 606, 615, 624). Play Makers paid Factor for

legal services he provided to Glick. (*Id.* ¶¶ 615, 617). Play Makers paid Bari for legal services

she provided to Play Makers. (*Id.* ¶¶ 606, 608). Play Makers paid Alilovich (*id.* ¶¶ 624, 626),

but it is unclear why.[6] Play Makers also made several post-petition payments for Glick's benefit

(for example, when Play Makers made the lease payments on his car). (*Id.* ¶ 354).

---

[6]        Gierum alleges the payments were for legal services (*id.* ¶¶ 624, 626), but he does
not allege that Alilovich was a lawyer, and the website of the Illinois Attorney Registration &
Disciplinary Commission (www.iardc.org, select "Lawyer Search") does not list her as having
ever been admitted to practice law in Illinois. (The court can take judicial notice of information
on the web site. *Denius*, 330 F.3d at 926.) Gierum describes her as "Glick's long-time
assistant." (Am. Compl. ¶¶ 23, 352).

-16-

After the petition date, Glick made a post-petition payment to Theodore Allen Wolff ("Wolff"), his former accountant. (*Id.* ¶¶ 24, 633).

## 2. AEB's Post-petition Actions

About two months after the petition date, AEB conducted a UCC sale of the collateral securing its loan to Awesome Toys in accordance with section 9-610 of the Illinois Commercial Code, 810 ILCS 5/9-610 (2014). AEB was the successful bidder at the sale and purchased the patent rights in the toy car for an undisclosed amount. In early 2014, AEB sold those rights, again for an undisclosed amount, and assigned them to Barbie C. (*Id.* ¶¶ 161, 539, 660).[2]

## K. The Adversary Proceeding

### 1. Original Complaint

On May 15, 2015, Gierum commenced this adversary proceeding, filing a seventeen-count complaint against fifteen defendants: Glick, the JCG 2012 Trust, Nancy, Larry, Bari, Alilovich, Wolff, BTM, Chapman, Optimum, HMB, Hal, Hechtman, Kenneth A. Goldstein ("Goldstein," a third HMB partner), and Factor. Among other relief, the original complaint sought to avoid the "transfers of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust" as fraudulent under sections 544 or 548 of the Bankruptcy Code. (*See* Dkt. No. 1 at 41-45). The original complaint also sought damages from ten of the defendants for allegedly aiding and abetting the fraudulent transfers. (*Id.* at 45-56).

Several defendants moved to dismiss, arguing that Gierum had failed to state fraudulent

---

[2]    Gierum somehow neglects to allege that AEB acquired the patent rights and then assigned them. Information about the acquisition and assignment is available on the web site of the U.S. Patent and Trademark Office, http://www.uspto.gov/patent. The court can take judicial notice of information on the web site. *See Denius*, 330 F.3d at 926.

transfer claims because he had sought to avoid transfers of property not belonging to Glick or his estate. *See Fowler v. Shadel*, 400 F.3d 1016, 1019 (7th Cir. 2005) (noting that assets of a corporation the debtor owns are neither his assets nor assets of his bankruptcy estate). Gierum apparently recognized the problem. Rather than contest the motions, he asked for and received leave to amend.

## 2. Amended Complaint

In his amended complaint, Gierum seeks to get around the deficiency of its predecessor with several corporate veil-piercing theories. Gierum alleges that the many Glick entities (the LLCs, partnerships, and trusts) are simply Glick's alter egos. According to Gierum, the activities of these entities are also so saturated with fraud that their separate existences should be ignored to prevent injustice to Glick's creditors.

Gierum employs his veil-piercing theories in two ways. First, he invokes the theory to set up turnover claims. Because the Glick entities are all really Glick, Gierum asserts, their assets are all really assets of Glick's estate and must be turned over. Second, Gierum invokes the theories to set up avoidance claims. Because the Glick entities are really Glick, Gierum says, transfers they made should be treated as Glick's transfers. Transfers made pre-petition should be avoided as fraudulent; transfers made post-petition should be undone because neither the Code nor the court authorized them.

But Gierum does not stop there. He wants damages from Larry, Nancy, HMB, the three HMB partners, Bari, Chapman, Optimum, and BTM for aiding and abetting the alleged fraudulent transfers. He wants Glick to provide an accounting of transfers involving two entities that the JCG 1999 Trust owned, both allegedly Glick's alter egos. And he wants BTM's secured

-18-

claim subordinated to the claims against Glick on the ground that BTM's claim stems from a loan crucial to what Gierum believes was Glick's fraudulent scheme.

Named as defendants are the same fifteen defendants in the original complaint. The number of counts, however, has ballooned from seventeen to twenty-three. Twenty-one of the twenty-three counts fall into four major groups.

• Counts I-VI are the "alter ego/piercing the corporate veil" claims.[8]

• Counts VII-X are the fraudulent transfer claims: Counts VII and VIII allege actual and constructive fraud under section 548 of the Code, and Counts IX and X allege actual and constructive fraud under section 544 of the Code and relevant provisions of the Illinois Uniform Fraudulent Transfer Act (the "IUFTA").[9]

• Counts XI-XVI are the aiding and abetting claims.[10]

• Counts XVII-XXI are the claims to avoid the post-petition transfers.[11]

The remaining two counts stand alone. Count XXII is the accounting claim. Count XXIII is the subordination claim.

All of the defendants but Wolff have moved to dismiss the counts directed at them.

---

[8]    The headings of the counts suggest that each count is directed at a specific Glick entity. Count I, for example, is headed: "JCG 1999 Trust." As discussed below, however, the actual substance of these counts shows matters are not nearly so straightforward.

[9]    The headings of the fraudulent transfer counts suggest that each count involves only the "JCG 2012 Trust." But as with the alter ego/piercing counts, matters are not so simple.

[10]    The defendants in these counts are Larry (Count XI); Nancy (Count XII); BTM, Chapman, and Optimum (Count XIII); HMB and the three HMB partners (Count XIV); and Bari (Counts XV and XVI).

[11]    The defendants in these counts are Bari (Count XVII), Factor (XVIII); Alilovich (Count XIX); Wolff (Count XX); and Glick (Count XXI).

(Wolff has neither answered nor moved to dismiss and is in default.) Glick, the JCG 2012 Trust,

Nancy, Alilovich, and Factor (collectively the "Glick defendants") have moved to dismiss Counts

I-X, XII, XVIII, XIX, XXI and XXII under Rule 12(b)(1) for lack of subject matter jurisdiction,

under Rule 12(b)(6) for failure to state a claim, or both. Larry has moved to dismiss Count XI

for lack of jurisdiction and failure to state of claim. HMB, Hal, Hechtman, and Goldstein

(collectively the "Horwood defendants") have moved to dismiss Count XIV for lack of

jurisdiction and failure to state a claim. Bari has moved to dismiss Counts XV-XVII for lack of

jurisdiction and failure to state a claim. And Chapman, BTM, and Optimum have moved to

dismiss Counts XIII and XXIII, also for lack of jurisdiction and failure to state a claim.


## II. Discussion

The defendants' motions to dismiss will be granted in part and denied in part. To the

extent the motions request dismissal for lack of jurisdiction, they will be denied. To the extent

the motions request dismissal for failure to state a claim, on the other hand, they will largely be

granted. All of the claims but two will be dismissed, and the dismissals will be with prejudice.


### A. The Amended Complaint Reorganized

For the decision on the motions to be explained, the amended complaint must first be

reorganized in a way that makes an explanation possible. As discussed earlier, the amended

complaint is immense, ignoring the admonition in Rule 8(a)(2) that when it comes to complaints

only "a short and plain statement" is necessary. *See* Fed. R. Civ. P. 8(a)(2) (made applicable by

Fed. R. Bankr. P. 7008).

Not only is the pleading immense, but its size makes it something of a mess. The drafters

-20-

must have struggled to maintain control of the document as it grew, and at some point their

attention appears to have lapsed. Many counts end with confusing requests for relief. Some

contain claims repeated in other counts. Other claims do not find their way into a count at all.

These defects do not warrant dismissal,[12] but they pose major obstacles to an orderly analysis.

For a ruling to be possible (let alone understandable), Gierum's claims have to be reorganized

and clarified.

The first six counts, all dealing with veil-piercing, have overlapping and even redundant

requests for relief.[13] For example, Count I is headed "JCG 1999 Trust" but asks to pierce the

"veils" of both the JCG 1999 Trust *and* "the JCG 1999 Trust Entities." The "JCG 1999 Trust

Entities" are JZ Enterprises LP and JZ Enterprises GP. (*See* Am. Compl. Ex. 1).[14] Counts II-IV,

---

[12]     A complaint cannot be dismissed merely because of its length unless the
complaint is also unintelligible. *See Stanard v. Nygren*, 658 F.3d 792, 797-98 (7th Cir. 2011)
(noting that "[l]ength may make a complaint unintelligible[ ]," and "unintelligibility is certainly a
legitimate reason to [dismiss]"). Though difficult to digest, the amended complaint here is not
unintelligible. No defendant has charged that it is.

[13]     Technically, the veil-piercing requests do not belong in separate counts. A
"count" is a device for pleading a claim, *see* Fed. R. Civ. P. 10(b) (made applicable by Fed. R.
Bankr. P. 7010), meaning a discrete set of facts giving rise to a right to relief, *Matrix IV, Inc. v.
American Nat'l Bank & Trust Co.*, 649 F.3d 539, 548 (7th Cir. 2011). Veil-piercing is a remedy,
not a claim. *Conseco, Inc. v. Schwartz (In re Conseco, Inc.)*, 330 B.R. 673, 685 (Bankr. N.D. Ill.
2005); *Gillespie Cmty. Unit Sch. Dist. v. Union Pac. R.R.*, 43 N.E.3d 1155, 1180 (Ill. App. Ct.
4th Dist. 2015). Since Gierum probably placed his veil-piercing requests in separate counts as a
matter of convenience, these requests will be addressed by count.

[14]     Gierum's attempts to describe the ownership scheme and the definitions he adopts
are a source of considerable confusion – particularly when it comes to the so-called "1999 Trust
Entities." Gierum defines JZ Enterprises LP and JC Illinois Ventures LP as the "Limited
Partnerships" (*id.* ¶ 32), alleges that the JCG 1999 Trust owns the "Limited Partnerships" (*id.* ¶
33), and then defines the entities that the JCG 1999 Trust owned as the "1999 Trust Entities" (*id.*
¶ 33). That suggests the JCG 1999 Trust owned not only JZ Enterprises LP but also JC Illinois
Ventures LP. A few paragraphs on, Gierum implies that Awesome Toys, Excitement, and
Virtual were also "1999 Trust Entities." (*See id.* ¶ 37). And later, he alleges that Play Makers
was also one of the "1999 Trust Entities." (*See, e.g., id.* ¶ 607). But the organizational chart

-21-

however, are separate requests to pierce the veils of JZ Enterprises LP, JZ Enterprises GP, and

Play Makers.

A similar problem attends the piercing claims for the JCG 2012 Trust. Count V is headed

"JCG 2012 Trust" but asks to pierce the "veils" of both the JCG 2012 Trust *and* the "JCG 2012

Trust Entities." The JCG 2012 Entities are defined by reference to the organizational chart. (*See*

Am. Compl. ¶ 33, Ex. 1). But the exhibit contains no definition of "JCG 2012 Trust Entities."

They may or may not include BEG, Madhouse, and Telegraph, each of which the JCG 2012

Trust owns directly or indirectly. (Count VI, though, asks to pierce the veil of BEG – but not

Madhouse and Telegraph.)

To facilitate a ruling, some order has to be imposed on this chaos. Count I will be treated

as if directed against the JCG 1999 Trust alone. The remaining piercing counts will be treated as

directed at the entities mentioned in the headings. So Count II will be treated as directed against

JZ Enterprises, LP, Count III as directed against JZ Enterprises GP, Count IV as directed against

Play Makers, Count V as directed against the JCG 2012 Trust alone, and Count VI as directed

against BEG. No veil-piercing requests against any other entity will be considered, even if the

JCG 1999 Trust or JCG 2012 Trust arguably owned some interest in the entity.[15]

---

shows that the JCG 1999 Trust held *no* interest in JC Illinois Ventures LP and no direct interest
in Play Makers, Awesome Toys, Excitement, or Virtual. (*Id.* Ex. 1). According to the chart, the
JCG 1999 Trust held a direct interest in just two entities: JZ Enterprises LP and JZ Enterprises
GP. (*Id.*). Again, the organizational chart governs over Gierum's careless and contradictory
allegations. *Bogie*, 705 F.3d at 609.

[15]    The Glick defendants argue that Gierum should have named as a defendant each
entity that was allegedly Glick's alter ego. Because he did not, they say, counts seeking to pierce
the veils of those entities, as well as Gierum's fraudulent transfer counts, should be dismissed
under Rule 19, Fed. R. Civ. P. 19 (made applicable by Fed. R. Bankr. P. 7019). The Glick
defendants are right that no Glick entity other than the JCG 2012 Trust is a defendant. But
assuming the entities in question are indeed parties that must be joined if feasible, *see* Fed. R.

Then there are the claims that do not appear in any count. Gierum is asserting (or at least believes he is asserting) turnover claims under section 542(a) of the Code, 11 U.S.C. § 542(a), against Glick's purported alter egos. (*See* Pl. Resp. at 3, 37). But the amended complaint has no count with a turnover claim: none of the requests for relief associated with any count specifically asks for turnover. The omission is surprising since Gierum is employing his veil-piercing theories partly to set up turnover claims that will force the assets of the alter egos into Glick's bankruptcy estate. *See* discussion, *supra*, at 18. He goes to great lengths to set up those claims but never makes them directly.

Just as the amended complaint's length is not a reason to dismiss, though, neither is its failure specifically to demand turnover. *See Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) ("Although Rule 8(a)(3) of the civil rules requires that a complaint contain 'a demand for judgment for the relief the pleader seeks,' the demand is not itself a part the plaintiff's claim, . . . and so failure to specify relief to which the plaintiff was entitled would not warrant dismissal under Rule 12(b)(6) . . . ."). Gierum's turnover claims are lurking in the shadows. Because they are, they must be addressed. The logical place to address them is after the veil-piercing counts.

With these adjustments, the defendants' arguments for dismissal can be addressed in a fashion that makes some sense.

---

Civ. P. 19(a), the Glick defendants have not explained why their joinder is not feasible, Fed. R. Civ. P. 19(b), a prerequisite to dismissal on this ground, *Thomas v. United States*, 189 F.3d 662, 667 (7th Cir. 1999); *see also Askew v. Sheriff of Cook Cnty.*, 568 F.3d 632, 635 (7th Cir. 2009) (noting that even then dismissal is not automatic). Before dismissal, moreover, a plaintiff must be given the chance to join the missing party. *See* Fed. R. Civ. P. 19(a)(2); 7 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure* § 1609 at 132 (3d ed. 2001) (noting that the court may decide amendment is preferable to dismissal). So dismissal of the veil-piercing and fraudulent transfer counts under Rule 19(a) would not be an option at this stage.

## B. Challenges under Rule 12(b)(1)

First up are the defendants' jurisdictional challenges. The motions to dismiss on jurisdictional grounds will be denied because subject matter jurisdiction here is secure.

The grant of bankruptcy jurisdiction appears in section 1334 of the U.S. Code's title 28. Section 1334(a) confers on the district court original and exclusive jurisdiction over all bankruptcy cases. 28 U.S.C. § 1334(a). Section 1334(b) confers on the district court non-exclusive jurisdiction over proceedings "arising under title 11" as well as proceedings "arising in" or "related to" cases under title 11. 28 U.S.C. § 1334(b). Under section 157(a), district courts may refer those proceedings (and, of course, the bankruptcy cases themselves) to the bankruptcy court. 28 U.S.C. § 157(a). The district court for this district has done so. N.D. Ill. L.R. 40.3.1(a); N.D. Ill. Internal Op. Proc. 15(a).

The court has jurisdiction over most of Gierum's claims because they plainly arise under title 11. Claims "arising under" the Bankruptcy Code are claims that are "created or determined by" a Code provision. *Nelson v. Welch (In re Repository Techs., Inc.)*, 601 F.3d 710, 719 (7th Cir. 2010); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987).

• The claims for turnover (the claims without counts) arise under title 11 because they are based on section 542(a), which requires parties holding or controlling property of the bankruptcy estate to deliver it to the trustee. *See CLC Creditors' Grantor Corp. v. Sonnenschein Nath & Rosenthal LLP (In re Commercial Loan Corp.)*, 363 B.R. 559, 567 n.9 (Bankr. N.D. Ill. 2007). It makes no difference that the claims are premised on a state law veil-piercing theory. *See, e.g., BCL-Sheffield, LLC v. Gemini Int'l, Inc. (In re Tolomeo)*, 832 F.3d 815, 817 (7th Cir. 2016).

• The claims to avoid pre- and post-petition transfers also arise under title 11. The pre-

-24-

petition transfer claims are claims to avoid fraudulent transfers under section 548 and 544 of the

Code. The section 548 claims arise under title 11. *See KHI Liquidation Trust v. Wisenbaker*

*Builder Servs., Inc. (In re Kimball Hill, Inc.)*, 480 B.R. 894, 895 (Bankr. N.D. Ill. 2012). So do

the section 544 claims, even though they "borrow[ ] applicable state law standards regarding

avoiding the transfer in question." *Note Holders v. Large Private Beneficial Owners (In re*

*Tribune Co. Fraudulent Conveyance Litig.)*, 818 F.3d 98, 111 (2d Cir. 2016), *petition for cert.*

*filed*, 85 U.S.L.W. 3095 (U.S. Sept. 12, 2016) (No. 16-317); *KHI*, 480 B.R. at 895.

The post-petition transfer claims are claims under section 549(a) of the Code. They, too,

arise under title 11. *See Redmond v. Gulf City Body & Trailer Works, Inc. (In re Sunbridge*

*Capital, Inc.)*, 454 B.R. 166, 169 (Bankr. D. Kan. 2011).

• The subordination claim against BTM also arises under title 11. The claim is brought

under section 510(c) of the Code. That section "creat[es] the basis for the action" and an action

premised on it is "within the scope of the 'arising under'. . . jurisdiction." *Boyer v. Simon (In re*

*Fort Wayne Telsat, Inc.)*, 403 B.R. 590, 593 (Bankr. N.D. Ind. 2009).

Gierum's accounting claim does not arise "under" title 11, but it does arise "in" a case

under that title. Claims "arising in" a case under title 11 are "administrative matters that arise

*only* in bankruptcy cases." *Nelson*, 601 F.3d at 719 (emphasis in original) (internal quotation

omitted); *Wood*, 825 F.2d at 97. The goal of Gierum's claim is to have Glick account for post-

petition payments that his alleged alter egos, JZ Enterprises LP and JZ Illinois Ventures LP,

made. (Pl. Resp. at 56-58). An accounting claim of that kind is meant to ensure the trustee

obtains "control over all that is rightfully considered part of the bankruptcy estate." *Bakst v.*

*Smokemist, Inc. (In re Gladstone)*, 513 B.R. 149, 157 (Bankr. S.D. Fla. 2014). Because that

-25-

accounting would be "an integral part" of the trustee's duty to identify estate property, the claim

is one "arising in" the bankruptcy case. *Id.*

     The remaining claims – the damage claims for aiding and abetting the fraudulent transfers

– are all "related to" Glick's bankruptcy case. Claims are related to a case under title 11 if they

"affect[ ] the amount of property for distribution [i.e., the debtor's estate] or the allocation of

property among creditors." *In re FedPak Sys., Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996). If

successful, Gierum's aiding and abetting claims would result in damage awards in the estate's

favor, increasing its size and affecting the amount of property available for creditors. *Id.*; *cf.*

*Torrence v. Comcast Corp.*, 663 F. App'x 475, 477 (7th Cir. 2016) (finding damage claims for

conduct occurring post-petition were not "related to" a chapter 7 debtor's bankruptcy case

because they would have no effect on her estate), *cert. denied*, 137 S. Ct. 1118 (2017).

     In short, every claim in the amended complaint either arises under the Bankruptcy Code

or arises in or is related to Glick's bankruptcy case. The court has subject matter jurisdiction

over all the claims in this proceeding.[16]

---

[16]    Whether the court can enter final judgment is another matter. The nature of the proceeding not only informs subject matter jurisdiction, it also determines "[t]he manner in which a bankruptcy judge may act." *Stern v. Marshall*, 564 U.S. 462, 473 (2011). A bankruptcy judge can enter a final judgment only in a proceeding arising "under" title 11 or arising "in" a case under title 11 (a "core" proceeding), 28 U.S.C. § 157(b)(1), as long as there is no constitutional impediment, *Stern*, 564 U.S. at 473. In a proceeding "related to" a case under title 11 (a "non-core" proceeding), on the other hand, a bankruptcy judge can only propose findings of fact and conclusion of law to the district court. 28 U.S.C. § 157(c)(1). The district court enters final judgment. *Id.* But the parties' consent can alter this scheme. With consent, the bankruptcy judge can enter final judgment in a non-core proceeding. 11 U.S.C. § 157(c)(2). With consent, the bankruptcy judge can also enter final judgment in a core proceeding for which the Constitution would otherwise require proposed findings of fact and conclusions of law. *Wellness Int'l Network, Ltd. v. Sharif*, ___, U.S. ___, ___, 135 S.Ct. 1932, 1939 (2015).

    As just discussed, some of Gierum's claims are non-core claims on which the district court must enter final judgment, unless the parties consent to a final judgment here. Other claims

## 1. The Substantive Consolidation Argument

The defendants do not seriously contest subject matter jurisdiction under section 1334(b) – in the sense that each of Gierum's claims arises under title 11 or arises in or is related to a case under title 11.[17] They question subject matter jurisdiction instead for two other reasons.

First, the Glick defendants assert that Gierum's veil-piercing claims essentially amount to claims for substantive consolidation.[18] (Glick Defs. Mot. at 10-11). If Gierum were to change his theory expressly to pursue substantive consolidation, they argue, he would be asking the court to exercise jurisdiction over property belonging to entities that are not debtors in any bankruptcy case. That, the Glick defendants say, is something the court cannot do.

This argument has several flaws. One is that there is no reason (one might even say no jurisdiction, *see United States v. Russell*, 340 F.3d 450, 458 (7th Cir. 2003)) to consider a jurisdictional challenge to a claim a plaintiff is not pursuing. Another is that Gierum denies he will ever pursue substantive consolidation. (*See* Pl. Resp. at 60). But the major flaw is that the argument assumes Gierum would not prevail on a substantive consolidation claim – because the

---

are arguably core claims on which the Constitution requires a final judgment in the district court unless, again, the parties consent. No party has expressed a view on the consent question – not even Gierum, although Bankruptcy Rule 7008 required him allege whether he "d[id] or d[id] not consent to entry of final . . . judgment by the bankruptcy court," Fed. R. Bankr. P. 7008.

[17]    The Glick defendants alone argue that jurisdiction under section 1334(b) is absent, at least over the veil-piercing claims in Counts I-VI. (Glick Defs. Mot. at 18-19). But again, the veil-piercing claims are not "claims" in the Rule 8(a) sense. They represent a form of relief Gierum wants in connection with other claims – claims "arising under" title 11 and over which there is plainly jurisdiction.

[18]    Substantive consolidation is "the merger of separate entities into one entity so that the assets and liabilities of both entities may be aggregated in order to effect a more equitable distribution of property among creditors." *Paloian v. LaSalle Bank N.A. (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 706-07 (Bankr. N.D. Ill. 2013) (internal quotation omitted).

-27-

property would be property of "non-debtor entities" only if he did not prevail.  (And if he did not, of course, that would be the end of it.)  If he did prevail, on the other hand, the property would be deemed Glick's property and so property of his bankruptcy estate rather than of the non-debtors.  In no event, then, would the court be called upon to assume jurisdiction over the property of a non-debtor.[19]  The substantive consolidation argument is meritless.

## 2. The Standing Arguments

Second, the Glick defendants and several others (Larry, the Horwood defendants, Bari, Chapman, BTM, and Optimum) contend the court lacks subject matter jurisdiction over the veil-piercing claims and the aiding and abetting claims because Gierum lacks standing to pursue them.  He lacks standing to pursue them, the defendants say, because he has no authority to do so.

On the standing point, at least, the defendants are mistaken.  Standing "concerns whether a litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R. 211, 223 (Bankr. N.D. Ill. 2003) (internal quotation omitted), *aff'd*, No. 03 C 8023, 2004 WL 2075442 (N.D. Ill. Aug. 31, 2004).  In the Article III sense, standing is indeed jurisdictional:  standing is "a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action." *Meyers v. Nicolet Rest. of De*

---

[19]      As the Glick defendants acknowledge, their jurisdictional challenge is not only hypothetical but also controversial.  Courts disagree over whether a bankruptcy court can order the substantive consolidation of a debtor's assets with the assets of a non-debtor. *Compare In re Pearlman*, 462 B.R. 849, 854 (Bankr. M.D. Fla. 2012) (rejecting substantive consolidation of a debtor and non-debtor), *with Lassman v. Cameron Constr. LLC (In re Cameron Constr. & Roofing Co.)*, 565 B.R. 1, 8-10 (Bankr. D. Mass. 2016) (reaching the opposite conclusion).

*Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016), *petition for cert. filed*, 85 U.S.L.W. 3469 (U.S.

Mar. 13, 2017) (No. 16-1113); *see In re GT Automation Grp., Inc.*, 828 F.3d 602, 604 (7th Cir.

2016) (distinguishing Article III standing from prudential standing).

Gierum has Article III standing. To have standing in that sense, a plaintiff need only have

"suffered an injury in fact, which is fairly traceable to the challenged action of the defendant, and

which would likely be redressed by a favorable decision." *GT Automation*, 828 F.3d at 604

(internal quotation omitted). Each requirement is met here. Gierum alleges an injury in fact:

Glick's failure to pay his creditors in full, creditors Gierum represents as trustee. That injury is

fairly traceable to Glick, since he is the one who failed to pay them. And a favorable decision

would redress the injury. A finding that the Glick entities are no more than extensions of Glick

himself would bring the assets of those entities into Glick's bankruptcy estate, allowing his

creditors to be paid – if not in full, at least more than if the decision were unfavorable. A

favorable finding on Gierum's damage claims would have the same effect. If there is some

deficiency in this analysis, the defendants have not identified it.

In contesting Gierum's authority to pursue the claims, the defendants mistake the

question of a trustee's authority for one of standing.[20/] That mistake is common, originating with

the Supreme Court's 1972 use of the phrase "lacks standing" in *Caplin v. Marine Midland Grace

Trust Co.*, 406 U.S. 416 (1972), to "describe its conclusion that a bankruptcy trustee may not sue

on behalf of investors who thought a third party's acts had injured them and the debtor jointly."

---

[20/]    A trustee has authority to pursue claims the debtor had as of the petition date.
*Steinberg v. Buczynski*, 40 F.3d 890, 892 (7th Cir. 1994). A trustee also has authority to bring
claims "on behalf of creditors as a class-so called 'general claims.'" *Levey v. Systems Div., Inc.
(In re Teknek, LLC)*, 563 F.3d 639, 646 (7th Cir. 2009). Or, stated in the negative, a trustee has
no authority to bring claims a debtor did not have as of the petition date or claims "accru[ing]
individually" to a single creditor rather than to the creditor body as a whole. *Id.* at 647.

*Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 900 (7th Cir. 2010). But *Caplin* used "the language

of 'standing'" to refer, not to whether the trustee had satisfied "the three ingredients of standing"

for purposes of justiciability, but to "whether Congress had authorized a trustee to pursue a given

kind of action." *Id.* That is "a question on the merits rather than one of justiciability." *Id.*

The defendants' "standing" arguments here concern Gierum's authority, not the

justiciability of his claims. The defendants maintain Gierum lacks authority to bring some of his

veil-piercing claims and all of his aiding and abetting claims – the veil-piercing claims because

they belong to fewer than all creditors, and the aiding and abetting claims because there is no

such thing as a claim for aiding and abetting a fraudulent transfer. But these arguments concern

the merits of the claims rather than Gierum's standing to bring them. *Id.* Since the arguments

are not jurisdictional – deficiencies in the merits of claims do not deprive the court of jurisdiction

to hear them, *Bell v. Hood*, 327 U.S. 678, 682 (1946) – they will be addressed under Rule

12(b)(6) rather than under Rule 12(b)(1). *See Peckmann v. Thompson*, 966 F.2d 295, 297 (7th

Cir. 1992) (stating that a Rule 12(b)(1) motion constituting "an indirect attack on the merits" may

be treated as a Rule 12(b)(6) motion).

Because the court has subject matter jurisdiction under section 1334(b) to entertain

Gierum's adversary proceeding, and because Gierum has standing to pursue his claims, the

motions to dismiss the complaint under Rule 12(b)(1) for lack of jurisdiction will be denied.

### C. Challenges under Rule 12(b)(6)

The defendants' motions to dismiss under Rule 12(b)(6), on the other hand, will be

granted in large part. With two exceptions, none of the counts in the amended complaint states a

claim. The sole exceptions are the turnover claim against Glick concerning the JCG 1999 Trust

and the section 549(a) claim against Wolff in Count XX.  Otherwise, all of the claims – for veil-

piercing, fraudulent transfers, aiding and abetting the fraudulent transfers, turnover (whether in

numbered counts or otherwise), post-petition transfers, an accounting, and equitable

subordination – will be dismissed.  And because the deficiencies in these claims are deficiencies

of law and cannot be remedied through amendment, all of the dismissals will be with prejudice.

### 1. Rule 12(b)(6) Standards

To survive a Rule 12(b)(6) motion, a complaint must clear two hurdles.  *EEOC v.*

*Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007).  First, it must contain enough

factual detail to give the defendant fair notice of the claim under Rule 8(a).  "[A] formulaic

recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007).  Specific facts are unnecessary, *Olson v. Champaign Cnty.*, 784 F.3d 1093,

1098 (7th Cir. 2015), but some facts must support each element of the claim, *Ashcroft v. Iqbal*,

556 U.S. 662, 678-79 (2009); *Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334

(7th Cir. 2015).

Second, the claim must be plausible – meaning the allegations must raise the plaintiff's

right to relief above a "speculative level." *Twombly*, 550 U.S. at 555; *see also Kubiak v. City of*

*Chicago*, 810 F.3d 476, 480 (7th Cir.), *cert. denied*, 137 S. Ct. 491 (2016).  The plausibility

standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  To establish plausibility, a

plaintiff must "include enough details about the subject-matter of the case to present a story that

holds together." *Runnion v. Girl Scouts of Greater Chicago*, 786 F.3d 510, 526 (7th Cir. 2015)

(internal quotations omitted).  The facts must be sufficient "to raise a reasonable expectation that

-31-

discovery will reveal evidence supporting the allegations." *Huri v. Office of the Chief Judge*, 804

F.3d 826, 833 (7th Cir. 2015).

And where fraud is concerned, more must be pled. Rule 9(b) requires a party to "state

with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b) (made applicable by

Fed. R. Bankr. P. 7009). As the court of appeals for this circuit has explained for roughly the last

two decades, particularity means "the 'who, what, when, where, and how' of the fraud – 'the first

paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health

Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-

Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)); *see also Camasta v. Jos. A. Bank Clothiers,

Inc.*, 761 F.3d 732, 737 (7th Cir. 2014); *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th

Cir. 1996).[21/]

The "fraud" to which Rule 9(b) applies includes fraudulent transfer claims, whether the

claim is based on actual or constructive fraud. *General Elec. Capital Corp. v. Lease Resolution

Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997); *PNC Equip. Fin., LLC v. Zilderbrand*, No. 12 C

3074, 2014 WL 448384, at *9 (N.D. Ill. Feb. 4, 2014). To plead an actual or constructive fraud

with the necessary particularity, "the complaint must allege what (or how much) was transferred,

when the transfer was made, how it was made, who made it, who received it, and under what

---

[21/]    More recently, the Seventh Circuit cautioned against taking "an overly rigid view"
of this formulation. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631
F.3d 436, 442 (7th Cir. 2011). "[T]he precise details that must be included in a complaint 'may
vary on the facts of a given case.'" *Presser*, 836 F.3d at 776 (quoting *Pirelli*, 631 F.3d at 442).
When it comes to pleading fraud, the task is to strike a balance between "[t]he twin demands of
detail and flexibility." *Pirelli*, 631 F.3d at 442. It may not be necessary, then, for a plaintiff to
plead "the specific date, place, or time of the fraudulent acts." *Id.* (internal quotation omitted.).
But if not, plaintiffs must find some "alternative means of injecting precision and some measure
of substantiation into their allegations of fraud." *Id.* (internal quotation omitted).

circumstances." *Marwil v. Oncale (In re Life Fund 5.1 LLC)*, Nos. 09 B 32672, 10 A 42, 2010

WL 2650024, at *3 (Bankr. N.D. Ill. June 30, 2010); *see also Handler v. Heidenry*, No. 11 C

4494, 2012 WL 2396615, at *5 (N.D. Ill. June 25, 2012).

Even if a plaintiff alleges enough facts to give notice and presents "a story that holds

together," *Runnion*, 786 F.3d at 526, his complaint will be dismissed when the facts state no

claim as a matter of law. Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a

dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). If "as a matter of law it

is clear no relief could be granted under any set of facts that could be proved consistent with the

allegations, a claim must be dismissed . . . ." *Id.* at 327 (internal quotation and citation omitted);

*see also Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000); *Quinones ex rel.*

*Quinones v. Ariezaga*, No. 07-CV-0004, 2008 WL 907442, at *3 (N.D. Ill. Mar. 31, 2008);

*Glenn v. Cavalry Invs. LLC (In re Glenn)*, 542 B.R. 833, 838 (Bankr. N.D. Ill. 2016).

### 2. The Alter Ego/Piercing the Corporate Veil Requests
### (Counts I-VI)

The motion of the Glick defendants' to dismiss Counts I-VI, the counts containing the

requests to pierce the corporate veil, will be granted. None of those counts states grounds for

invoking the remedy – because the applicable law does not permit the form of piercing Gierum

wants to employ, because he has not alleged facts warranting the remedy's use, because his

targets are not corporations and so lack veils to be pierced, or some combination of these.

### a. General Principles

### i. Veil-Piercing Basics

A corporation enjoys a legal identity separate from the identities of its shareholders. 1

William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 25 at 70 (2015 rev.).

Indeed, "[s]eparate legal personality" is "an almost indispensable aspect" of a corporation, *First*

*Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 625 (1983)

(internal quotation omitted), and thus "[a] basic tenet of American corporate law," *Dole Food*

*Co. v. Patrickson,* 538 U.S. 468, 474 (2003); *see also Stamp v. Inamed Corp.,* 777 F. Supp. 623,

626 (N.D. Ill. 1991) (calling the "entity theory" one of the "most important and pervasive

principles underlying corporations law"). Because a corporation has an identity of its own, its

shareholders ordinarily are not liable for corporate debts. Stephen B. Presser, *Piercing the*

*Corporate Veil* § 1:1 at 6 (2016).

Under certain circumstances, however, a corporation's separate identity will be

disregarded – the prevailing metaphor is that the corporate "veil" will be "pierced" – and the

corporation's shareholders held liable for its debts. *ALT Hotel, LLC v. DiamondRock Allerton*

*Owner, LLC (In re ALT Hotel, LLC)*, 479 B.R. 781, 800-01 (Bankr. N.D. Ill. 2012).

Formulations differ, but most states impose two requirements before piercing the veil. *See*

Presser, *supra*, § 2:14 at 285 (referring to the "familiar two-part test."). First, the court must find

that the shareholder dominated the corporation to the point that it had no separate existence and

was effectively his alter ego. *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205, 427 N.E.2d 94,

101 (1981); *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175,

1184 (Del. Ch. 1999). Second, the court must conclude that failing to set aside corporate identity

and hold the shareholder liable would "sanction a fraud or promote injustice." *Main Bank*, 86 Ill.

2d at 205, 427 N.E.2d at 101; *Cencom*, 752 A.2d at 1184.

Traditionally, piercing is aimed at holding corporate shareholders liable. *ALT Hotel*, 479

B.R. at 801. But some jurisdictions also recognize a form of "piercing the veil in 'reverse.'" *Id.*

(internal quotation omitted). In the typical reverse piercing case, the corporation is the object. The idea is to hold the corporation liable for the debts of a corporate insider, a shareholder, or a subsidiary. *Id.* (citing Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. Corp. L. 33, 36 (1990)); 1 William Meade Fletcher, *supra*, § 41.70 at 322 ("In a 'reverse piercing of the corporate veil,' the plaintiff seeks to hold the corporation liable for the actions of its shareholder.").

Reverse piercing takes two forms depending on who is requesting the remedy. *ALT Hotel*, 479 B.R. at 801. "Outside" reverse piercing occurs when a third party – a creditor or bankruptcy trustee – makes the alter ego argument, either to hold the corporation liable for the acts of its shareholder or subsidiary, or to pursue the shareholder or subsidiary in the name of the corporation. *Id.* "Inside" reverse piercing occurs when a corporate insider, usually a shareholder, advances the alter ego theory to assert a corporate claim on behalf of himself against a third party. *Id.* Of the two, "inside" reverse piercing is more common. *See* 1 William Meade Fletcher, *supra*, § 41.70 at 326 (calling "inside" reverse piercing the "typical 'reverse pierce' case" and "outside" reverse piercing a "variant").

As Gierum admits, his piercing requests are all premised on a reverse piercing theory. (*See* Pl. Resp. at 3 (asserting that "all Glick's entities should be reversed pierced"), 13, 16). In fact, they all involve outside reverse piercing. The plaintiff is a corporate outsider – Gierum, a bankruptcy trustee representing creditors of Glick – rather than an insider. Instead of asking for the veils of the Glick entities to be pierced to reach Glick himself (a conventional piercing claim), he is doing the reverse: asking to reach the Glick entities through Glick and have the property of those entities deemed property of Glick's bankruptcy estate. (*Id.* at 16 (stating that under his theory "[a]ny property once owned by the [companies] would become property of

-35-

Glick's bankruptcy estate").

Reverse piercing is controversial. Not all states endorse it. *In re Howland*, No. 5:14-426-KKC, 2016 WL 3176649, at *3 (E.D. Ky. June 7, 2016) ("Reverse veil piercing is by no means a widely accepted legal principle."), *aff'd*, ___ F. App'x ___, 2017 WL 24750 (6th Cir. Jan. 3, 2017); *Boeing Co. v. KB Yuzhnoye*, No. CV 13-00730-AB (AJWx), 2016 WL 2851297, at *29 (C.D. Cal. May 13, 2016) ("Reverse veil piercing is a highly controversial and intensely debated corporate law doctrine . . . ."); *ALT Hotel*, 479 B.R. at 801 (noting that courts are "deeply split on the theory"); 1 William Meade Fletcher, *supra*, § 41.70 at 322-25 (stating that "not all" jurisdictions recognize reverse piercing, and some that do recognize it "only under very limited circumstances"). So when a plaintiff makes a reverse piercing request, it is critical to know which state's law governs the request.

### ii. Governing Law

Deciding the applicable law has two steps. *See In re Morris*, 30 F.3d 1578, 1581 (7th Cir. 1994); *In re Aircrash Disaster near Roselawn, Ind.*, 948 F. Supp. 747, 751 (N.D. Ill. 1996). First, the court "must determine what choice-of-law rule should be used . . . ." *Morris*, 30 F.3d at 1581; *see also Aircrash Disaster*, 948 F. Supp. at 751. Then, the court must apply the controlling choice-of-law rule to determine which substantive law governs the dispute. *Aircrash Disaster*, 948 F. Supp. at 751.

The first step can be difficult in bankruptcy cases because the Seventh Circuit has not resolved the "persisting uncertainty as to whether state or federal law supplies the choice of law rules in a bankruptcy case." *In re Jafari*, 569 F.3d 644, 649 (7th Cir. 2009); *see also Knauer v.*

*Kitchens (In re Eastern Livestock, Co., LLC)*, 547 B.R. 277, 283-84 (Bankr. S.D. Ind. 2016).[22/]
That difficulty disappears, however, when the federal and state choice-of-law rules produce the
same result. *See Jafari*, 569 F.3d at 649. If the two rules honor the same governing substantive
law, there is no need to decide which one applies. *See, e.g., In re Stoecker*, 5 F.3d 1022, 1029
(7th Cir. 1993).

The two possible sources of choice-of-law rules here, federal common law and Illinois
law (since Illinois is the forum state), both apply the law of the state of incorporation to requests
to pierce the corporate veil. "[F]ederal common law generally follows the Restatement (Second)
of Conflict of Laws." *Eastern Livestock*, 547 B.R. at 284. Section 307 of the Restatement says
that "[t]he local law of the state of incorporation will be applied to determine the existence and
extent of a shareholder's liability . . . to its creditors for corporate debts." Restatement (Second)
of Conflict of Laws § 307 (1971); *see, e.g., Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns,
Inc.*, No. 11-CV-252-GKF-PJC, 2012 WL 4006122, at *4-5 (N.D. Okla. Sept. 12, 2012)
(applying section 307 as a matter of federal common law). Illinois likewise "applies the law of
the state of incorporation for veil piercing claims." *Wachovia Sec., LLC v. Banco Panamericano,
Inc.*, 674 F.3d 743, 751 (7th Cir. 2012); *see also Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 957,
889 N.E.2d 671, 676 (1st Dist. 2008).

The targets of Gierum's piercing requests (at least in Counts II-IV and VI) are JZ
Enterprises LP, JZ Enterprises GP, Play Makers, and BEG. JZ Enterprises LP, JZ Enterprises

---

[22/]      The difficulty arises because a district court exercising diversity jurisdiction
"generally applies the choice-of-law rules of the state in which it sits," but "a bankruptcy court's
jurisdiction does not arise from diversity, but from federal bankruptcy law . . . ." *Jafari*, 569 F.3d
at 648. At the same time, state law typically governs property rights in bankruptcy cases. *Id.*
"Thus, there is a tension as to whether bankruptcy courts follow federal common law choice-of-
law principles or the forum state's choice-of-law principles." *Id.*

GP, and Play Makers are all Delaware entities. Delaware law therefore applies to the piercing

requests directed at them. BEG, on the other hand, is an Illinois entity. Illinois applies to the

piercing request directed at BEG.

Gierum disagrees, contending that Illinois law applies not only to his piercing request for

BEG but also to his request to pierce the veils of the Delaware entities. He argues that Illinois

law applies to the Delaware entities because Illinois is the state with the most "significant

relationship" to this proceeding. (*See* Pl. Resp. at 40-42).

His argument is unconvincing. In support, Gierum relies on two decisions, *AT & T*

*Global Info. Solutions Co. v. Union Tank Car Co.*, 29 F. Supp. 2d 857 (S.D. Ohio 1998), and

*Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097 (E.D. Mich. 1997). Both involved claims

under the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* Neither is persuasive.

*AT & T* is unpersuasive because it is distinguishable. The case involved a request to

assign derivative CERCLA liability to a corporate subsidiary by piercing the parent company's

corporate veil. *AT & T*, 29 F. Supp. 2d at 862. As Gierum points out, the court in *AT & T*

concluded that the law governing the piercing request was the law of the state with the most

significant relationship to the proceeding. *Id.* at 865. In reaching that conclusion, however, the

court relied on the general choice-of-law rule that Ohio, the forum state, employs for tort claims:

the "most significant relationship" test. *Id.* The court did not consider section 307 of the

Restatement which specifically addresses shareholder liability for corporate debts. What is more,

the forum state here is Illinois. Illinois has a different choice-of-law rule.

*Chrysler* is unpersuasive not only because it is distinguishable but also because it was

wrongly decided. Unlike *AT & T*, *Chrysler* acknowledged that section 307 addresses piercing

-38-

requests. *Chrysler*, 972 F. Supp. at 1102. But the court mistakenly characterized that section as applying "the law of the state of incorporation *except* where another state has a more significant relationship." *Id.* at 1103 (emphasis added). Not so. Section 307 declares without exception that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability . . . to its creditors for corporate debts." Restatement (Second) of Conflict of Laws § 307 (1971). Like *AT & T, Chrysler* also involved the law of another state. The court mentioned section 307 in determining the choice-of-law rule that Michigan, the forum state, would follow, since Michigan had no rule on the subject. *Chrysler*, 972 F. Supp. at 1102. The forum state here is Illinois. Illinois has a choice-of-law rule for piercing requests.

Because the state of incorporation determines the governing law, Delaware law applies to the Glick entities formed in Delaware, and Illinois law applies to those formed in Illinois.

### b. Requests to Pierce the Veils of
### JZ Enterprises LP, JZ Enterprises GP, and Play Makers
### (Counts II-IV)

The piercing requests in Counts II, III, and IV will be dismissed. These counts attempt to employ an outside reverse piercing theory against JZ Enterprises LP, JZ Enterprises GP, and Play Makers. Delaware law, which applies to the requests, has not recognized that theory.

In 2012, this court considered whether Delaware had acknowledged the validity of an inside reverse piercing theory. *See generally ALT Hotel*, 479 B.R. at 801–03. In an extensive discussion, the court found it "highly problematic" whether Delaware would accept that theory – or for matter "reverse piercing of any kind." *Id.* at 801. Delaware, the court said, had never recognized "any form of reverse piercing." *Id.* at 802. Only four unpublished Delaware decisions had even mentioned the theory. *Id.* Not only that, but Delaware's "exceptionally

strong policy of respecting the corporate form" made its recognition "doubtful." *Id.* With no

guidance from the Delaware courts, and with Delaware taking a conservative approach to veil

piercing, this court declined to predict that Delaware would endorse a reverse piercing theory,

"moving Delaware law in a direction that Delaware's own courts have not yet gone." *Id.* at 803.

"State courts, not federal courts, are the place for innovations in state law." *Id.*

Nothing has changed since 2012. The Delaware courts still have not recognized reverse

piercing. A single unpublished Delaware trial court decision from 2015 mentioned reverse

piercing, commenting that the plaintiff was pursuing a reverse piercing theory, and that if the

claim had been properly supported "it might have prevailed." *Cancan Dev., LLC v. Manno*, No.

6429-VCL, 2015 WL 3400789, at *22 (Del. Ch. May 27, 2015), *aff'd without op.*, 132 A.3d 750

(Del. 2016. But that was the extent of the discussion. "Might have prevailed" is not an

endorsement. Just last year, the district court in Delaware declared: "[W]hether Delaware law

recognizes reverse veil piercing is an unsettled question." *Crystallex Int'l Corp. v. Petróleos de

Venezuela, S.A.*, 213 F. Supp. 3d 683, 690 n.7 (D. Del. 2016).[23/] The Seventh Circuit has not

retreated from its view that federal courts should be reluctant "to expand state law" when state

law is unsettled. *See Vision Church v. Village of Long Grove*, 468 F.3d 975, 1004 (7th Cir.

2006) (internal quotation omitted); *ALT Hotel*, 479 B.R. at 802-03.

Because Delaware law does not recognize reverse piercing, Gierum has no piercing

---

[23/]    Since 2012, two more decisions outside Delaware have held that Delaware would
recognize reverse veil piercing. *See Sky Cable, LLC v. Coley*, No. 5:11cv00048, 2016 WL
3926492, at *13-15 (W.D. Va. July 18, 2016) (conceding, however, that "Delaware . . . has not
expressly authorized reverse veil piercing"), *appeal docketed*, No. 16-1920 (4th Cir. Aug. 12,
2016); *Kelley v. Opportunity Fin., LLC (In re Petters Co.)*, 561 B.R. 738, 751-52 (Bankr. D.
Minn. 2016). These decisions are no more persuasive than the non-Delaware decisions that *ALT
Hotel* cited in 2012. *See ALT Hotel*, 479 B.R. at 803 n.14

remedy under Delaware law – and in his response, he actually concedes as much. (Pl. Resp. at 13).[24/]  To save Counts II-IV, he suggests instead that Illinois law governs his veil-piercing requests for JZ Enterprises LP, JZ Enterprises GP, and Play Makers.  (*Id.* at 40-42).  As discussed earlier, though, his suggestion is a non-starter.  *See* discussion, *supra*, at 37-39.  These are Delaware entities formed under Delaware law.  Delaware law therefore governs Gierum's ability to invoke a reverse piercing theory no matter which choice-of-law rule applies – the Illinois rule or the federal common law rule.  Illinois veil-piercing law is irrelevant.

Because Counts II, III, and IV depend on an outside reverse corporate veil piercing theory that Delaware law does not recognize, the motion of the Glick defendants to dismiss these counts will be granted.  Counts II, III, and IV will be dismissed.

### c. Request to Pierce the Veil of BEG
### (Count VI)

Count VI will also be dismissed.  Count VI is an outside reverse piercing request directed at BEG, an Illinois LLC.  Illinois law therefore governs the request.  But Illinois has no more recognized outside reverse piercing than Delaware.  Even if it had, Gierum's amended complaint does not allege facts sufficient to make out a plausible request to pierce BEG's corporate veil.

No Illinois decision approves reverse piercing.  The only one that ever did was *Crum v.*

---

[24/]       Gierum would have no piercing remedy for JZ Enterprises LP even if Delaware did recognize reverse piercing.  JZ Enterprises LP is a limited partnership, not a corporation, and so has no "corporate veil" to pierce.  Some states nonetheless recognize "veil piercing" of limited partnerships.  *See, e.g., Canter v. Lakewood of Voorhees*, 420 N.J. Super. 508, 519, 22 A.3d 68, 75 (App. Div. 2011).  Others do not.  *See, e.g., Seidler v. Morgan*, 277 S.W.3d 549, 558 n.5 (Tex. Ct. App. 2009).  JZ Enterprises LP is a Delaware limited partnership.  No Delaware decision has addressed whether to recognize piercing of limited partnerships, and the only decision elsewhere to consider whether Delaware would recognize the theory concluded it would not.  *See Faulkner v. Kornman (In re Heritage Org., L.L.C.)*, 413 B.R. 438, 514 n.64 (Bankr. N.D. Tex. 2009).

*Krol*, 99 Ill. App. 3d 651, 425 N.E.2d 1081 (1st Dist. 1981), an inside reverse piercing case in

which a plaintiff shareholder and his corporation were treated "as a single entity" to allow him to

recover damages for payments the corporation had made to the defendant. *Id.* at 661, 425 N.E.2d

at 1088-89. But *Crum* is no longer good law. In 1994, the Illinois Supreme Court categorically

rejected inside reverse piercing, *see In re Rehabilitation of Centaur Ins. Co.*, 158 Ill. 2d 166, 173-

74, 632 N.E.2d 1015, 1018 (1994), a view the court reaffirmed in *Forsythe v. Clark USA, Inc.*,

224 Ill. 2d 274, 297-98, 864 N.E.2d 227, 241-42 (2007). *Centaur* and *Forsythe* represent a

"broad-based and explicit rejection of reverse piercing." *Trossman v. Philipsborn*, 373 Ill. App.

3d 1020, 1053, 869 N.E.2d 1147, 1174 (1st Dist. 2007); *see also* Presser, *supra*, § 2:14 at 286

(stating that "Illinois has rather summarily dismissed the possibility of reverse-piercing").

Despite this dearth of authority, several federal decisions from this circuit assert (usually

with no discussion or analysis) that Illinois recognizes reverse piercing. But the foundation for

these assertions is shaky at best. The decisions tend to rely on *Boatmen's Nat'l Bank v. Smith*,

706 F. Supp. 30 (N.D. Ill. 1989), a pre-*Centaur* case in which the court found "nothing

problematic about reversing the traditional piercing procedure" although "no Illinois court ha[d]

squarely addressed this issue." *Id.* at 31-32. They also rely on *Sea-Land Servs., Inc. v. Pepper

Source*, 941 F.2d 519 (7th Cir. 1991), and *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). *Sea-

Land*, another pre-*Centaur* case, did not address either the validity of reverse piercing or whether

Illinois would recognize it. *See Sea-Land*, 941 F.2d at 521-22. Neither did *Scholes*, which

treated reverse piercing in dictum as a given and did not discuss Illinois law. *See Scholes*, 56

F.3d at 758.[25/] For the most part, the federal decisions simply cite and rely on each other. The

_____

[25/]    A more recent Seventh Circuit decision notes that Illinois prohibits inside reverse
piercing. *See Wachovia Sec, LLC v. Loop Corp.*, 726 F.3d 899, 908 (7th Cir. 2013).

entire body of case law is nothing but a house of cards.[26]  *Cf. ALT Hotel*, 479 B.R. at 803 n.14

(finding "thinly reasoned" the non-Delaware decisions holding that Delaware would recognize

reverse piercing).

　　As with Delaware law, *see id.* at 802, the tenor of Illinois law suggests the state is

unlikely to accept outside reverse piercing.  Illinois, too, respects the corporate form, treating it as

"[f]undamental," *Dregne v. Five Cent Cab Co.*, 381 Ill. 594, 602, 46 N.E.2d 386, 390 (1943),

and a "bedrock principle," *Forsythe*, 224 Ill. 2d at 302, 864 N.E.2d at 244 (Freeman, J.

concurring), the separate existence of a corporation and the limited liability of its shareholders.

Because "separate corporate existence is the rule" in Illinois, even conventional piercing is "a

stringently applied exception."  *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.*,

826 F.2d 725, 728 (7th Cir. 1987).  The state's approach to veil-piercing is "conservative,"

Presser, *supra*, § 2:14 at 285, with Illinois courts employing the remedy only reluctantly, *see*

*Gajda v. Steel Solutions Firm, Inc.*, 39 N.E.3d 263, 272 (Ill. App. Ct. 1st Dist. 2015); *Walker v.*

*Dominick's Finer Foods*, 92 Ill. App. 3d 645, 649, 415 N.E.2d 1213, 1217 (1st Dist. 1980).

---

　　[26]　*See BCL Sheffield, LLC v. Gemini Int'l, Inc. (In re Tolomeo)*, No. 15 C 8118,
2015 WL 8741730, at *7 (N.D. Ill. Dec. 15, 2015) (citing *Sea-Land* and *Paloian v. Geneva Seal,*
*Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696 (N.D. Ill. 2012), *appeal dismissed*, 832 F.3d 815
(2016)); *TCF Nat'l Bank v. SIS Global (USA), Inc.*, No. 14 C 9429, 2015 WL 6673838, at *3
(N.D. Ill. Oct. 30, 2015) (citing *Canopy* and noting that it cited *Sea-Land*); *Wachovia Sec., LLC*
*v. Neuhauser*, No. 04 C 3082, 2013 WL 3273816, at *3 (N.D. Ill. June 27, 2013) (citing *Scholes*
and *Boatmen's* and finding no support for the position that reverse piercing "is not permitted" in
Illinois); *Paloian v. Geneva Seal, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 703 (N.D. Ill.
2012) (citing *Sea-Land* and *KZK Livestock*); *BCL-Sheffield, LLC v. Gemini Int'l, Inc. (In re*
*Tolomeo)*, 537 B.R. 869, 878 n.7 (Bankr. N.D. Ill. 2015) (citing *Scholes* and *Neuhauser*); *Barber*
*v. Prod. Credit Servs. (In re KZK Livestock, Inc.)*, 221 B.R. 471, 477-78 (Bankr. C.D. Ill. 1998)
(citing *Sea-Land* and *Boatmen's* and finding it "unquestionable" that reverse piercing "is a viable
doctrine" in Illinois).  None of these decisions mentions *Centaur* or *Forsythe*.  In *Fish v.*
*Hennessy*, No. 12 C 1856, 2013 WL 5770512 (N.D. Ill. Oct. 24, 2013), the court acknowledged
that "the law is far from settled" but stated in dictum that Illinois "appears" to allow outside
reverse piercing – citing *Canopy, Sea-Land, Boatmen's*, and *Crum. Id.* at *1 n.1.

They have refused to venture into reverse piercing at all. *See, e.g., Forsythe*, 224 Ill. 2d at 297-98, 864 N.E.2d at 241-42; *Centaur*, 158 Ill. 2d at 173-74, 632 N.E.2d at 1018.

When state law is unsettled and prediction difficult, federal courts should hesitate before "venturing beyond the frontiers" of established law. *ALT Hotel*, 479 B.R. at 802-03 (citing *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1034 (7th Cir. 2005)). If the proper interpretation is in doubt, a federal court should adopt the one that "restricts liability rather than expands it," *id.* at 803 (citing *Home Valu, Inc. v. Pep Boys–Manny, Moe & Jack of Del., Inc.*, 213 F.3d 960, 965 (7th Cir. 2000)). Given the current shape of Illinois law – no decision recognizing reverse piercing, two decisions rejecting inside reverse piercing, and a conservative take on veil-piercing generally – the proper tack is to let things be rather than advance Illinois law in a direction Illinois courts have not yet taken. Federal courts are not "the place for innovations in state law." *Id.* (citing *Great Cent. Ins. Co. v. Insurance Servs. Office, Inc.*, 74 F.3d 778, 786 (7th Cir. 1996)); *see also Howland*, 2016 WL 3176649, at *4 (refusing to "read[ ] tea leaves" when "no Kentucky court has issued a definitive ruling on reverse piercing").

Count VI would have to be dismissed even if Illinois did recognize reverse piercing. Again, two requirements must be met before an Illinois court will pierce the corporate veil in a conventional case. *See* discussion, *supra*, at 34. First, the court must find that the shareholder dominated the corporation to the point that it had no separate existence and was effectively his alter ego. *Main Bank*, 86 Ill. 2d at 205, 427 N.E.2d at 101. Second, the court must conclude that failing to ignore corporate identity and holding the shareholder liable would sanction a fraud or promote injustice. *Id.*

Gierum alleges only the first of these requirements. The amended complaint suggests that BEG did not in fact have a separate corporate existence, and that BEG and Glick were one and

-44-

the same. Gierum alleges that BEG was inadequately capitalized, had no employees, did not

observe corporate formalities. and occupied the same offices as several other Glick entities.

(Am. Compl. ¶¶ 467, 469, 470-71). He also alleges that Glick was BEG's manager, maintained

total control over all of its operations, and was its sole decision maker. (*Id.* ¶ 468).

The second requirement, though, Gierum alleges as a series of legal conclusions, not

facts. He asserts that "adher[ing] to the fiction that BEG is a separate business entity . . . would

sanction a fraud and allow Glick to hide behind sham business entities to protect Glick from

personal liability." (*Id.* ¶ 478). Two paragraphs on, Gierum adds that "allow[ing] Glick to hide

behind BEG . . . as a shield from personal liability results in a substantial injustice and is

tantamount to a fraud on his creditors." (*Id.* ¶ 480). These allegations simply restate the second

requirement for veil-piercing. They fail to explain *why* observing BEG's corporate form would

permit fraud or promote injustice. It is no answer, as Gierum seems to believe, that observing it

would allow Glick to shield himself from liability. Limited liability is the point of incorporating.

*See Import Sales, Inc. v. Continental Bearings Corp.*, 217 Ill. App. 3d 893, 903, 577 N.E.2d

1205, 1212 (1st Dist. 1991) (stating that "[t]he mere formation of a corporation" does not make

its shareholders the corporation's alter egos).[22]

Because Illinois does not recognize the reverse piercing theory on which Count VI

depends, and because Count VI fails to allege the elements necessary for piercing BEG's

---

[22]    Other allegations in the amended complaint actually undermine Gierum's request
to pierce BEG's corporate veil. Gierum alleges that at least one other creditor – Ashworth, one
of BEG's two shareholders (Am. Compl. ¶¶ 271, 275) – may have claims against BEG. (*See id.*
¶ 271). Gierum does not explain why reverse piercing BEG would not prejudice Ashworth. *See
Scholes,* 56 F.3d at 758 (stating that reverse piercing "is ordinarily possible only in one-man
corporations, since if there is more than one shareholder the seizing of the corporation's assets to
pay a shareholder's debts would be a wrong to the other shareholders").

corporate veil in any event, the motion of the Glick defendants to dismiss Count VI will be

granted. Count VI will be dismissed.

### d. Requests to Pierce the "Corporate Veils"
### of the JCG 1999 Trust and the JCG 2012 Trust
### (Counts I and V)

Counts I and V will be dismissed as well. These counts are one step beyond Count VI.

They request not only reverse piercing of Illinois entities but reverse piercing of two Illinois

*trusts*, the JCG 1999 Trust and the JCG 2012 Trust. Just as Illinois has not yet recognized

reverse piercing, it has yet to recognize piercing a trust's "veil." The validity of his legal theories

aside, Gierum has not alleged facts suggesting the separate identities of the two trusts should be

ignored.

Veil-piercing of trusts is as controversial as reverse-piercing of corporations – but without

the extensive case law. The few courts to address the question have disagreed on the theory's

validity. *Compare, e.g., Babitt v. Vebeliunas (In re Vebeliunas)*, Nos. 01 CIV 1108, 1225, 1230,

2002 WL 115656, at *4-5 (S.D.N.Y. Jan. 28, 2002) (predicting New York would approve

piercing of trusts), *rev'd on other grounds*, 332 F.3d 85 (2d Cir. 2003); *Gordon v. Harman (In re*

*Harman)*, 512 B.R. 321, 341 (Bankr. N.D. Ga. 2014) (finding reverse piercing of trusts under

Georgia law not precluded at dismissal stage), *with Henkel v. Brothers Mill, Ltd. (In re Eddy)*,

Nos. 6:12-bk-04736-CCJ, 6:13-ap-00112-CCJ, 6:13-ap-00115-CCJ, 2015 WL 1585513, at *4

(Bankr. M.D. Fla. Apr. 3, 2015) (expressing "doubts that the alter ego doctrine applies to

irrevocable trusts" and refusing to extend it); *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486,

521-22, 121 Cal. Rptr. 3d 118, 145-46 (2010) (rejecting piercing of trusts).[28]

No Illinois decision has recognized the piercing of trusts as opposed to corporations.

Two federal decisions, *Laborers' Pension Fund v. Lay-Com*, 580 F.3d 602, 615 (7th Cir. 2009),

and *Dexia Credit Local v. Rogan*, No. 02 C 8288, 2008 WL 4543013, at *7 (N.D. Ill. Oct. 9,

2008), assume piercing of trusts is possible but do not decide the question. More recently, the

Seventh Circuit observed that piercing in Illinois arises "most commonly, if not exclusively," in

the context of corporations. *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 774 (7th Cir.

2013), *rev'd on other grounds*, ___ U.S. ___, 135 S. Ct. 1932 (2015). The court found it

"unclear whether Illinois recognizes an analogous alter ego theory to disregard the separate legal

identity of a trust." *Id.* There have been no decisions since *Wellness*.

With no Illinois authority on the subject and the law consequently unsettled, the correct

course again is to refrain from offering an unfounded prediction – really no better than a shot in

the dark – about the course of state law, making changes no Illinois court has thus far seen fit to

make. *ALT Hotel*, 479 B.R. at 803; *see, e.g., Waldron v. Huber (In re Huber)*, 493 B.R. 798, 810

(Bankr. W.D. Wash. 2013) (declining to "speculate as to whether Washington courts would

apply the alter ego doctrine in the trust context" in the absence of Washington authority). To

expand Illinois law on piercing, Gierum should have brought his action in an Illinois court.

Nothing prevented him from doing so. He chose instead to sue in federal court, and "it is not the

role of a federal court to expand state law in ways not foreshadowed by state precedent." *City of*

---

[28]      A recent unpublished decision incorrectly declares that "nearly every court to have
addressed the issue . . . has concluded that alter ego liability should apply to trusts to the same
extent it applies to other legally created fictions." *Bash v. Sydney Jackson Williams, Jr.
Irrevocable Trust*, No. 5:16 CV 257, 2016 WL 1592445, at *3 (N.D. Ohio Apr. 20, 2016).

-47-

*Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002).[29]

All Gierum offers as authority to support his trust-piercing request is *Wellness*, which he claims "acknowledged that Illinois recognizes an alter ego theory to disregard the separate legal entity of a trust . . . ." (Pl. Resp. at 51 n.8). That rather badly mischaracterizes the decision. After finding it "unclear" whether Illinois would recognize a trust-piercing theory, the court in *Wellness* decided to "proceed on the assumption that such a theory exists . . . because the parties have so assumed and the merits are not at issue in this appeal." *Wellness*, 727 F.3d at 774. At no point did the court say Illinois "recognizes" trust-piercing. *Wellness* is no help to Gierum.

Even if Illinois had approved piercing the "corporate veil" of a trust, the amended complaint here alleges insufficient facts to make Gierum's request plausible.

• *The JCG 1999 Trust.* The facts alleged about the JCG 1999 Trust at most support the "no separate existence" element of veil-piercing. Gierum alleges that Glick owns 100 percent of the trust, he treats the trust property as its own, and he exercises exclusive control over the trust's "operations." (Am. Compl. ¶¶ 364, 369, 371). He also alleges that the trust did not have a separate bank account and did not maintain financial records. (*Id.* ¶ 368).

---

[29]    The only hint that Illinois might be favorably inclined toward piercing of trusts comes from the rationale courts supply for rejecting piercing, a rationale to which Illinois courts do not subscribe. Courts rejecting piercing reason that a trust is "not a legal person which can own property or enter into contracts." *Greenspan*, 191 Cal. App. 4th at 521, 121 Cal. Rptr. 3d at 146 (internal quotation omitted). A trust, they say, is instead "fundamentally a relationship." *Babitt v. Vebeliunas (In re Vebeliunas)*, 252 B.R. 878, 886 (Bankr. S.D.N.Y. 2000), *rev'd*, 2002 WL 115656 (S.D.N.Y. Jan. 28, 2002). Without the kind of separate legal existence a corporation has, a trust "cannot have an alter ego." *Id.* at 887. And because it has none, piercing a trust makes no sense: a person or entity cannot exercise undue control over what is effectively a "non-entity." *Greenspan*, 191 Cal. App. 4th at 522, 121 Cal. Rptr. 3d at 146. Illinois courts, on the other hand, have frequently said that a "written trust possesses a distinct legal existence" and is more than just "an arrangement relating to property." *See, e.g., Sullivan v. Kodsi*, 359 Ill. App. 3d 1005, 1010, 836 N.E.2d 125, 131 (1st Dist. 2005) (citing cases). But this crumb is not enough to support a prediction that Illinois would actually endorse the piercing of trusts.

-48-

Nowhere, though, does Gierum allege that unless the trust's "veil" is pierced, some fraud or injustice will be visited upon creditors. He does not allege, for example, that Glick's creditors expected to recover claims from the trust assets and will have those expectations frustrated unless the trust's "veil" is pierced. Nor does he allege that assets otherwise available to Glick's creditors from any of the Glick entities have been squirreled away in the trust. Gierum offers only the conclusion that allowing Glick to "hide behind" the trust would be a "substantial injustice" to his creditors and "tantamount to a fraud." (*Id.* ¶ 375). Conclusions are not enough. *Iqbal*, 556 U.S. at 678-79; *Defender Sec.*, 803 F.3d at 334.

• *JCG 2012 Trust.* The allegations about the JCG 2012 Trust suffer from the same deficiencies. Again, Gierum alleges facts that tend to support the "no separate existence element." (*See* Am. Compl. ¶¶ 455-59). No facts, though, indicate that failing to pierce the trust's "veil" would sanction a fraud or promote injustice. Gierum alleges only that Glick formed the JCG 2012 Trust "to operate his newly formed businesses" (*id.* ¶ 3), an allegation he later contradicts (*see id.* ¶ 453 (stating that the JCG 2012 Trust was just a ""holding company for other Glick . . . companies")). In the end, Gierum asserts simply that allowing Glick to hide behind the trust's "facade" would result in "substantial injustice" and a "fraud" – the same bald conclusions alleged about the JCG 1999 Trust. (*Id.* ¶ 461).

If anything, the amended complaint suggests the trusts were legitimate rather than candidates for some sort of piercing. Gierum complains that at least as to the JCG 1999 Trust, Glick was trustee, grantor, and beneficiary and treated its assets as his own. But Illinois courts have "readily upheld inter vivos trust arrangements where the settlor has named himself trustee and retained indicia of ownership and control." *Johnson v. La Grange State Bank*, 73 Ill. 2d 342, 356, 383 N.E.2d 185, 191 (1978); *see also Farkas v. Williams*, 5 Ill. 2d 417, 425-33, 125 N.E.2d

600, 605-08 (1955).

Gierum also objects that both the JCG 1999 Trust and JCG 2012 Trust were part of "a wealth management and estate planning strategy" designed "to shelter assets." (Am. Compl. ¶¶ 366, 451). But avoidance of taxes, concealment of ownership, even protection from creditors, are all legitimate purposes for which trusts are formed. *Hanley v. Kusper*, 61 Ill. 2d 452, 461, 337 N.E.2d 1, 6 (1975). On the face of the documents, both trusts appear to be standard estate planning instruments. If something untoward was going on, something in which the trusts played a role, the amended complaint fails to describe it.[30/]

Because Illinois has not recognized the veil piercing of trusts (let alone the reverse veil piercing of trusts), and because Counts I and V do not allege facts that would justify ignoring the separate existence of either the JCG 1999 Trust or the JCG 2012 Trust in any case, the motion of the Glick defendants to dismiss Counts I and V will be granted. Counts I and V will be dismissed.

### 3. Turnover Claims

Next, all but one of Gierum's turnover claims (the claims that do not appear in any count) will be dismissed. These are claims under section 542(a) of the Code seeking to compel Glick to turn over to Gierum the assets of the various Glick-controlled entities. But Gierum can only have those assets turned over if they are property of Glick's bankruptcy estate – and that is true only if Gierum can maintain his requests for veil-piercing. As detailed above, he cannot. Because he cannot, Gierum has no claims for turnover. The sole exception is his claim for turnover of the

---

[30/]     Gierum alleges indignantly that Glick "treats the property of the JCG 1999 Trust as his own property." (Am. Compl. ¶¶ 361, 369). The trust declaration entitles him to. (*See id.* Ex. 2 at 2, 4-5).

JCG 1999 Trust's assets, a claim that does not require any form of piercing.

A debtor's bankruptcy estate comes about as soon as his petition is filed. *Matthews v. Potter*, 316 F. App'x 518, 521 (7th Cir. 2009); *Holstein v. Knopfler (In re Holstein)*, 321 B.R. 229, 234 (Bankr. N.D. Ill. 2005). In a chapter 7 case, the trustee sells property that the estate holds and distributes the proceeds to creditors with allowed claims. *See* 11 U.S.C. § 704(a)(1); *Teed v. Thomas & Betts Power Solutions, L.L.C.*, 711 F.3d 763, 769 (7th Cir. 2013). To that end, any entity in possession, custody, or control of property potentially subject to sale must deliver it to the trustee. 11 U.S.C. § 542(a). When property has not been delivered, a trustee – like Gierum – can sue under section 542(a) to compel its turnover. *See Kasdorf v. Green Tree Servicing, LLC (In re Wenzel)*, 554 B.R. 861, 863 (Bankr. W.D. Wis. 2016).

To succeed on the claim, though, the property must in fact be property of the estate. The Code defines estate property to consist of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The breadth of this definition is well-established. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983); *United States v. Van Allen*, 524 F.3d 814, 822 (7th Cir. 2008). Under it, "virtually all property of the debtor" becomes property of his bankruptcy estate. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). As broad as it is, though, the definition is not unlimited. The debtor must first have an interest in the property. 11 U.S.C. § 541(a)(1). Whether he does depends on state law. *Butner v. United States*, 440 U.S. 48, 54-55 (1979); *Holstein*, 321 B.R. at 234-35.

State law limits the property Gierum can reach here without some form of piercing. Under Illinois law, a debtor who is a member of an Illinois LLC has no interest in the assets of the LLC. 805 ILCS 180/30-1(a) (2014); *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 647 n.10 (Bankr. N.D. Ill. 2004). So the LLC's assets do not become property of his

-51-

bankruptcy estate. *See Fowler*, 400 F.3d at 1019. The same is true of Delaware corporations, *see Cohen v. State ex rel. Stewart*, 89 A.3d 65, 95 n.130 (Del. 2014), Delaware LLCs, *see* Del. Code Ann. tit. 6, § 18-701 (2013), and Delaware limited partnerships, *see* Del. Code Ann. tit. 6, § 17-701 (2013). Without piercing, then, the assets of JZ Enterprises LP, JZ Enterprises GP, Play Makers, and BEG did not become property of Glick's bankruptcy estate on the petition date.[31/]

The same holds true of the assets of the JCG 2012 Trust. Ownership of trust assets tends to depend on the particular trust, making generalizations difficult. As a rule, though, the settlor of a trust transfers to the trustee legal title to the property intended to form the trust *res*. Helene S. Shapo, George Gleason Bogert & George Taylor Bogert, *Law of Trusts and Trustees* § 141 at 2 (3d ed. 2012). Upon transfer, the trustee acquires a "bare legal interest" in the trust property that he holds for the benefit of the trust beneficiary. *Id.* The beneficiary has an "equitable or beneficial interest" in the property. *Id.*

Glick was the settlor of the JCG 2012 Trust, transferring property to the trust on its creation. (Am. Compl. ¶¶ 15, 452; Ex. 2 at 1). Larry and Nancy have served as trustees. (Am. Compl. ¶¶ 16-17). Glick's wife, Stacey, and his descendants are the beneficiaries. (Am. Compl. ¶¶ 1, 515; Ex. 2 at 2). As trustees, Larry held, and Nancy now holds, legal title to the trust assets. Stacey held and still holds the equitable interest in the trust. Glick had no interest, legal or equitable, in the JCG 2012 Trust assets on the petition date (and the trustee was actually

---

[31/]    Glick is one step farther removed from these entities, since he was neither a partner in JZ Enterprises LP, a shareholder of JZ Enterprises GP, a member of Play Makers, nor a member of BEG. The partners in JZ Enterprises LP are other Glick entities: JZ Enterprises GP and the JCG 1999 Trust. (*See* Am. Compl. ¶¶ 32-33, 107, 381; Ex. 1). The shareholders of JZ Enterprises GP are the JCG 1999 Trust and Glick's sons (or their trusts). (*See* Am. Compl. ¶¶ 32, 379, 399; Ex. 1). The sole member of Play Makers is JZ Enterprises LP. (*See* Am. Compl. ¶ 107). The members of BEG are the JCG 2012 Trust and Ashworth. (*See* Am. Compl. ¶¶ 206, 271, 275; Ex. 1).

prohibited from paying Glick's obligations out of trust principal or income (*id.* Ex. 2 at 2).
Those assets therefore did not become property of Glick's estate.

The JCG 1999 Trust presents a different situation. The JCG 1999 Trust is a self-settled,
revocable *inter vivos* (or "living") trust with a conventional form but complex provisions. *See
generally* Myron Kove, George Gleason Bogert & George Taylor Bogert, *Law of Trusts and
Trustees* § 233 (3d ed. 2012); Restatement (Third) of Trusts § 25 cmt. a (2003); *see, e.g., In re
Rowand*, No. 11-81717, 2012 WL 3070215, at *1-*5 (Bankr. C.D. Ill. July 30, 2012) (describing
similar trusts as "valid *inter vivos* trusts"). Glick is not only the settlor and trustee but also a
beneficiary. *See, e.g., In re Estate of Michalak*, 404 Ill. App. 3d 75, 84, 934 N.E.2d 697, 707 (1st
Dist. 2010) (describing the settlor of a self-settled trust as "the primary beneficiary");
Restatement (Third) of Trusts § 48 (2003) (defining beneficiary).[32]

Because Glick is both trustee and a beneficiary of the JCG 1999 Trust, any interests he
held in the trust became property of his bankruptcy estate on the petition date. Glick's equitable
interest as a beneficiary became estate property. *Mapother & Mapother, P.S.C. v. Cooper (In re
Downs)*, 103 F.3d 472, 478 (6th Cir. 1996). So did his powers as trustee under the trust
declaration, *In re Gifford*, 93 B.R. 636, 640 (Bankr. N.D. Ind. 1988): the powers to distribute
income and principal, to amend the trust, even to revoke the trust altogether, *see In re Johnson*,

---

[32]      He is not the only beneficiary, of course. Stacey and the Glick children are
beneficiaries as well. *See In re Estate of Zukerman*, 218 Ill. App. 3d 325, 332, 578 N.E.2d 248,
253 (1st Dist. 1991). Gierum admits as much, at least where the Glick children are concerned.
(*See* Am. Compl. ¶ 332 ("The JCG 1999 Trust was created for estate planning purposes to
benefit Glick's sons . . . ."). Contradicting this allegation, Gierum later implies incorrectly that
Glick is the sole beneficiary. (*See* Am. Compl. ¶ 371). If he were, the legal and equitable
interests in the trust would merge, and the trust would terminate. *See* Restatement (Third) of
Trusts § 69 (2003). No merger occurs, however, with a self-settled trust where the settlor is
trustee but not the sole beneficiary. *Id.* § 69 cmt. c, illus. 2.

513 B.R. 333, 342 (Bankr. S.D. Ill. 2014); *Olsen v. Reuter (In re Reuter)*, 499 B.R. 655, 670

(Bankr. W.D. Mo. 2013). No piercing of the trust's "veil" is necessary before Gierum can take

over Glick's equitable interest and exercise Glick's powers as trustee. Gierum can maintain a

turnover claim against Glick with respect to the JCG 1999 Trust.

Because the vast majority of Gierum's turnover claims under section 542(a) require him

to succeed on piercing theories that have yet to be recognized in the relevant states, the motion of

the Glick defendants to dismiss those claims will be granted.[33] Except for the claim for turnover

of the JCG 1999 Trust's assets, the turnover claims will be dismissed.

### 4. Fraudulent Transfer Claims
### (Counts VII-X)

Gierum's claims in Counts VII through X will also be dismissed. These are the claims to

avoid fraudulent transfers that some of the Glick entities, assertedly Glick's alter egos, allegedly

made before Glick filed his bankruptcy case. In Counts VII and VIII, Gierum attempts to allege

actual and constructive fraud under sections 548(a)(1)(A) and 548(a)(1)(B) of the Code. In

Counts IX and X, Gierum attempts to allege actual and constructive fraud under 544(b) of the

Code and the IUFTA. He apparently intends the fraudulent transfer claims as an alternative to

the veil piercing requests and turnover claims. (*See* Pl. Resp. at 2-3).

Counts VII through X will be dismissed for two reasons. The claims in those counts fail

to plead fraud with particularity, as Rule 9(b) requires. But even if they did plead fraud with the

---

[33] The Glick defendants have not moved to dismiss the turnover claims in so many words, perhaps because the claims do not appear in any counts. But Gierum's piercing requests are plainly designed to set up turnover claims; otherwise, there would be no point to the requests. *See* discussion, *supra*, at 18. Because the Glick defendants moved to dismiss the piercing requests, their motion implicitly sought dismissal of the claims for turnover.

requisite particularity, they fail to state claims to avoid fraudulent transfers.

### a. Pleading Fraud

Whether the underlying theory is actual or constructive fraud, none of the four fraudulent transfer avoidance claims are pled with the detail Rule 9(b) demands.

As discussed earlier, a plaintiff satisfies Rule 9(b) by providing the "'who, what, when, where, and how of the fraud.'" *Presser*, 836 F.3d at 776 (internal quotation omitted). When the fraud is a fraudulent transfer, the plaintiff must allege "what (or how much) was transferred, when the transfer was made, how it was made, who made it, who received it, and under what circumstances." *Marwil*, 2010 WL 2650024, at *3.

Counts VII through X do not meet these standards. Each count alleges simply that the fraudulent transfers consisted of Glick's "transfer of assets and business opportunities from the JCG 1999 Trust to the JCG 2012 Trust." Repeatedly, Gierum makes this same allegation. (*See* Am. Compl. ¶¶ 482-84, 486-491, 497-98, 502, 504, 505). Arguably, at least, these allegations describe who made the transfers and who received them. What Gierum fails to allege, though, is when the transfers were made, how they were made, and under what circumstances. Most important, Gierum fails to allege "what (or how much) was transferred," *Marwil*, 2010 WL 2650024, at *3, other than "assets and business opportunities." That description is too general to satisfy the concerns that animate the rule. *See Fidelity Nat'l Title Ins. Co. v. Intercounty Title Ins. Co.*, 412 F.3d 745, 748-49 (7th Cir. 2005).

It may be that some of the necessary detail appears elsewhere in the complaint. Each of the four fraudulent transfer counts purports to incorporate by reference the allegations that precede them. (*See* Am. Compl. ¶¶ 481, 485, 496, 501). This pleading technique is allowed, *see*

-55-

Fed. R. Civ. P. 10(c) (made applicable by Fed. R. Bankr. P. 7010), and in a shorter complaint it

might be enough. Here, though, Gierum incorporates some *500 paragraphs* of earlier allegations

– in other words, everything in the entire amended complaint that comes before – "mak[ing] it

virtually impossible to know which allegations of fact are intended to support which claim(s) for

relief." *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011)

(internal quotation omitted); *see also Chriswell v Village of Oak Lawn*, No. 11 C 00547, 2013

WL 5903417, at *5 (N.D. Ill. Nov. 4, 2013) (terming "impermissibl[e]" this form of "shotgun

pleading"), *aff'd sub nom. Chriswell v. O'Brien*, 570 F. App'x 617 (7th Cir. 2014).

      Gierum also elaborates a bit in his response to the motions. He says Glick "transferred,

through non-exclusive licenses . . . , the right, title and interest in [the toy car] to Awesome

[Toys], Excitement, Glick Group, Virtual and finally, Play Makers." (Pl. Resp. at 6; *see also id.*

at 13 (stating that "Glick transferred all his valuable intellectual property . . . to Play Makers,

Madhouse, and Visionaries")). He also says Glick "transferred all his . . . management and

administrative services to Play Makers, Madhouse, and Visionaries" (*id.* at 13; *see also id.* at 16

(stating that "Glick transferred . . . administrative . . . and managerial services"), apparently

meaning Glick Group's administrative services agreements with Awesome Toys, Play Makers,

and BEG. But even if these allegations supplied the needed detail (they do not), that detail must

appear in the complaint itself. *See Hanna*, 834 F.3d at 779. "[T]he pleader is not free to hold

back and add facts via affidavit or brief." *Id.* (distinguishing Rule 9(b) from Rule 8).

### b. Substance of the Claims

      Gierum's fraudulent transfer claims have bigger problems than just an unacceptable level

of generality. Taking the claims as Gierum describes them in his response (an approach Rule 8

-56-

permits, *see Geinosky*, 675 F.3d at 745 n.1), none states a claim for relief.  Whether the claims

allege actual or constructive fraud, and whether they are based on federal or state law, they all

fail to allege a transfer of an interest in Glick's property.

Fraudulent transfer claims under section 548(a) of the Code – for actual fraud under

section 548(a)(1)(A) and constructive fraud under section 548(a)(1)(B) – share two elements.

There must have been a "transfer," and the transfer must have involved "an interest of the debtor

in property."  11 U.S.C. § 548(a)(1).  Fraudulent transfer claims under section 544(b) are no

different.  Section 544(b) allows a trustee to avoid transfers that are voidable under "applicable

law."  11 U.S.C. § 544(b).  "Applicable law" typically means a state's fraudulent transfer law.  *In

re Equipment Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014).  Under the IUFTA, the

state fraudulent transfer law applicable here, a fraudulent transfer must involve a "transfer," 740

ILCS 160/5(a) (2014), and the transfer must be of an "asset or an interest in an asset," 740 ILCS

160/2(*l*) (2014), meaning "property of a debtor" or an interest in property of debtor, 740 ILCS

160/2(b) (2014).

Gierum fails to allege a claim involving Glick's property or an interest in his property.

The amended complaint asserts that the transfers in question are transfers "of assets and business

opportunities from the JCG 1999 Trust to the JCG 2012 Trust."  (*See, e.g.,* Am. Compl. ¶¶ 482-

84.)  As Gierum's response explains, however, the transfers did not in fact involve property of

the trusts.  The transfers instead involved (1) "the right, title and interest in [the toy car]" (Pl.

Resp. at 6); and (2) "administrative . . . and managerial services," meaning services under the

administrative services agreements (*id.* at 16).

The problem for Gierum is that the rights to the toy car belonged, not to Glick, but to

Awesome Toys.  (*See* Am. Compl. ¶ 70).  Awesome Toys, again, is an Illinois LLC.  Its property

-57-

is its own.  Members of an LLC have no interest in the LLC's assets.  805 ILCS 180/30-1(a)

(2014).[34/]  The administrative services agreements, similarly, were agreements between Glick

Group and other Glick entities, not Glick.  (*Id.* ¶¶ 172, 181, 190).  Glick Group, too, is an Illinois

LLC.  Its agreements are its own.  805 ILCS 180/1-30 (2014).  The only way to identify Glick

with Awesome Toys and Glick Group would be through some form of reverse piercing.  But

Gierum has made no piercing request related to either entity, and for the reasons set out earlier

the request would be dead on arrival anyway.[35/]

Not only does Gierum fail to allege a claim involving an interest in Glick's property, but

he also fails to allege a "transfer."  The Code defines "transfer" broadly as "each mode, direct or

indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . .

property . . . or . . . an interest in property."  11 U.S.C. § 101(54)(D); *see Official Comm. of*

*Unsec. Creditors v. T.D. Invs. I, LLP* (*In re Great Lakes Quick Lube LP*), 816 F.3d 482, 485 (7th

---

[34/]      Glick is not a member of Awesome Toys in any event.  Awesome Toys is wholly
owned by Awesome! Group LLC.  (Am. Compl. ¶ 387).

[35/]      Even if Gierum's reverse piercing theories had been recognized in the relevant
states, there is a real question whether he would be able use them to undo past transfers, deeming
business entities to have been Glick's alter egos not only on the petition date but pre-petition
when each transfer occurred.  Bari in particular makes this point, arguing that reverse-piercing
"do[es] not apply retroactively to treat property that was supposedly fraudulently transferred by
an alter ego as if it had been transferred by the debtor."  (Bari Mem. at 11-12).  Several courts
have agreed, rejecting attempts by trustees to use veil-piercing this way.  *See, e.g., Spradlin v.
Beads & Steeds Inns, LLC* (*In re Howland*), 516 B.R. 163, 169-70 (Bankr. E.D. Ky. 2014)
(stating that even if Kentucky recognized reverse piercing, a trustee could not use the theory
"both prospectively and retroactively" to recover fraudulent transfers), *aff'd*, 2016 WL 2016 WL
3176649 (E.D. Ky. June 7, 2016), *aff'd*, ___ F. App'x ___, 2017 WL 24750 (6th Cir. Jan. 3,
2017); *Covey v. Casey's Gen. Stores, Inc.* (*In re Duckworth*), Nos. 10-83603, 11-8104, 2012 WL
4434681, at *8 (Bankr. C.D. Ill. Sept. 24, 2012) (refusing to permit a trustee to use piercing "to
rewrite history," calling it "a gross overextension of the alter ego doctrine"); *Rafool v. Propack
Sys., LLC* (*In re Fleming Packaging Corp.*), Nos. 03-82408, 05-8124, 2007 WL 1021884, at *3
n.1 (Bankr. C.D. Ill. Mar. 30, 2007).  Gierum offers no response to Bari's argument.

Cir. 2016). "The essence of a transfer is the relinquishment of a valuable property right." *Allan*

*v. Archer-Daniels-Midland (In re Commodity Merchs., Inc.)*, 538 F.2d 1260, 1263 (7th Cir.

1976). The definition under the IUFTA, which applies to claims under section 544(b), is

essentially the same. *See* 740 ILCS 160/2(*l*) (2014).

No transfer took place when Awesome Toys terminated the Awesome Toys/Virtual

license and entered into the new Awesome Toys/Play Makers license.

• First, Awesome Toys never transferred its "right, title, and interest" in the patent, as

Gierum asserts (Pl. Resp. at 6) – not to Virtual and not to Play Makers. The transactions were

*licenses* – "allowing the licensee to use the patent but not transferring any ownership interest in

the patent." *In re CFLC, Inc.*, 89 F.3d 673, 676 n.2 (9th Cir. 1996). As one might expect, the

Awesome Toys/Virtual license granted Virtual only "a non-exclusive right and license to use [the

patent]" and to manufacture and sell the toy car. (Am. Compl. Ex. 19 at 2). Virtual acquired "no

right, title or interest" in the patent itself. (*Id.*). The same was true of Play Makers and the

Awesome Toys/Play Makers license. (*Id.* Ex. 21 at 2).

• Second, the Awesome Toys/Virtual license expressly allowed the parties to terminate

the license "by mutual written consent at any time." (*Id.* Ex. 19 at 4). Gierum even alleges that

the Awesome Toys/Virtual license was terminated by consent according to its terms. (*See id.* ¶

89 (alleging that the license was terminated "by written agreement")). "When a termination is

pursuant to the terms of a contract, there is no transfer." *Sullivan v. Willock (In re Wey)*, 854

F.2d 196, 199 (7th Cir. 1988); *see also Hometown 2006-1 1925 Valley View, L.L.C. v. Prime*

*Income Asset Mgmt., L.L.C.*, 847 F.3d 302, 308 (5th Cir. 2017) (agreeing in dictum).

• Third, Gierum does not allege that Awesome Toys lost any "valuable property right"

from the change in licensee. *Allan*, 538 F.2d at 1263. In fact, the amended complaint suggests

-59-

the opposite. At the time the Awesome Toys/Virtual license was terminated, Virtual had

defaulted to its creditors and was struggling to survive. (Am. Compl. ¶¶ 52-59, 64-67, 90-91,

109, 441, 445 (describing Virtual as "debt ridden" and "defunct"). Virtual is not alleged to have

owed Awesome Toys anything at termination that went unpaid. Equipped with the new license,

meanwhile, Play Makers generated close to $2 million in revenue – a portion of which had to be

paid to Awesome Toys – in 2013 alone. (*Id.* ¶¶ 35, 123, 442). Events that do not diminish a

debtor's property typically do not constitute transfers for purposes of fraudulent transfer laws.

Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning & Exemptions* § 1:20 (2012).

The administrative service agreements are even harder to characterize as "transfers."

Glick Group, it will be recalled, entered into an ASA with Awesome Toys in 2010. (Am. Compl.

¶¶ 171-72). The ASA was never terminated and is still in effect. (*Id.* ¶¶ 173-74). Glick Group

has continued to receive payments under it. (*Id.* ¶ 180). Two years later, Glick Group entered

into ASAs with Play Makers (*id.* ¶ 181) and with BEG (*id.* ¶ 190). Those ASAs were never

terminated and are still in effect. (*Id.* ¶¶ 183, 192). Glick Group has continued to receive

payments under both of them. (*Id.* ¶¶ 188, 200).

How the Play Makers and BEG ASAs involved fraudulent transfers is anybody's guess.

Under the right circumstances, it is true, entering into a contract can entail a transfer that is

fraudulent. *See 2 Collier on Bankruptcy* ¶ 101.54 at 101-214 (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2017) (noting that the concept of "transfer" includes "ordinary

transactions in which goods and services are voluntarily exchanged for consideration"). Any one

of the ASAs, then, might conceivably have involved a fraudulent transfer. But that is not

Gierum's theory. Based on his response, Gierum seems to be alleging more broadly that in light

of the Awesome Toys ASA, the Play Makers and BEG ASAs were fraudulent. Those two ASAs,

-60-

though, did not replace the Awesome Toys ASA. Glick Group simply entered into two more agreements and received payments under all three. Far from relinquishing some "valuable property right," Glick Group gained from having three ASAs rather than one. If Glick Group suffered some loss as a consequence, Gierum has not identified it.

Because Counts VII through X fail to plead fraud with particularity, and because they would not state fraudulent transfer claims if they did, the motion of the Glick defendants to dismiss those counts will be granted. Counts VII through X will be dismissed.

### 5. Post-petition Transfer Claims
### (Counts XVII-XIX and XXI)

The claims in Counts XVII-XIX and XXI to avoid post-petition transfers will be dismissed as well. These claims, too, depend on Gierum's doomed piercing requests.

Under section 549(a), a trustee "may avoid a transfer of property of the estate – (1) that occurs after the commencement of the case; and . . . (2) . . . (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a). Avoidance under section 549(a) has four elements: (1) property was transferred; (2) the property was property of the bankruptcy estate; (3) the transfer occurred after the commencement of the case; and (4) neither the bankruptcy court nor the Bankruptcy Code authorized the transfer. *Boyer v. Gildea*, 374 B.R. 645, 651 (N.D. Ind. 2007); *Schechter v. Weiler (In re Blair)*, 330 B.R. 206, 213 (Bankr N.D. Ill. 2005).

The deficiency here lies with the second element. In Counts XVII-XIX, Gierum is attempting to recover payments he alleges Play Makers made to Factor and Bari for legal services and to Alilovich for reasons that are unclear. (*See* Am. Compl. ¶¶ 350-52, 606, 615, 624). Whether Glick had an interest in those payments, potentially making them property of his estate, depends on applicable state law. *Covey v. Peoria Speakeasy, Inc. (In re Duckworth)*, Nos. 10-

83603, 11-8092, 2013 WL 1397456, at *3 (Bankr. C.D. Ill. Apr. 4, 2013). Play Makers is a

Delaware LLC. (Am. Compl. ¶ 106). Under Delaware law, its assets were its own, not the assets

of its members (and Glick was not a member of Play Makers in any event). *See* discussion,

*supra*, at 52. Absent the use of a reverse piercing theory that Delaware has yet to adopt, *see*

discussion, *supra*, at 39-40, the payments cannot be considered property of Glick's bankruptcy

estate.[36]

Count XXI has the same problem. In that count, Gierum is attempting to recover

payments the "1999 Trust Entities" made to Glick. (Am. Compl. ¶ 639). Those entities, again,

are JZ Enterprises GP, a Delaware corporation, and JZ Enterprises LP, a Delaware limited

partnerships. Property of a Delaware corporation is its own, not property of its shareholders.

*Cohen*, 89 A.3d at 95 n.130. Property of a Delaware limited partnership is its own, not property

of the partners. Del. Code Ann. tit. 6, § 17-701 (2013). (And just as Glick was not a member of

Play Makers, he was not a shareholder of JZ Enterprises GP or a partner in JZ Enterprises LP.)

Without reverse piercing in forms Delaware has not recognized, the payments cannot be

considered property of Glick's estate.

Because Gierum has not alleged a post-petition transfer of property that was property of

Glick's bankruptcy estate, the motion of the Glick defendants to dismiss Counts XVII-XIX and

---

[36]      Gierum also alleges on information and belief that Factor, Bari, and Alilovich
"may have received additional payments . . . from other 1999 Trust Entities." (Am. Compl. ¶¶
608, 617, 626). Putting aside the incorrect allegations that Play Makers was one of the "1999
Trust Entities" (*id.* ¶¶ 607, 616, 625), *see* discussion, *supra*, at 21 n.14, a complaint that
speculates about what *may* have happened, rather than alleging what *did* happen, fails to state a
plausible claim. *See Twombly*, 550 U.S. at 555 (holding that a plaintiff's allegations must raise
his right to relief "above the speculative level"); *see, e.g., George v. Uponor Corp.*, 988 F. Supp.
2d 1056, 1074 (D. Minn. 2013) (noting that allegations asserting "what 'might' have happened"
fail to state a claim).

XXI will be granted.  Those counts will be dismissed.[37]

### 6. Accounting Claim
### (Count XXII)

Count XXII, the claim requesting an accounting from Glick of certain transfers he

received post-petition, fails for the same reason.  The claim depends on piercing requests that

Gierum cannot maintain.

Gierum alleges that despite repeated requests, the 1999 Trust Entities (JZ Enterprises GP

and JZ Enterprises LP) have refused to account for any transfers they made to Glick after the

petition date.  (Am. Compl. ¶ 644).[38]  Gierum therefore "requests that [Glick] provide an

accounting of all cash flowing into and out of the 1999 Trust Entities since the filing of the

Chapter 7 case."  (*Id.* at 87-88).[39]  But unless Gierum can pursue reverse piercing claims (and he

---

[37]        Count XX, on the other hand, will not be dismissed.  Count XX is the section
549(a) claim directed at Wolff.  Unlike Gierum's other section 549(a) claims, Count XX alleges
that the transferee, Wolff, received a payment "from Glick" rather than from a Glick entity.
(Am. Compl. ¶ 633).  Although the payment was made six months post-petition, Gierum alleges
that it consisted of estate property (*id.* ¶ 635), and the assertion is at least plausible.  Wolff has
not appeared or moved to dismiss Count XX in any event.

[38]        In his brief, Gierum asserts that the accounting claim is also aimed at pre-petition
payments, and the amended complaint does allege he is entitled to an accounting of transfers
"both prior to and after" the filing of the case.  (Am. Compl. ¶ 645).  But the preceding paragraph
alleges that Glick has refused to provide an accounting only of payments "*after* the Petition
Date."  (*Id.* ¶ 644 (emphasis added)).  There is no similar allegation about pre-petition transfers.
The claim is therefore best read to concern post-petition payments, not pre-petition ones.  (This
inconsistency – in adjacent paragraphs, no less – is yet another illustration of the amended
complaint's shortcomings in the draftsmanship department.)

[39]        Once more, Gierum's inattentive drafting plagues the amended complaint (and its
readers).  Although Count XXI purports to concern only the "1999 Trust Entities," earlier
Gierum alleges that he has received no accounting "from Play Makers, the Glick Group or the
JCG 1999 Trust."  (*Id.* ¶ 355).  The payments for which Glick should have to account are also
unclear, as are the sources of them.  In paragraph 644, Gierum alleges that Glick has refused to
provide an accounting of payments "from" the 1999 Trust Entities "after the Petition Date."  (*Id.*

cannot), the payments JZ Enterprises GP and JZ Enterprises LP made to Glick were payments of their own money, not property of the bankruptcy estate. Gierum has no accounting claim.

Gierum argues that he is able to pursue an accounting from Glick because section 8(a) of the IUFTA allows creditors seeking the avoidance of a fraudulent transfer the use of equitable remedies to recover the transfer, 740 ILCS 160/8(a) (2014), and an accounting is considered an equitable remedy, *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 785, 784 N.E.2d 312, 321 (1st Dist. 2002). There are two problems with Gierum's argument. First, he requests an accounting only in connection with the alleged post-petition transfers, not with the alleged fraudulent transfers. So section 8(a) is irrelevant. Second, even if his request had been made in connection with the fraudulent transfers, he has no fraudulent transfer claims under section 544(b) and the IUFTA. *See* discussion, *supra*, at 57-61. Without those claims as a basis, section 8(a) provides him no remedies.

The motion of the Glick defendants to dismiss Count XXII will be granted. That count will be dismissed.

### 7. Aiding and Abetting Claims
### (Counts XI-XVI)

Next, Counts XI-XVI will be dismissed. The claims in these counts are directed at ten defendants, and each is headed: "Aiding and Abetting Scheme to Defraud." The generality of the headings notwithstanding, Gierum alleges in these counts that the defendants aided and abetted the fraudulent transfers he tried to plead in Counts VII-X. The requests for relief

---

¶ 644). Yet in the very next paragraph, Gierum alleges that he is entitled to an account of transfers "to *and* from" the 1999 Trust Entities "both prior to *and* after the filing of the Chapter 7 case." (*Id.* ¶ 645 (emphasis added)).

accompanying each count refer to aiding and abetting "the Debtor's fraudulent transfer and concealment scheme" and ask for an order compelling the defendant to "return the avoided transfers." (Am. Compl. at 70-71, 74, 76, 81-83; *see also* Pl. Resp. at 12-13, 21-23, 28, 30, 35).

Counts XI-XVI do not state claims for aiding and abetting fraudulent transfers for two reasons. First, and most fundamentally, they do not state aiding and abetting claims because Counts VII-X do not state fraudulent transfer claims. "Aiding and abetting" is not a stand-alone claim. For an "aiding and abetting" claim to proceed, the underlying conduct aided and abetted must itself be actionable. *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006); *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000). As discussed earlier, *see* discussion, *supra*, at 59-61, Gierum has not stated fraudulent transfer claims because he has not alleged and cannot allege "transfers" of "an interest in [Glick's] property." Since the amended complaint alleges no actionable fraudulent transfers, it cannot state claims for aiding and abetting them. That alone warrants dismissal of Counts XI-XVI. *See GoHealth, LLC v. Simpson*, No. 13 C 2334, 2014 WL 2866222, at *2 n.2 (N.D. Ill. June 24, 2014) (noting that if the claim for the underlying wrong is dismissed, a related aiding and abetting claim "must also be dismissed").

Second, Gierum could not state claims for aiding and abetting fraudulent transfers even if he had alleged actionable fraudulent transfers. Section 550(a) specifically describes what a trustee can recover on a fraudulent transfer claim – and from whom. Whether the claim is for actual or constructive fraud, and whether the trustee is suing under section 548(a) or under section 544(b) and the IUFTA, the trustee can only recover "the property transferred, or, if the court so orders, the value of the property." 11 U.S.C. § 550(a). That recovery can come only from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or from "any immediate or mediate transferee of such transferee." *Id.*

Because the recovery under section 550(a) "is a form of disgorgement," *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005), parties who neither received transferred property nor benefitted from a fraudulent transfer in some other way are not subject to liability, *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 293 (Bankr. N.D. Ill. 2003) (stating that a trustee cannot recover from a "party who has not received any property or benefit from either the debtor or the debtor's transferee, immediate or mediate"); *see also Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*, No. Civ.A.04-1256-JJF, 2007 WL 129003, at *2 (D. Del. Jan. 12, 2007); *Official Comm. of Unsec. Creditors v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 548 (Bankr. D. Del. 2009); *Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003).

That includes liability for damages on an aiding and abetting theory. Overwhelmingly, courts have concluded that parties cannot be liable for a fraudulent transfer if all they have done is participate in it. *See, e.g., Mack v. Newton*, 737 F.2d 1343, 1357 (5th Cir. 1984); *GATX Corp. v. Addington*, 879 F. Supp. 2d 633, 643 (E.D. Ky. 2012) (noting that "courts generally do not recognize aiding and abetting a fraudulent conveyance as a viable cause of action against a non-transferee"); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, No. 1:03-CV-0132-DFH, 2004 WL 771230, at *14 (S.D. Ind. Mar. 24, 2004) ("Accessory liability for fraudulent transfers cannot be supported by either the Bankruptcy Code or the [Indiana UFTA]"); *Miller v. Greenwich Capital Fin. Prods., Inc. (In re American Bus. Fin. Servs., Inc.)*, 457 B.R. 314, 324 (Bankr. D. Del. 2011) ("Aiding and abetting a fraudulent transfer is not a valid claim under state or federal law where a trustee is bringing the claim."); *Ray v. Garland (In re Martin)*, Nos. 08-52631, 10-5059, 2011 WL 6130422, at *5 (Bankr. E.D. Tenn. Dec. 8, 2011) ("[C]ourts have consistently

held that there is no such thing as liability for aiding and abetting a fraudulent conveyance . . . as

a matter of federal law under the Code" (internal quotation omitted)); *McCook Metals*, 319 B.R.

at 591.

To support his aiding and abetting claims, Gierum relies almost entirely on *Paloian v.

Greenfield (In re Restaurant Dev. Grp., Inc.)*, 397 B.R. 891 (Bankr.N.D. Ill. 2008). (*See* Pl.

Resp. at 24). In *Paloian*, the court refused to dismiss a chapter 7 trustee's claims for aiding and

abetting fraudulent transfers he sought to recover under section 544(b) and the IUFTA. *Id.* at

897.

*Paloian* is unpersuasive. Rather than consider the obstacle that section 550(a) poses to

aiding and abetting claims under sections 548(a) and 544(b), the decision analyzed Illinois law.

Even that analysis is open to question.

• *Paloian* first cited *Hefferman* for the proposition that "Illinois decisions recognize

aiding and abetting liability for fraudulent transfers." *Paloian*, 397 B.R. at 898. A Seventh

Circuit decision, *Hefferman* concerned a common law fraud claim, not a claim to avoid a

fraudulent transfer. *See Hefferman*, 467 F.3d at 601.

• *Paloian* next cited two unpublished district court decisions purportedly recognizing

aiding and abetting liability for fraudulent transfers. *Paloian*, 397 B.R. at 898. The first, *Firstar

Bank, N.A. v. Faul*, No. 00 C 4061, 2001 WL 1636430 (N.D. Ill. Dec. 20, 2001), indeed did so,

but only because it saw "no reason not to." *Id.* at *6. The decision contained no analysis. The

second, *Colman v. Greenfield*, 05 C 3894, 2005 WL 2592538 (N.D. Ill. Oct. 11, 2005), did not.

Its discussion was limited to whether Illinois permitted an independent claim for "aiding and

abetting." *Id.* at *1-3.

• Finally, *Paloian* cited section 11 of the IUFTA, saying it "supplement[ed] applicable

-67-

aider-abettor state law." *Paloian*, 397 B.R. at 897-98.  That section provides: "Unless displaced

by the provisions of this Act, the principles of law and equity . . . supplement its provisions."

740 ILCS 160/11 (2014).  The difficulty in relying on section 11 as a basis for applying aiding

and abetting liability principles is that another section of the IUFTA has displaced them.  Section

8 specifies the remedies a creditor "may obtain" in "an action for relief against a transfer or

obligation under this Act."  740 ILCS 160/8 (2014).  An award of damages against an aider-and-

abettor is not one of them.[40]

Because Gierum has not stated fraudulent transfer claims, and because there is no such

thing as a claim for aiding and abetting a fraudulent transfer, the motions of the defendants to

dismiss the aiding and abetting claims in Counts XI-XVI will be granted.[41]  Counts XI-XVI will

be dismissed.

---

[40]    Section 8 also has a catch-all provision that allows a creditor "any other relief the
circumstances may require."  740 ILCS 160/8(3)(C) (2014).  No Illinois decision discusses this
provision, but courts elsewhere have "consistently interpreted the catch-all language of the UFTA
as not providing a cause of action for aiding and abetting a fraudulent transfer."  *Warne Invs.,
Ltd. v. Higgins*, 219 Ariz. 186, 196-97, 195 P.3d 645, 655-56 (Ariz. Ct. App. 2008) (citing
decisions).

[41]    These deficiencies aside, the amended complaint fails to allege that many of the
defendants "aided and abetted" any fraud.  To plead an aiding and abetting claim, a plaintiff must
allege not only that there was a wrongful act but also that the aider and abettor "was aware of his
role when he provided the assistance" and "knowingly and substantially assisted the violation."
*Hefferman*, 467 F.3d at 601.  Larry is alleged only to be Glick's father, the former trustee of the
JCG 2012 Trust, and a lawyer "specializing in estate planning and asset protection" who received
loans from Telegraph and paid for Glick to file bankruptcy.  (*See* Am. Compl. ¶¶ 17, 216, 508,
509).  Nancy is said only to have served as trustee of the JCG 2012 Trust, to have known little
about the trust or its property, and to have done even less.  (*See id.* ¶¶ 208-15, 217-24, 230-32).
Chapman and BTM are claimed simply to have known that Awesome Toys and Virtual needed
financing to continue selling the toy car, and that a loan to Play Makers would allow it to make
the sales.  (*See id.* ¶¶ 527, 533).  Optimum is described merely as a company that packages and
distributes the toy cars to "big box retailers."  (*See id.* ¶ 540).  These allegations do not begin to
suggest that Larry, Nancy, Chapman, BTM, or Optimum knowingly and substantially assisted
Glick in committing a fraud.

## 8. Equitable Subordination Claim
### (Count XXIII)

Count XXIII, finally, will also be dismissed.  In Count XXIII, Gierum attempts to allege a

claim under section 510(c)(1) for equitable subordination of BTM's claim secured by a lien on

accounts receivable of Play Makers.  For two reasons, though, Gierum has stated no equitable

subordination claim.  First, Play Makers is not the debtor here.  Its assets are therefore not estate

assets from which Gierum will make distributions to creditors.  And second, BTM has filed no

proof of claim in Glick's case.  There is consequently no claim to subordinate.

Section 510(c) provides that a court "may (1) under principles of equitable subordination,

subordinate for purposes of distribution all or part of an allowed claim to all or part of another

allowed claim . . . or (2) order that any lien securing such a subordinated claim be transferred to

the estate." 11 U.S.C. § 510(c).  Equitable subordination is a discretionary doctrine under which

the court "sift[s] the circumstances surrounding any claim to see that injustice or unfairness is not

done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 308 (1939).

Gierum's equitable subordination claim runs up against the same barrier that so many of

his claims do.  Play Makers is not the debtor in this bankruptcy case.  Glick is the debtor.  And

although Gierum argues otherwise (Pl. Resp. at 54), he has no piercing theory that will permit

Play Makers to be deemed Glick's alter ego and its property declared property of Glick's

bankruptcy estate.  Equitable subordination is a remedy under the Code designed to alter the

priority in which creditors receive payment from the debtor's estate.  *Pepper*, 308 U.S. at 310; *In

re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008).  BTM's secured claim against Play Makers, a

non-debtor, cannot be equitably subordinated.

But equitable subordination would be unavailable even if piercing were possible.  The

remedy is available only as to an "allowed claim." 11 U.S.C. § 510(c)(1); *see Max Sugarman*

*Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 n.16 (1st Cir. 1991) (noting that

"[o]nly an 'allowed claim' . . . may be subjected to equitable subordination under Bankruptcy

Code § 510(c)"). An allowed claim is one "proof of which is filed under section 501." 11

U.S.C. § 502(a). According to the claims register maintained for the Glick bankruptcy case, *see*

Fed. R. Bankr. P. 5003(b), BTM has not filed a proof of claim.[42] With no claim in the case,

BTM will receive no distributions from the estate. There is consequently no priority of payment

to alter and nothing to subordinate.

Because Gierum has failed to state a claim for equitable subordination of BTM's claim,

the motion of Chapman, BTM, and Optimum to dismiss Count XXIII will be granted. Count

XXIII will be dismissed.

### III.  Leave to Amend

Most of Gierum's claims, then, will be dismissed. The only remaining question is

whether he should be given leave to amend. The answer is no.

Because the "spirit of the Federal Rules" is to ensure "decisions on the merits," *Foman v.*

*Davis*, 371 U.S. 178, 181 (1962), the Rules reflect "a liberal attitude towards the amendment of

pleadings," *Campania Mgmt. Co. v. Rooks, Pitts & Poust,* 290 F.3d 843, 849 (7th Cir. 2002).

Rule 15(a)(2) instructs that "[t]he court should freely give leave when justice so requires," Fed.

R. Civ. P. 15(a)(2), and the Rule's mandate, the Supreme Court has said, "is to be heeded."

*Foman*, 371 U.S. at 182. In light of that mandate, a plaintiff whose original complaint has been

---

[42]    A bankruptcy court can take judicial notice of its claim register. *Maxwell v.*
*Novell, Inc. (In re marchFirst, Inc.)*, 431 B.R. 436, 440 n.5 (Bankr. N.D. Ill. 2010).

dismissed should ordinarily be given "at least one opportunity to amend her complaint before the entire action is dismissed." *Runnion*, 786 F.3d at 519. This is generally so "'regardless of how unpromising the initial pleading appears.'" *Id.* at 520 (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2d ed. 1990)).[43/]

That said, courts have "broad discretion to deny leave to amend" under appropriate circumstances. *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (internal quotation omitted). One is when "the amendment would be futile." *Id.*; *see also Foman*, 371 U.S. at 182; *Runnion*, 786 F.3d at 519-20. An amendment is futile if, among other things, the plaintiff's claim cannot succeed as a matter of law. *See, e.g., Kimbrell v. Federal Hous. Fin. Agency,* ___ F. App'x ___, ___, 2017 WL 1202621, at *3 (7th Cir. Mar. 31, 2017) (finding leave to amend properly denied where "the statutes that [the plaintiff] invokes cannot afford her relief"); *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 355 (7th Cir. 2017) (declaring amendment futile where there was "no basis in law for appellants' theory"); *Doermer v. Callen*, 847 F.3d 522, 528 (7th Cir. 2017) (holding amendment futile where "the law is clearly on the defendants' side").

Although some of Gierum's claims have the kinds of defects an amendment could cure – the lack of particularity in the fraudulent transfer claims, for example – all the dismissed claims are deficient as a matter of law in a way no amendment can fix. The piercing requests in Counts

---

[43/]     It might be argued that Gierum has already amended once and is now on his second complaint. Therefore, he has had his "one opportunity" and is not entitled to another. *Runnion*, 786 F.3d at 519. But *Runnion* said that a plaintiff should have at least one opportunity after his "original complaint has been dismissed." *Id.* The amendment should not count if it is made as a matter of right under Rule 15(a)(1)(B) – that is, the amendment comes in response to a motion to dismiss before the court rules on the motion. *See Weddle v. Smith & Nephew, Inc.*, No. 14 C 9549, 2016 WL 1407634, at *6 (N.D. Ill. Apr. 11, 2016) (granting leave to amend where the plaintiff had amended once in response to a motion to dismiss but had not had "the opportunity to amend her complaint in response to a ruling . . . .").

I-VI cannot succeed because applicable state law has yet to recognize Gierum's piercing theories. Most of the remaining claims fall with the piercing requests. Without those requests, Gierum has no legal basis for his turnover claims (with one exception that does not depend on piercing), his fraudulent transfer claims in Counts VII-X (although those claims have other theoretical problems), his post-petition transfer claims in Counts XVII-XIX and XXI, his accounting claim in Count XXII, and his equitable subordination claim in Count XXIII (although that claim, too, has other theoretical problems). Gierum also has no legal basis for his aiding and abetting claims in Counts XI-XVI.

The bar for denying leave to amend because of futility is admittedly high: it must be "*certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted . . ." *Runnion*, 786 F.3d at 520 (emphasis in original). But that bar is met here. The law simply does not support Gierum's claims. Leave to amend will therefore be denied, and the dismissal will be with prejudice.

### IV. Conclusion

For these reasons, the motions of defendants Jonathan Glick, the JCG 2012 Trust, Nancy Glick, Michelle Alilovich, The Law Office of William J. Factor, Ltd., Larry Glick, Horwood, Marcus & Berk, Chartered, Hal J. Wood, Jeffrey A. Hechtman, Kenneth A. Goldstein, Bari Wood, Robert Chapman, Optimum Fulfillment, LLC, and BTM, LLC to dismiss the amended complaint of John Gierum as trustee are granted in part and denied in part. To the extent the defendants request dismissal of the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, the motions are denied. To the extent the defendants request dismissal of Counts I-XIX and XXI-XXIII under Rule 12(b)(6) for failure to state a claim, the motions are

granted, and those counts are dismissed with prejudice.  As to the turnover claim concerning the

JCG 1999 Trust, the defendants' motions are denied.  Nor will Count XX be dismissed.

A separate order will be entered consistent with this opinion.

Dated:  June 8, 2017

A. Benjamin Goldgar
United States Bankruptcy Judge



*In re Glick: Entity Chart*

**Exhibit**

**1**

*Last updated 5/27/2014*